**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| R. RUDNICK & CO., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 08 C 2560 |
| | ) | |
| JOE ANDERSON and RICHARD ANDERSON | ) | Judge Guzman |
| doing business as | ) | Magistrate Judge Denlow |
| DISPOSAL MANAGEMENT SYSTEMS, | ) | |
| and JOHN DOES 1-10, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION**
**TO DEFENDANTS' MOTION TO DISMISS**

Plaintiff R. Rudnick & Co. respectfully submits this response in opposition to defendants' motion to dismiss.

## I.    DEFENDANTS' MOTION TO DISMISS IS IMPROPER

Defendants' motion to dismiss is improper and should be denied.  Defendants move to dismiss generally under Fed. R. Civ. P. 12(b), yet the content of this motion challenges factual assertions, instead of the sufficiency of plaintiff's complaint.  *See* Def. Mtn. ¶¶ 5, 9, 10. "The purpose of a Rule 12(b)(6) motion to dismiss is to test the sufficiency of the complaint, not to decide the merits of the case." *Chicago Tile Inst. Welfare Plan v. Tile Surfaces, Inc.*, 04 C 4194, 2004 U.S. Dist. LEXIS 21612, at * 2 (N.D. Ill. Oct. 26, 2004).

Defendants improperly attach and rely upon exhibits to their motion to dismiss. Pursuant to Fed. R. Civ. P. 12(b) and (c), attaching exhibits to a motion to dismiss converts the motion into a motion for summary judgment. *Bucciarelli-Tieger v. Victory Records, Inc.*, 488

1

F.Supp.2d 702, 708 (N.D. Ill. 2007).  However, defendants have not provided a statement of

material facts, nor has plaintiff had an opportunity for discovery.  Defendants' motion is not a

proper motion for summary judgment, nor a proper Rule 12 motion.

The Court should decline to consider documents attached to the motion to

dismiss.  *Berthold Types, Ltd. v. Adobe Sys. Inc.*, 242 F.3d 772, 775 (7th Cir. 2001).   Without

such documents, the motion to dismiss is baseless.

Plaintiff respectfully requests that defendants' motion to dismiss be denied as

improper.

## II.    DEFENDANTS WERE PROPERLY SUED AS INDIVIDUALS

Defendants' motion states that defendants should not have been sued (or served

with process) individually but instead as a corporation.  (Def. Mtn. ¶¶ 4-7)  Pursuant to the

Illinois Business Corporations Act, 805 ILCS 5/12.35(a), a corporation may be administratively

dissolved if:

> It has failed to file its annual report or final transition annual report and pay its
> franchise tax as required by this Act before the first day of the anniversary month
> or, in the case of a corporation which has established an extended filing month,
> the extended filing month of the corporation of the year in which such annual
> report becomes due and such franchise tax becomes payable....

Prior to the date the complaint was filed, Disposal Management Systems,

Inc. was not in good standing pursuant to the Illinois Secretary of State's website.  (Ex. A) It

appears that defendants did not conform with the statutory requirements in filing its annual report

until April 21, 2008, as evidenced by the Illinois Secretary of State's website.  (Ex. B)

Pursuant to 815 ILCS 5/12.40(c), "The administrative dissolution of a corporation

terminates its corporate existence and such a dissolved corporation shall not thereafter carry on

2

any business..."  Therefore, according to the documents provided on the Illinois Secretary of State's website, Disposal Management, Inc. was administratively dissolved prior to and at the time plaintiff's complaint was filed.

Accordingly, 805 ILCS 5/3.20 provides, "All persons who assume to exercise corporate powers without authority so to do shall be jointly and severally liable for all debts and liabilities incurred or arising as a result thereof."  Since Disposal Management, Inc. was administratively dissolved, it was proper to name both Joe Anderson and Richard Anderson, shareholders and officers (president and secretary, respectively) of Disposal Management, Inc., individually as defendants.

Pursuant to 805 ILCS 5/8.65(a)(3):

The directors of a corporation that carries on its business after the filing by the Secretary of State of articles of dissolution, otherwise than so far as may be necessary for the winding up thereof, shall be jointly and severally liable to the creditors of such corporation for all debts and liabilities of the corporation incurred in so carrying on its business.

Clearly, defendants Joe Anderson and Richard Anderson are personally liable for Disposal Management, Inc.'s acts while it was a dissolved corporation.

"An individual incurs personal liability for an obligation undertaken during the time when a corporation had been administratively dissolved if he knew, or because of his position should have known, that the corporation had been dissolved." *Chicago Tile Institute Welfare Fund v. Hermansen*, 94 C 7216, 1996 U.S. Dist. LEXIS 3355, at *7-10 (N.D. Ill. March 21, 1996).  As officers of Disposal Management, Inc., Joe Anderson and Richard Anderson knew or should have known that Disposal Management, Inc. was administratively dissolved.

Under Illinois case law, 805 ILCS 5/8.65(a)(3), has been interpreted in such a way

that Joe Anderson and Richard Anderson cannot avoid personal liability.  *Hong Kong Electro-Chemical Works, Ltd. v. Less*, 05 C 3582, 2006 U.S. Dist. LEXIS 29714, at *6-7 (N.D. Ill. April 25, 2006).

> If the reinstatement of the corporation were held to "relate back" so as to nullify the personal liability of the person who incurred the debts, a former officer of a dissolved corporation could obtain credit, and subsequently shift his personal liability to the corporation simply by paying the arrearage in franchise tax. [citation omitted.] . . . Such a result is against public policy because it would create a mechanism by which just debts could be easily evaded.  We hold that the reinstatement of a dissolved corporation does not "relate back" to the time of dissolution so as to absolve the officers of personal liability for debts incurred by them during the period of dissolution.

*Boards of Trustees of the Bricklayers Local 74 Fringe Benefit Funds v. Michael J. Vorkapic, Inc.*, 01 C 1048, 2002 U.S. Dist. LEXIS 6790, at *7-8  (N.D. Ill. April 17, 2002) *citing Plepel's Estate v. Industrial Metals, Inc.*, 450 N.E.2d 1224, 1246 (Ill. App. 1st Dist. 1983) (citations omitted).

For the foregoing reasons, defendants were properly sued (and served) as individuals.

## III.    PLAINTIFF DID NOT CONSENT TO RECEIVING DEFENDANTS' ADVERTISEMENTS BY FACSIMILE AND PLAINTIFF DID NOT HAVE AN ESTABLISHED BUSINESS RELATIONSHIP WITH DEFENDANTS

Defendants[1] argue that a paragraph from the Blue Book of Building and Construction's Terms and Conditions ("Blue Book") set forth in Exhibits D and E to defendants' motion to

---

[1]  Plaintiff has named Joe Anderson and Richard Anderson as defendants.  However, in this argument defendants are arguing that Disposal Management Systems, Inc., who is not named as a defendant, has an established business relationship with plaintiff and/or that plaintiff consented to receiving facsimiles from Disposal Management Systems, Inc.  Plaintiff will address defendants' arguments as if Disposal Management Systems, Inc. was named as a defendant.

4

dismiss provides the basis for consent to receive the faxes at issue.  However, when read in connection with the paragraph quoted below, there is no consent to receive the advertisements at issue in this case.  (Def. Mtn. ¶¶ 9, 11)  The terms and conditions for thebluebook.com state as follows:

> Acceptable Usage: Contractors Register, Inc. permits usage of BB-Bid and our database *for the sole purpose of communicating construction project information.* Users may not use any electronic means to copy, extract, or duplicate the Blue Book Database through thebluebook.com and/or BB-Bid.  BB-Bid is not to be used for promotional purposes.  If it is communicated to Contractors Register, Inc. that a user has misused the service, we reserve the right to terminate their usage.

(emphasis added)  The fax at issue in this case does not contain any "construction project information," but instead is a general advertisement for defendants' business.  The above-quoted paragraph clearly and unambiguously provides that the database of members of the Blue Book cannot be used for advertising and the only messages members authorize relate to bids for projects.

Pursuant to 47 U.S.C. § 227(a)(4), an "unsolicited advertisement" is "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission." Defendants' facsimile is advertises the availability of "20 or 30 Yard Dumpsters" with a price of "$310."  The facsimiles at issue are clearly advertisements pursuant to the TCPA.

Inclusion of plaintiff's contact information in the Blue Book does not lead to the conclusion that there was consent to send it advertisements.  (Def. Mtn. ¶ 11)  Defendants' Exhibit E provides:

> Fax and Email Consent: All participants of the Electronic Blue Book and the BB-Bid Network agree to receive *messages* from other users of the BB-Bid Network

and from the Blue Book via Fax and/or email.

(emphasis added) Defendants' "messages" should be what have been previously defined as an "Acceptable Usage," that is, "for the sole purpose of communicating construction project information." Defendants' facsimile fails to comply with the express terms and conditions of the Blue Book, and therefore, there is no consent to receive the defendants' advertisements by fax.

Furthermore, the document attached to defendants' motion as Exhibit E regarding "Fax and Email Consent" is dated April 25, 2008. The document has not been authenticated and there is no evidence of when that provision came into effect and/or if it is retroactive and/or that plaintiff agreed to that term.[2]

Defendants' argument that voluntary publication of plaintiff's fax number is sufficient to create an existing business relationship is flawed. (Def. Mtn. ¶¶ 12-15) The Junk Fax Prevention Act ("JFPA") became a law on July 9, 2005 and for the first time included in the TCPA an established business relationship defense. *Lampkin v. GGH, Inc.*, 146 P.3d 847, 853-54 (Okla. Ct. App. Oct. 31, 2006); *Grady v. Progressive Business Compliance*, 2007 Ohio App. LEXIS 5340 (Ohio App. Nov. 15, 2007). The regulations define an established business relationship as "a voluntary two-way communication" 47 C.F.R. § 64.1200(f)(5). Further, pursuant to 47 U.S.C. § 227(b)(1)(C), the established business relationship defense only applies "if the sender possessed the facsimile machine number of the recipient" *before* the JFPA was enacted. Plaintiff has averred in its complaint that the parties did not have an established business relationship. (Cmplt., ¶ 14) Defendants have failed to show that they possessed

---

[2] Although there is a footnote on page 2 of Defendants' Exhibit E, that states "Rev. 3.13 12/1/04," there is no evidence as to what "Terms and Conditions" were revised.

6

plaintiff's fax number prior to July 9, 2005.  Therefore, there is an issue of fact whether such relationship existed, and defendants' motion should be denied.

In sum, defendants have failed to show that the plaintiff either consented to receive the fax at issue or had an established business relationship with defendants due to its inclusion in the Blue Book and plaintiff has stated a claim for relief pursuant to the TCPA. Because plaintiff has stated a claim for a violation of the TCPA, plaintiff has alleged facts to support its claim for conversion.  As set forth in plaintiff's complaint, defendants without authorization and wrongfully appropriated plaintiff's paper and ink or toner to print its unsolicited advertising faxes.  Consequently, plaintiff's paper and ink or toner were converted in a manner that made those materials unusable. (Cmplt., ¶¶ 49-53) Thus, the Court must accept these well-pleaded facts as true.  *Thompson v. Illinois Dep't of Prof'l Regulation*, 300 F.3d 750, 753 (7th Cir. 2002).

## IV.    PLAINTIFF CAN ASSERT AN ICFA CLAIM

Finally, without citation to any authority, defendants assert that the Illinois Consumer Fraud Act ("ICFA") applies exclusively to consumers.  (Def. Mtn. ¶¶ 16-17) Defendants are wrong.  "[A] non-consumer may bring a claim if he can allege a nexus between the complained-of conduct and consumer protection concerns.  A plaintiff must plead that the alleged conduct involves trade practices addressed to the market generally, or otherwise implicates consumer protection concerns." *Credit Insurance Consultants, Inc. v. Gerling Global Reinsurance Corp. of America*, 210 F.Supp.2d 980, 985 (N.D. Ill. 2002) (internal citation omitted).  Similar complaints alleging that junk faxing violated the ICFA were sustained in *Pollack v. Cunningham Financial Group, LLC*, 08 C 1405 (N.D. Ill. June 2, 2008) (slip opinion);

*Sadowski v. Med1Online, LLC*, 07 C 2973, 2008 U.S. Dist. LEXIS 41766 (N.D. Ill. May 27, 2008); and *Centerline Equipment Corp. v. Banner Personnel Service, Inc.*, 07 C 1611, 2008 U.S. Dist. LEXIS 15946 (N.D. Ill. March 3, 2008).

In this case, plaintiff has alleged that the mass transmission of facsimile advertisements constitutes an "unfair practice" under the ICFA in that defendants' conduct causes the recipients to bear the costs of defendants' advertising campaign. (Cmplt., ¶¶ 34, 39) *See Destination Ventures, Ltd. v. F.C.C.*, 844 F.Supp. 632, 636 (D. Ore.1994), *aff'd* 46 F.3d 54 (9th Cir. 1995). Furthermore, plaintiff has alleged that this cost-shifting that arises from unsolicited fax advertising is against Illinois public policy. Practices that inflict unavoidable injury are oppressive and unfair. *Elder v. Coronet Ins. Co.*, 201 Ill. App. 3d 733, 746, 558 N.E.2d 1312 (1st Dist. 1990); *People ex rel Fahner v. Hedrich*, 108 Ill. App. 3d 83, 90, 438 N.E.2d 924 (2nd Dist. 1982); *Pollack v. Cunningham Financial Group, LLC*, 08 C 1405 (N.D. Ill. June 2, 2008) (slip opinion); *Sadowski v. Med1Online, LLC*, 07 C 2973, 2008 U.S. Dist. LEXIS 41766 (N.D. Ill. May 27, 2008); *Centerline Equipment Corp. v. Banner Personnel Service, Inc.*, 07 C 1611, 2008 U.S. Dist. LEXIS 15946 (N.D. Ill. March 3, 2008).

In *Hedrich* the court held that a "commissions" on the sale of their mobile homes was a oppressive practice because the tenants had no reasonable alternative but to submit. *Id.* at 90. Business and individuals must leave their fax machines on in order to run their operations or communicate. In this case, like in *Hedrich*, plaintiff had no reasonable alternative but to receive the unwanted faxes and pay the charges associated with receiving the faxes. Defendants did not seek permission prior to sending the unsolicited fax advertisement as defendants are well aware that permission would not be forth coming.

8

If plaintiff is required to take time out of its work day to participate in this process, plaintiff is further damaged. Plaintiff is expending time that should be spent on work related issues and not spending the day opting out of the numerous faxes it receives daily.

Defendant's actions are also injurious. A 1990 study by the California Public Utility Commission found that unsolicited fax advertising cost recipients millions of dollars in California alone. An August 2, 2002 citation issued by the FCC to fax broadcaster Fax.com, Inc. noted that some businesses had received hundreds or thousands of fax advertisements within short periods, tying up fax equipment for hours." *In re Fax.com, Inc.*, FCC 02-226, 2002 FCC LEXIS 3853, 5-6, n. 21 (FCC Aug. 2, 2002) (Ex. C). Moreover, these abuses occur when it is illegal to send unsolicited fax advertising at all.

The problem created by junk faxing has increased in recent years. A 2006 GAO report on junk faxes states: "Since 2003, consumers complained more to the FCC about junk faxes than about any other issue under FCC's jurisdiction except indecency and obscenity in radio and television broadcasting." "In 2000, [the] FCC recorded about 2,200 junk fax complaints; in 2005, it recorded over 46,000." GAO-06-425, Report to Congressional Committees, Telecommunications, Weaknesses in Procedures and Performance Management Hinder Junk Fax Enforcement, April 2006, p. 2 (http://www.gao.gov/new.items/d06425.pdf). The GAO Study of Junk Fax Enforcement was ordered by Congress and required:

> (a) In General.--The Comptroller General of the United States shall conduct a study regarding complaints received by the Federal Communications Commission concerning unsolicited advertisements sent to telephone facsimile machines, which study shall determine--
>
>> (1) the mechanisms established by the Commission to receive, investigate, and respond to such complaints;

9

(2) the level of enforcement success achieved by the Commission regarding such complaints;

(3) whether complainants to the Commission are adequately informed by the Commission of the responses to their complaints; and

(4) whether additional enforcement measures are necessary to protect consumers, including recommendations regarding such additional enforcement measures.

(b) Additional Enforcement Remedies.--In conducting the analysis and making the recommendations required under subsection (a)(4), the Comptroller General shall specifically examine--

(1) the adequacy of existing statutory enforcement actions available to the Commission;

(2) the adequacy of existing statutory enforcement actions and remedies available to consumers;

(3) the impact of existing statutory enforcement remedies on senders of facsimiles;

(4) whether increasing the amount of financial penalties is warranted to achieve greater deterrent effect; and

(5) whether establishing penalties and enforcement actions for repeat violators or abusive violations similar to those established under section 1037 of title 18, United States Code, would have a greater deterrent effect.

(c) Report.--Not later than 270 days after the date of enactment of this Act, the Comptroller General shall submit a report on the results of the study under this section to the Committee on Commerce, Science, and Transportation of the Senate and the Committee on Energy and Commerce of the House of Representatives.

Public Act 109-21, July 9, 2005.   Clearly, the sending of unsolicited faxes has been known to cause substantial injury to consumers.  *See, Orkin Exterminating Co. v. FTC*, 849 F.2d 1354 (11th Cir. 1988).

Plaintiff has suffered an actual and substantial injury as alleged in the complaint.

"Costs that are imposed on an unwilling consumer can constitute a substantial injury."

*Centerline Equipment Corp. v. Banner Personnel Service, Inc.*, 07 C 1611, 2008 U.S. Dist.

LEXIS 15946, at *27 (N.D. Ill. March 3, 2008).  Since the factor determining unfairness is not

focused on individual injury to the plaintiff but rather "whether it causes substantial injury to

consumers."  Plaintiff has alleged that it received 1 unsolicited advertising facsimiles from

defendant, but also alleged that a "mass broadcasting of faxes" to "at least 40 other persons in

Illinois" occurred.  (Cmplt., ¶¶ 9, 15-16) Plaintiff has also received another 2-page fax from

defendant on April 11, 2008.  (Ex. D)  Thus, "the aggregate harm caused by this practice would

be substantial."  *Centerline*, 2008 U.S. Dist. LEXIS 15946, at *29.

Indeed, the taking of small amounts of money from large numbers of persons is

precisely the sort of conduct that implicates the ICFA.  *Eshaghi v. Hanley Dawson Cadillac Co.*,

214 Ill. App. 3d 995, 574 N.E.2d 760, 766 (1st Dist. 1991).  Illinois law does not permit a

defendant to steal large sums of money in small increments.  In *People ex rel Hartigan v.*

*Stianos*, 131 Ill. App. 3d 575, 475 N.E.2d 1024, 1029 (2nd Dist.1985), the court held that a

retailer's practice of charging consumers sales tax in an amount slightly greater than that

authorized by law was both deceptive and unfair precisely because it took small amounts of

money (a few cents per transaction  – less than involved here) from large numbers of consumers:

> We conclude that the practice described in this case is both deceptive and unfair
> as those terms are used in the Consumer Fraud Act.  The sales tax rates which
> may be charged to consumers have been fixed by statute; the legislature set the tax
> rate at 1.25%, but the evidence here is that defendants collected an average of
> 4.75%.  While the three sales upon which this case is premised reflect only a few
> cents in overcharges, it is apparent that similar overcharges, if permitted to
> continue, could aggregate very substantial losses and injury to the consuming

> public. It is also unfair to permit the extraction from the consumer of excessive sums under the guise it is a lawful tax. If, as defendants alleged in their answer, the excess sums collected were turned over to the State, defendants' conduct remains unfair and deceptive to the consumers' injury. (Emphasis added)

*Accord*, *Saltzman v. Enhanced Services Billing, Inc.*, 348 Ill. App. 3d 740, 811 N.E.2d 191 (1st Dist. 2004); *Sanders v. Lincoln Service Corp.*, 91 C 4542, 1993 U.S. Dist. LEXIS 4454 (N.D. Ill., April 5, 1993) ("A lender with numerous customers could realize substantial profits from the use of the funds gained through small individual overcharges"); *Orkin Exterminating Co. v. FTC*, 849 F.2d 1354, 1365 (11th Cir. 1988) (FTC Act; "[I]njury may be sufficiently substantial [to constitute an unfair practice] if it causes small harm to a large class of people").

"Junk faxing" is also an "unfair method of competition." "Unfair methods of competition" are methods which are illegal or unscrupulous or dishonest and give businesses that engage in them a competitive advantage over those which do not. *FTC v. R. F. Keppel & Bro., Inc.*, 291 U.S. 304 (1934); *Fitzgerald v. Chicago Title & Trust Co.*, 72 Ill. 2d 179, 380 N.E.2d 790 (1978) (following *Keppel*). Businesses that obey the law and pay all of the costs associated with their advertising (e.g., postage) are at an unfair disadvantage compared to businesses that engage in the "unfair shifting of the cost of advertising from the advertiser to the unwitting customer." Indeed, the entire purpose and effect of "junk faxing" is to accomplish this.

Judge Pallmeyer of this Court has recently upheld an ICFA claim in *Centerline Equipment Corp. v. Banner Personnel Service, Inc.*, 07 C 1611, 2008 U.S. Dist. LEXIS 15946 (N.D. Ill. March 3, 2008), as did Judge Aspen in *Sadowski v. Med1Online, LLC*, 07 C 2973, 2008 U.S. Dist. LEXIS 41766 (N.D. Ill. May 27, 2008), and Judge Hibbler in *Pollack v. Cunningham Financial Group, LLC*, 08 C 1405 (N.D. Ill. June 2, 2008) (slip opinion). Illinois

12

state courts upholding ICFA claims based on "junk faxing"  include *Brill v. Becktold Enterprises, Inc.*, 06 CH 1520 (Cook Co., Ill., Cir. Ct., Oct. 26, 2006)(Ex. E); *Rosario's Fine Jewelry, Inc, v. Jurgens Fine Jewelry, Inc.*, 06 CH 6677 (Cook Co., Ill., Cir. Ct. Jan. 19, 2007) (Ex. F); Telecommunications Network Design, Inc. v. Bach Business Credit, Inc., 03 CH 9246 (Cook Co., Ill., Cir. Ct. Jan. 26, 2005) (Ex. G);  *Mark Chair Co. v. Mortgage Mgrs., Inc.*, 02 LK 247 (Kane Co., Ill., Cir.Ct. Dec. 20, 2002) (Ex. H);  *American Life Ins. Co. v. American Tel. & Data*, 04 L 974  (DuPage Co., Ill., Cir.Ct. March 24, 2005) (Ex. I);  *Eclipse Mfg. Co. v. T.J. Copy Products, Inc.*, 03 CH 1344 (Lake Co., Ill., Cir.Ct. 2004) (Ex. J); *Zoes v. Fairon & Assoc., Inc.*, 04 CH 455 (McHenry Co., Ill., Cir Ct. Jan. 12, 2005) (Ex. K). Further, the Central District of Illinois has upheld an ICFA claim based on "junk faxing" brought by the Attorney General. *People v. Discovery Mktg., Inc.*, 99-3243 (C.D.Ill., Feb. 14, 2000) (Ex. L).

Plaintiff has adequately alleged both a nexus between junk faxing and consumer protection concerns and implicated that defendants' conduct in sending or causing to send unsolicited advertising facsimiles implicates consumer protection concerns.

V.    CONCLUSION

For the foregoing reasons, defendants' motion to dismiss must be denied.

Respectfully submitted,


s/ Heather Kolbus
Heather Kolbus

Daniel A. Edelman
Heather Kolbus
EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
120 S. LaSalle Street, 18th Floor
Chicago, Illinois  60603
(312) 739-4200
(312) 419-0379 (FAX)

## **CERTIFICATE OF SERVICE**

       I, Heather Kolbus, certify that on June 23, 2008  I caused a true and accurate copy of the foregoing document to be served upon the party listed below via the Court's CM/ECF system.

David T. Grisamore
dgriz67@sbcglobal.net

                           /s/ Heather Kolbus
                           Heather Kolbus

EXHIBIT A



SERVICES    PROGRAMS    PRESS    PUBLICATIONS    DEPARTMENTS    CONTACT

## CORPORATION FILE DETAIL REPORT

| Entity Name | DISPOSAL MANAGEMENT SYSTEMS, INC. | File Number | 55786143 |
|---|---|---|---|
| Status | NOT GOOD STANDING | | |
| Entity Type | CORPORATION | Type of Corp | DOMESTIC BCA |
| Incorporation Date (Domestic) | 12/28/1989 | State | ILLINOIS |
| Agent Name | THOMAS R ALLEN | Agent Change Date | 12/28/1989 |
| Agent Street Address | 11 S LA SALLE ST STE 1020 | President Name & Address | JOE ANDERSON 4805 HIGHLAND AVE DOWNERS GROVE 60515 |
| Agent City | CHICAGO | Secretary Name & Address | RICHARD ANDERSON 420 CUTTERS MILL SCHAUMBURG 60194 |
| Agent Zip | 60603 | Duration Date | PERPETUAL |
| Annual Report Filing Date | 00/00/0000 | For Year | 2007 |

**Return to the Search Screen**

BACK TO CYBERDRIVEILLINOIS.COM HOME PAGE

# EXHIBIT B



## CORPORATION FILE DETAIL REPORT

| Entity Name | DISPOSAL MANAGEMENT SYSTEMS, INC. | File Number | 55786143 |
|---|---|---|---|
| Status | GOODSTANDING | | |
| Entity Type | CORPORATION | Type of Corp | DOMESTIC BCA |
| Incorporation Date (Domestic) | 12/28/1989 | State | ILLINOIS |
| Agent Name | THOMAS R ALLEN | Agent Change Date | 12/28/1989 |
| Agent Street Address | 11 S LA SALLE ST STE 1020 | President Name & Address | JOE ANDERSON 4805 HIGHLAND AVE DOWNERS GROVE 60515 |
| Agent City | CHICAGO | Secretary Name & Address | RICHARD ANDERSON 420 CUTTERS MILL SCHAUMBURG 60194 |
| Agent Zip | 60603 | Duration Date | PERPETUAL |
| Annual Report Filing Date | 04/21/2008 | For Year | 2007 |

Return to the Search Screen         Purchase Certificate of Good Standing
(One Certificate per Transaction)

BACK TO CYBERDRIVEILLINOIS.COM HOME PAGE

# EXHIBIT C

LexisNexis® *Total Research System*

■ Switch Client ┊ Preferences ┊ Sign Out ┊ ? Help

My Lexis™ ┊ Search ┊ Research Tasks ┊ Get a Document ┊ *Shepard's*® ┊ Alerts ┊ Total Litigator ┊ Transactional Advis…

Service: **Get by LEXSEE®**
Citation: **2002 FCC LEXIS 3853**

*17 FCC Rcd 15927, \*; 2002 FCC LEXIS 3853, \*\*;*
*27 Comm. Reg. (P & F) 459*

In the Matter of Fax.com, Inc.; Apparent Liability for Forfeiture

File No. EB-02-TC-120; NAL/Acct. No. 200232170004; FRN 0007-2970-47

**RELEASE-NUMBER:** FCC 02-226

FEDERAL COMMUNICATIONS COMMISSION

17 FCC Rcd 15927; 2002 FCC LEXIS 3853; 27 Comm. Reg. (P & F) 459

August 7, 2002 Released; Adopted August 2, 2002

**CORE TERMS:** fax, com, advertisement, unsolicited, facsimile, consumer, telephone, forfeiture, machine, message, entity, opt-out, staff, advertiser, sending, transmission, recipient, database, website, broadcasting, faxing, broadcaster, accessed, sender, maximum, right of action, transmitted, permission, toll-free, automated

**ACTION:**
[\*\*1] NOTICE OF APPARENT LIABILITY FOR FORFEITURE

**JUDGES:** By the Commission: Commissioner Abernathy issuing a statement

**OPINION:**
[\*15927] I. INTRODUCTION

1. In this Notice of Apparent Liability for Forfeiture (NAL), we find that Fax.com, Inc. (Fax.com) n1 apparently willfully or repeatedly violated section 227 of the Communications Act of 1934, as amended (Act), n2 and the Commission's rules and orders, by sending unsolicited advertisements to telephone facsimile machines on 489 separate occasions. n3 Based on the facts and circumstances surrounding these apparent violations, we find that Fax.com is apparently liable for forfeiture in the amount of $ 5,379,000. n4

n1 Fax.com, Inc. is headquartered at 120 Columbia Street, Suite 500, Aliso Viejo, California 92656. According to Dun & Bradstreet Business Information Report, Fax.com began operations in 1998. Fax.com is a closely held corporation whose president, Mr. Kevin Katz, owns 35% of the capital stock. Value Capital owns 33% of capital stock and Fax.com employees own the remaining 32% of capital stock. *See* Dun & Bradstreet Business Information Report, April 3, 2002. For purposes of this NAL, we specify that Fax.com encompasses all affiliated entities, successors, and assigns as well as its corporate officers, Mr. Katz, Thomas Roth, Jeffrey Dupree, and Eric Wilson. [\*\*2]

n2 Section 227 was added to the Communications Act of 1934 by the Telephone Consumer Protection Act of 1991, Pub.L 102-243, 105 Stat. 2394, and is most commonly known as the TCPA.

n3 *See* 47 U.S.C. § 227(b)(1)(C); 47 C.F.R. § 64.1200(a)(3); *see also Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Report and Order*, 7 FCC Rcd 8752, 8779, (1992) (*TCPA Report and Order*) (stating that section 227 of the Act prohibits the use of telephone facsimile machines to send unsolicited advertisements).

n4 *See* 47 U.S.C. § 503(b)(1). The Commission has the authority under this section of the Act to assess a forfeiture against any person who has "willfully or repeatedly failed to comply with any of the provisions of this Act or of any rule, regulation, or order issued by the Commission under this Act . . . ."

**[\*15928] II. BACKGROUND**

2. Fax.com characterizes itself as a "fax broadcaster," transmitting messages to telephone facsimile machines on behalf of other entities for a fee. According to its website, Fax.com specializes in transmitting its clients' **[\*\*3]** advertisements to telephone facsimile machines whose numbers are contained in the Fax.com database, which it touts as "the industry's largest fax number database." n5 In its promotional materials, Fax.com also offers to design or improve its clients' advertising copy. n6 The unsolicited facsimile advertisements that are the subject of this NAL are the product of Fax.com's fax broadcasting enterprise. With the exception of one message, n7 the advertisements do not promote products, goods, or services provided by Fax.com but, instead, promote a wide variety of products, goods, or services offered by numerous entities that have employed Fax.com to send their advertisements to telephone facsimile machines.

n5 *See* http://www.fax.com/Services/faxblast.asp (website accessed May 29, 2002). Fax.com's website, copyrighted 2000, contains the following additional claims:

> Fax.com is the only company that can boast 16 million fax numbers. With another 16 million records soon available, Fax.com will be the leading place to purchase fresh fax broadcasting data. http://www.fax.com/company_profile/our_business.asp (website accessed May 29, 2002).

> Broadcast your advertising fax based on radius, Zip Codes, Metro Area, Area Code, County, State or the entire U.S. using a database that will exceed 30 million fax numbers. http://www.fax.com/Why_use_fax/direct.asp (website accessed May 29, 2002).

**[\*\*4]**

n6 *See* http://www.fax.com/Consumer_support/FAQs.asp (website accessed May 29, 2002) ("If you would like, we can send you a questionnaire about your company, consult with you and design outstanding fax broadcast ads for you."); http://www.fax.com?Services/addl_seerv.asp (website accessed May 29, 2002) ("Our design department will work with you to design your fax ad, choose type fonts, create graphics, and develop the ideal fax that will achieve the greatest response.").

n7 *See* note 40, *infra.*

3. In December 2000 and May 2001, after receiving correspondence from consumers who complained about having been faxed unsolicited advertisements on behalf of six Fax.com

clients, the Commission staff issued citations to Fax.com n8 pursuant to section 503(b)(5) of the Act. n9 The staff cited Fax.com for allegedly violating section 227(b)(1)(C) of the Act and **[*15929]** section 64.1200(a)(3) of the Commission's rules by transmitting unsolicited advertisements to consumers' telephone facsimile machines on behalf of the six clients. n10 The citations noted that

> although entities that merely transmit facsimile messages on behalf of others are not liable for compliance with the **[**5]** prohibition on faxing unsolicited advertisements, the exemption from liability does not exist when a fax transmitter has "'a high degree of involvement or actual notice of an illegal use and [has] failed to take steps to prevent such transmissions.'" Accordingly, fax transmitters do not enjoy an absolute exemption from liability under the TCPA and the Commission's Rules. n11

n8 Citation letters from Kurt A. Schroeder, Deputy Chief, FCC Telecommunications Consumers Division to Kevin Katz, Fax.com President (Dec. 26, 2000; May 11, 2001; May 31, 2001) (collectively *Fax.com Citations* or staff citations).

n9 47 U.S.C. § 503(b)(5). Under section 503(b)(5), the Commission may not assess a forfeiture penalty against any person that does not hold a license, permit, certificate, or other Commission authorization, and is not an applicant for such instruments, unless "(A) such person is first issued a citation of the violation charged; (B) is given a reasonable opportunity for a personal interview with an official of the Commission, at the field office of the Commission nearest to the person's place of residence; and (C) subsequently engages in conduct of the type described in the citation." We note that this section does not require the multiple citations given by the staff here; only a single citation was necessary before initiation of a forfeiture proceeding. **[**6]**

n10 The staff also cited the following Fax.com clients for alleged violations of section 227 and the Commission's rules and orders: Platinum Travel Club and Teleconcepts Technologies; Colorjet, Inc.; Millenium Marketing and Sales, Ltd.; Website University; US Travel Services, Inc.; and Advanced Cellular Communications, Inc. This proceeding does not encompass any actions against the cited companies.

n11 *Fax.com Citations* at 2 (footnotes omitted) (citing *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Memorandum Opinion and Order*, 10 FCC Rcd 12391, 12407 (1995) (*TCPA Memorandum Opinion and Order*); *TCPA Report and Order*, 7 FCC Rcd 8752, 8780 (1992) (quoting *Use of Common Carriers*, 2 FCC Rcd 2819, 2820 (1987))).

4. The citations informed Fax.com that it could face monetary forfeitures up to $ 11,000 for each subsequent violation if Fax.com either (1) was highly involved on behalf of the sender of any unsolicited facsimile advertisements, or (2) continued to transmit advertisements for the six named clients without taking steps to ensure that those **[**7]** entities had obtained permission from recipients to fax the advertisements. The citations also directed Fax.com to answer several questions regarding its general practices with respect to its fax broadcasting activities and its specific arrangements with the six clients. Finally, the citations informed Fax.com that within 21 days of the date of each citation, it could either request a personal interview at the nearest Commission field office, or provide a written statement responding to the citation.

5. On January 31, 2001, June 1, 2001, and June 21, 2001, Fax.com responded to the citations with virtually identical pleadings that were filed jointly on behalf of Fax.com and its six cited clients. In each instance, Fax.com and the clients claimed that the prohibition on faxing unsolicited advertisements contained in section 227 and the Commission's implementing regulations is an unconstitutional infringement on the First Amendment free speech rights of Fax.com and its advertisers. Fax.com also addressed the staff's questions regarding its fax broadcasting operations. In that regard, Fax.com claimed that although it offers clients "advice and assistance relative to graphics presentations," **[**8]** it had not exercised any editorial control over any of the advertisements that were at issue in the six citations. n12 Nonetheless, Fax.com **[*15930]** emphasized that it retains discretion to refuse to transmit any advertisement it deems "offensive or misleading." n13 Fax.com stated that it provided the fax distribution lists for each of six clients whose advertisements were addressed by the citations. Fax.com explained that it compiles its database of telephone facsimile numbers by (1) purchasing lists of fax numbers from independent vendors, (2) identifying fax numbers "through its own research methods," and (3) recording fax numbers provided by individuals who have asked, through an automated process, to be included in Fax.com's database. With respect to the telephone facsimile numbers obtained from independent vendors and Fax.com's research efforts, Fax.com conceded that it "has historically taken no steps to verify consent or established business relationships." n14 Fax.com stated that it "routinely" sends what it characterizes as a "non-commercial" message regarding missing children to each number added to the Fax.com database. n15 Entitled "Your Permission Please," the message "asks" **[**9]** recipients to agree to receive from Fax.com alerts regarding missing children. The message states that "to help offset the cost' of the missing children alerts, Fax.com will also send "a limited amount of commercial paid advertising" not to exceed one fax per week. The message instructs recipients who do not wish to receive the alerts or advertisements to call a toll-free "opt-out" number. Finally, Fax.com emphasized that it only transmits advertisements that contain such an opt-out number that fax recipients may call if they do not wish to receive similar advertisements in the future. n16

n12 January 31 Response at 27; June 1 Response at 28; June 21 Response at 27.

n13 January 31 Response at 27; June 1 Response at 29; June 21 Response at 28.

n14 January 31 Response at 30; June 1 Response at 31-32; June 21 Response at 30.

n15 January 31 Response at 30-31; June 1 Response at 32; June 21 Response at 31. Judging by information provided by consumers to this Commission, it does not appear that Fax.com is using this message routinely at the present time; only one such message is included in the instant forfeiture action. *See* note 40, *infra*.

n16 January 31 Response at 28-29; June 11 Response at 27; June 21 Response at 27-28. **[**10]**

6. Following Fax.com's receipt of the staff's citations, the Commission has continued to receive information from numerous consumers indicating that Fax.com is still conducting its fax broadcasting activities in a manner that apparently violates section 227(b)(1)(C) of the Act and section 64.1200(a)(3) of the rules. The forfeiture proposed herein is based on this body of consumer information, which alleges that after Fax.com's receipt of the staff's citations, consumers continued to receive a variety of unsolicited facsimile advertisements, all traceable to Fax.com.

7. Table 1, "Unsolicited Advertisements Transmitted by Fax.com and Subject to Forfeiture

Pursuant to FCC 02-226," lists 489 unsolicited fax advertisements that form the basis of this NAL. n17 Although only one of these advertisements mentions Fax.com in any way, some **[*15931]** consumers were able to discover that Fax.com had transmitted the ads. By obtaining information that identifies Fax.com as the telephone subscriber for (1) the various toll-free opt-out telephone numbers that are displayed on each advertisement, and/or (2) the telephone facsimile machine numbers from which various advertisements were sent, which are displayed **[**11]** in the advertisements' fax headers, the Commission staff has confirmed that Fax.com sent each advertisement listed in Table 1.

n17 As set forth in Table 1, these unsolicited facsimile advertisements were received by 46 individuals, businesses, or government offices between September 2001 and March 2002. Although some consumers' correspondence and related declarations detail additional unsolicited advertisements received before August 7, 2001, we do not list these violations in Table 1 because they are beyond the one-year statute of limitations set forth in section 503(b)(6)(B) of the Act, 5 U.S.C. § 503(b)(6)(B). Finally, we note that evidence of additional instances of unlawful conduct by Fax.com, subject to section 503(b)(6)(B)'s statute of limitations, may form the basis of additional enforcement actions.

8. Nine consumers have provided information showing that they each received over 20 unsolicited and unwanted advertisements that were transmitted by Fax.com clients on behalf of its clients. n18 The remaining 36 consumers have provided between one and 16 unsolicited fax ads each. n19 Each consumer who has provided information regarding the **[**12]** fax messages at issue herein has signed a declaration, under penalty of perjury, attesting that he or she (1) is either the owner of or responsible for the telephone facsimile machine that received the advertisement(s); (2) did not have an established business relationship with either Fax.com or the entity whose products, goods, or services were being advertised; and (3) did not grant prior express permission or invitation for the faxes to be sent. n20

n18 *See* Table 1 recording faxes received by Robert Isaac Carr (27 faxes), George D. Demet (29 faxes), Robert R. Dzimidas (21 faxes), L. ("Les") R. Docks (24 faxes), Allan Howard Frey (21 faxes), Heather Ann Hartnett (30 faxes), Douglas M. McKenna (95 faxes; 28 faxes - residential line, 67 faxes - business line), John P. Strang (30 faxes), and Wayne George Strang (48 faxes).

n19 Some consumers indicate that they actually have received far more advertisements from Fax.com than they have submitted to the Commission. *See* Facsimile message from John Koltun to Evelyn Dyson, FCC Telecommunications Consumers Division (Apr. 12, 2002); facsimile message from George Craig (on behalf of Gary Chou, Internal Revenue Service) to Evelyn Dyson, FCC Telecommunications Consumers Division (Mar. 18, 2002). **[**13]**

n20 One consumer describes particular circumstances to show that he neither solicited the faxes nor permitted another individual to do so on his behalf. *See* Declaration of Wayne George Strang (Jul. 22, 2002) (stating that Mr. Strang is the only member of his household and, thus, the only individual entitled to grant access to his telephone facsimile machine).

9. Consumer complaints about the faxes offer a snapshot of the disruption, expense, and inconvenience caused by Fax.com's unwanted fax transmissions. n21 For instance, several **[*15932]** consumers describe being awakened very late at night or in the early hours of the morning by the noise of their fax machines receiving an unsolicited advertisement from a Fax.com client. n22 Another consumer, Elkins Cox, describes the expense and inconvenience of receiving Fax.com's unwanted transmission on an older telephone facsimile machine and states

that he has chosen to turn off his machine rather than deal with the stream of unsolicited advertisements. n23 Robert McMeekin, M.D., complains about receiving unsolicited advertisements on a line that is reserved **[*15933]** for the receipt of patient medical data, and emphasizes the serious disruption to **[**14]** patient care caused by such unwanted faxes. n24

n21 Although not the basis for our action here, we note that accounts in public media, litigation against Fax.com, and correspondence to the Commission describe in detail substantial disruption and expense caused by Fax.com's widespread fax broadcasting of unsolicited advertisements. See "E-Mail Bill May Fail to Curtail Spamming," Brett Arquette, eWEEK Magazine, www.eweek.com/article/0,3658,s=1868&a=8229,00.asp, 2001 WL 4412169 (July 16, 2001) (describing disruption caused by business organization's receipt of up to 1,000 faxes per week from Fax.com):

> We have 320 DID (direct inward dialing) fax numbers assigned to our organization and recently had to add two more inbound trunks to keep up with the number of unsolicited faxes Fax.com was purnping out. During one week, Fax.com took up all four of the inbound lines that feed our 320 RightFax server numbers for 1.5 hours, virtually shutting down our fax system for that time.

See also "Fighting Back on the Fax," Ed Foster, InfoWorld Magazine, 2001 WL 22048648 (Aug. 13, 2001) (relaying readers' reports of disruption caused by Fax.com: "'We received over 100 faxes from Fax.com even though we had previously opted out for all our 135 or so incoming phone numbers. . .'"); Covington & Burling v. International Marketing & Research, Inc., et.al., Second Amended Complaint, Civil Action No. 01-004360 (D.C. Superior Court, filed Dec. 13, 2001) ($ 2.45 million lawsuit alleging Fax.com "bombarded" law firm with 1,634 unsolicited advertisements during one week, "substantially interfering with the work of the firm."); Letter from Phillip L. Verveer and David M. Don, counsel for j2 Global Communications, Inc. to Kurt Schroeder, Deputy Chief, FCC Telecommunications Consumers Division (May 9, 2001) (describing disruption to j2's business operations caused by faxes transmitted by Fax.com and other fax broadcasters that send unsolicited advertisements):

> Over the last several months, Fax.com and American Blast Fax (and its affiliates) have flooded j2s telephone facsimile lines with hundreds of unsolicited faxes, despite j2's requests that they cease and desist transmission of unsolicited faxes. The flood of unsolicited advertisements severely disrupts the j2 service, interferes with customers' abilities to utilize the services, and on many occasions, crashes j2's servers for several hours at a time during the workday. When a server crashes, j2 customers are unable to access their accounts and thus cannot receive or send faxes and voicemails using the j2 service. Delivery of legitimate faxes to customers' email accounts is often delayed for hours.

See also "j2 Global Communications, Inc. Secures Agreement to End Unsolicited Fax Spam," j2 Global Communications, Inc. Press Release, http://biz.yahoo.com/prnews/020130/law050 (Jan 30, 2002) (reporting that j2 secured an agreement to end Fax.com's transmission of unsolicited fax advertisements to j2's more than 4.5 million customers). **[**15]**

n22 See Letter from James Allan Dobbins to the Direct Marketing Association (Oct. 4, 2001); facsimile message from Richard V.N. Ginn to Carmen Bates, FCC Telecommunications Consumers Division (Mar. 16, 2002); Letter from Steven M. Greenberg to FCC (Dec. 7, 2001);

Letter from Sally Collins to FCC Consumer Information Bureau (Dec. 13, 2001).

n23 Letter from Elkins Cox to FCC Consumer Information Bureau (Sep. 21, 2001) and attached letter from Elkins Cox to Georgia Governor's Office of Consumer Affairs (Sep. 5, 2001) ("In my home setup, I must answer the phone, realize it is a fax call, and transfer the call to the fax machine," which prints the fax at a cost of $ .30 per page).

n24 Letter from Robert R. McMeekin, M.D. to FCC Consumer Information Bureau (Jan. 11, 2002). Dr. McMeekin mistakenly identifies two faxes as being transmitted on October 31 and December 31, 2000. The faxes included with Dr. McMeekin's letter contain header information that shows that they actually were received on those days in the year 2001.

10. Some consumers complain about unsuccessful attempts to remove their telephone facsimile machine numbers from Fax.com's database and describe frustration **[**16]** with Fax.com's automated opt-out lines, which do not identify Fax.com as the entity responsible for the fax number database. n25 Fax.com is not identified on its clients' advertisements and similarly, in many cases, the advertiser itself is unnamed. n26 In such instances, consumers describe difficulties in ascertaining the entity to which they should direct a complaint about receipt of the faxes. Some consumers who were able to contact either the advertiser or Fax.com report that they encountered hostility, misrepresentation, and unresponsiveness. For example, Andrew Hansis has asked the Commission to take action with respect to two unsolicited advertisements he received in October 2001, neither of which identified the company whose service was being **[*15934]** advertised. n27 With respect to the first advertisement, Mr. Hansis states that he called the telephone number provided on the advertisement for service orders and was provided with a name and telephone number of a "responsible individual" with whom he could discuss the unsolicited advertisement. After unsuccessfully attempting to reach this individual, Mr. Hansis reports he received a telephone call from Charles Martin, an employee of **[**17]** Fax.com. According to Mr. Hansis, Mr. Martin "was unwilling to tell me the source of how the number was placed in the database, only that it was 'called in'" at an earlier date. n28

n25 Information provided by consumers indicates that Fax.com continued to send faxes even after receiving optout calls. For instance, a log provided by William Robert White, President of Regency Sales, Inc., documents over 50 attempts between May 2000 and August 2001 to use Fax.com's opt-out numbers to halt Regency's receipt of unsolicited advertisements from Fax.com clients. Despite these attempts, Fax.com continued to transmit unsolicited advertisements to Regency, as evidenced by at least 12 faxes received by Regency from December 2001 to February 2002. *See Table 1; see also* Letter from Andrew Hansis to Consumer Information Bureau (Oct. 5, 2001) (*October 5 Hansis Letter*) (stating that Mr. Hansis continued to receive faxes even after using Fax.com's automated opt-out system and speaking with a senior Fax.com employee in an effort to end the faxing); Consumer Form for Telephone-Related Issues from Norman Jensen, III (rec'd Jan. 8, 2002) (consumer continued to receive at least one advertisement a week despite "repeatedly" calling opt-out numbers and faxing a message to the originating fax number asking that his telephone facsimile number be removed from the fax number database); Consumer Form for Telephone-Related Issues from Dora Wong Goto (rec'd Oct. 15, 2001) (*Goto Complaint Form*); annotated copies of faxes submitted by James Allan Dobbins. It is clear that a call to one Fax.com opt-out line does not end all fax transmissions from the company. We emphasize here that even an effectively administered opt-out system does not change the statutory ban on sending unsolicited facsimile advertisements or insulate such transmissions from statutory penalties. However, the fact that Fax.com apparently does not even adhere to its own stated procedures makes its conduct even more egregious. **[**18]**

n26 Over 20 per cent of the faxes listed in Table 1 do not identify the entity whose products, goods, or services are being advertised. Section 227(d)(1)(B) of the Act and section 68.318 of the Commission's rules require that all faxes display in a margin at the top or bottom of each page or on the first page of a fax transmission, the following information: the date and time of transmission; the name of the individual, business, or other entity that sent the fax; and the telephone number of either the sending machine or the individual, business, or other entity responsible for sending the fax. With respect to identification requirements for the fax sender and the telephone number of the sender or sending machine, the Commission has determined that the entity that creates the content of the fax message is generally responsible for compliance. *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Order on Further Reconsideration*, 12 FCC Rcd 4609, 4610 n.7, 4613 (1997) (finding that liability rests with entity that is responsible for the content of the fax message, not with a fax broadcaster that does "not determine the message content or to whom they are sent.") If, however, a fax broadcaster voluntarily chooses to place its own identifying information on a message faxed for another entity, "it must be clear which entity is the content originator and which entity is merely the transmitter of the message." 12 FCC Rcd at 4613. **[\*\*19]**


n27 Letter from Andrew Hansis to Consumer Information Bureau (Oct. 4, 2001) (*October 4 Hansis Letter); October 5 Hansis Letter*.


n28 *October 4 Hansis Letter; see, e.g., Goto Complaint Form* (consumer made two calls to Fax.com but was unable to reach a live person or have calls returned).

## III. DISCUSSION

11. Section 227(b)(1)(C) of the Act prohibits any person from using "a telephone facsimile machine, computer, or other device to send an unsolicited advertisement to a telephone facsimile machine." n29 An unsolicited advertisement is defined as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission." n30 The Commission has determined that an established business relationship between a fax sender and recipient demonstrates consent to receive telephone facsimile advertisement transmissions. n31 The mere distribution or publication of a telephone facsimile number, however, does not confer invitation or permission to transmit advertisements to a particular telephone facsimile machine. n32


n29 47 U.S.C. § 227(b)(1)(C). Section 227 defines a telephone facsimile machine as "equipment which has the capacity (A) to transcribe text or images, or both, from paper into an electronic signal and to transmit that signal over a regular telephone line, or (B) to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper." *Id.* § 227(a)(2). This blanket prohibition applies to all unsolicited advertisements transmitted to telephone facsimile machines. The Act does not permit the sending of unsolicited advertisements by facsimile to either business or residential telephone facsimile machines. **[\*\*20]**


n30 47 U.S.C. § 227(a)(4); 47 C.F.R. § 64.1200(f)(5).


n31 *See TCPA Report and Order*, 7 FCC Rcd at 8779 n. 87; *TCPA Memorandum Opinion and Order*, 10 FCC Rcd at 12408.

n32 *Id.*

## A. Constitutional Issue.

12. Fax.com and its client advertisers have argued that the broad prohibition on sending unsolicited facsimile advertisements violates their constitutional right to free speech guaranteed under the First Amendment. Federal courts have previously considered similar arguments. For example, the Court of Appeals for the Ninth Circuit, where Fax.com is located, has determined that the TCPA does not violate the First Amendment's protection of commercial **[*15935]** speech. n33 Moreover, administrative agencies are to presume that the statutes that Congress directs them to implement are constitutional. n34 Accordingly, we reject Fax.com's arguments in this regard.

n33 *See Destination Ventures v. FCC*, 46 F.3d 54, 55-57 (9th Cir. 1995) (ban on unsolicited fax advertisements does not violate the advertiser's First Amendment rights because it reasonably fits the government's interest in preventing the shifting of advertising costs to consumers); *see also Kenro, Inc. v. Fax Daily, Inc.*, 962 F.Supp. 1162, 1167-69 (S.D. Ind. 1997) (ban on unsolicited fax advertisements is narrowly tailored to achieve the government's intended purpose and does not violate the First Amendment guarantee of commercial free speech); *Texas v. American Blast Fax*, 121 F. Supp. 2d 1085, 1091-92 (W.D. Tex. 2000). *But see Missouri v. American Blast Fax*, 196 F. Supp. 920 (E.D. Mo. 2002), appeal pending Nos. 02-2705, 02-2707 (8th Cir.) (government failed to demonstrate that the harms associated with unsolicited facsimile advertisements are real, that the blanket prohibition on faxing such materials would significantly alleviate such harms, and that the prohibition was not more extensive that necessary to serve the government's interests). The latter case is not implicated in this NAL because none of the fax transmissions for which we are assessing a forfeiture were received in or, to our knowledge, sent from the eastern judicial district of Missouri. **[**21]**

n34 *Johnson v. Robison*, 415 U.S. 361, 368 (1974) (quoting *Oestereich v. Selective Service Board*, 393 U.S. 233, 242 (1968) (Harlan, J., concurring in result) ("Adjudication of the constitutionality of congressional enactments has generally been thought beyond the jurisdictions of administrative agencies.")).

## B. Fax.com's Liability Under 47 U.S.C. § 227(b)(1)(C) and 47 C.F.R. § 64.1200(a)(3).

13. Because of the nature of its operations, Fax.com is liable for violations of section 227(b)(1)(C) of the Act and section 64.1200(a)(3) of our rules even though it generally acts on behalf of other parties in sending unsolicited advertisements to telephone facsimile machines. The Commission has held that the prohibition on sending unsolicited fax advertisements does not apply to fax broadcasters that operate like common carriers by merely transmitting their customers' messages without determining either content or destination. n35 In finding that such entities are not liable under section 227(b)(1)(C) of the Act or section 64.1200(a)(3) of the rules, the Commission has focused on the nature **[**22]** of an entity's activity rather than any label that that entity may claim. Specifically, the Commission's rulings clearly indicate that a fax broadcaster's exemption from liability is based on the type of activities it undertakes, and only exists "in the absence of 'a high degree of involvement or actual notice of an illegal use and failure to prevent such transmissions.'" n36 Regardless of whether Fax.com characterizes itself as a disinterested fax broadcaster, it is clear that the company's activities place it outside the exempted category of fax broadcasting applied by Commission and render it a fax sender within the meaning of section 227(b)(1)(C).

n35 *TCPA Memorandum Opinion and Order*, 10 FCC Rcd at 12407. *See TCPA Report and Order*, 7 FCC Rcd at 8780.

n36 *Id.* (quoting *Use of Common Carriers*, 2 FCC Rcd at 2820).

14. The record here clearly establishes that Fax.com uses its own extensive distribution list of telephone facsimile numbers to send its clients' advertisements, and that it knowingly sends advertisements to such numbers without regard to whether the facsimile machine **[**23]** owner or responsible party either granted permission to send the advertisement or had **[*15936]** an established business relationship with the advertiser or Fax.com. n37 In addition, Fax.com apparently reviews the text of its clients' advertisements, not only to assist with graphic design, n38 but also to assess content. n39 Such conduct is clear evidence of Fax.com's high degree of involvement in the unlawful activity. Moreover, the staff's citations provided Fax.com with actual notice that its fax broadcasting activities do not comply with federal law.

n37 *See* para. 5, *supra*.

n38 *See* note 6, *supra*.

n39 Fax.com's website states that "as a responsible service provider, Fax.com makes a conscious effort to censor any offensive literature or graphic content from its platform." http://www.fax.com/company_profile/our_business.asp (website accessed May 29, 2002). In addition, as indicated above, in response to our citations, Fax.com has suggested that it may review its clients' advertisements to ensure that they are not "offensive or misleading." *See* para. 5, *supra*. Such editorial influence is inconsistent with Fax.com's claim that it does not exercise control over the content of its clients' advertisements. Fax.com's close involvement in the undertakings of its clients is evidenced by the fact that Fax.com is the subscriber for the toll-free sales number (800-550-0406) displayed on one of its client's advertisements. *See, e.g.*, Advertisements from Infinity Communications to Heather Ann Hartnett (Nov. 2, 2001; Dec. 12, 2001).

**[**24] C. Violations Evidenced by the Consumer Correspondence.**

15. As an initial matter, the staff has reviewed every facsimile that forms the basis for this NAL to confirm that each message advertises the commercial availability or quality of a product, good or service and, thus, constitutes an advertisement as set forth by section 227(a)(4) of the Act and section 64.1200(f)(5) of our rules. n40 Further, the record indicates that the consumers at issue neither granted express permission to send the advertisements nor had an established business relationship with either Fax.com or the entities on whose behalf the advertisements were faxed. n41 In light of this information, we conclude that the 489 faxes **[*15937]** detailed in Table 1 all are unsolicited advertisements and, thus, violate the statutory prohibition on faxing such materials.

n40 47 U.S.C. § 227(a)(4); 47 C.F.R. § 64.1200(f)(5); *see* para. 8, *supra*. The advertisements include promotions for cellular telephone service, stock market offerings, commercially offered seminars, clocks, vacation packages, office supplies and equipment, and insurance services. The Moneyline Report's stock advertisements, claim, "This Fax is intended for information purposes only and is not a commercial solicitation under the Telephone Consumer Protection Act. It is not an offer to buy or sell anything." Despite this disclaimer, the faxes clearly promote

a stock offering and thus constitute an advertisement under 47 U.S.C. § 227(a)(4) and 47 C.F.R. § 64.1200(f)(4). *See, e.g.*, Advertisement from Moneyline Report to John P. Strang (Oct. 16, 2001) ("Moneyline Report is putting FXGP on our Strong Buy-Aggressive Growth recommendation list. . . ."). Finally, one of the advertisements included in this forfeiture action is Fax.com's own "Your Permission Please" message, which purportedly seeks permission to fax consumers both missing children alerts and "a limited amount of paid commercial advertising." See Advertisement from Fax.com to Heather Ann Hartnett (Dec. 31, 2001). Contrary to Fax.com's assertion, such messages are indeed both commercial and prohibited under section 227(b)(1)(C) of the Act and section 64.1200(a)(3) of our rules. *See TCPA Memorandum Opinion and Order*, 10 FCC Rcd at 12408 ("Facsimile requests for permission to transmit would impose costs on facsimile recipients unless and until the recipient were able to ask that such transmissions be stopped. This kind of 'negative option' (in which the sender presumes consent unless advised otherwise) is contrary to the statutory requirement for prior express permission or invitation."). **[\*\*25]**

n41 In fact, several consumers indicate that Fax.com continued to fax advertisements to them even after they attempted to stop such faxes by calling one or more of Fax.com's toll-free opt-out numbers. *See* note 25, *supra*.

**D. Forfeiture Amount.**

16. As set forth above, we conclude that Fax.com apparently willfully or repeatedly violated the Act and the Commission's rules and orders by using a telephone facsimile machine, computer, or other device to send unsolicited advertisements to telephone facsimile machines. Fax.com apparently did not cease its unlawful conduct even after the Commission staff issued citations warning that it was engaging in unlawful conduct and could be subject to monetary forfeitures for subsequent violations. Accordingly, a proposed forfeiture is warranted against Fax.com for its apparent willful or repeated violations of the ban on unsolicited facsimile advertisements contained in section 227 of the Act and the Commission's rules and orders.

17. Section 503(b) of the Act authorizes the Commission to assess a forfeiture of up to $ 11,000 for each violation of the Act or of any rule, regulation, or order issued by the Commission under the Act by **[\*\*26]** a non-common carrier or other entity not specifically designated in section 503 of the Act. n42 In exercising such authority, we are to take into account "the nature, circumstances, extent, and gravity of the violation and, with respect to the violator, the degree of culpability, any history of prior offenses, ability to pay, and such other matters as justice may require." n43

n42 Section 503(b)(2)(C) provides for forfeitures up to $ 10,000 for each violation by cases not covered by subparagraph (A) or (B), which address forfeitures for violations by licensees and common carriers, among others. *See* 47 U.S.C. § 503(b). In accordance with the inflation adjustment requirements contained in the Debt Collection Improvement Act of 1996, Pub. L. 104-134, Sec. 31001, 110 Stat. 1321, the Commission implemented an increase of the maximum statutory forfeiture under section 503(b)(2)(C) to $ 11,000. *See* 47 C.F.R. § 1.80(b)(3); *Amendment of Section 1.80 of the Commission's Rules and Adjustment of Forfeiture Maxima to Reflect Inflation*, 15 FCC Rcd 18221 (2000).

n43 47 U.S.C. § 503(b)(2)(D); *The Commission's Forfeiture Policy Statement and Amendment of Section 1.80 of the Rules to Incorporate the Forfeiture Guidelines, Report and Order*, 12 FCC Rcd 17087, 17100-17101, (1997), *recon. denied*, 15 FCC Rcd 303 (1999) (*Forfeiture Policy Statement*). **[\*\*27]**

18. Although the Commission's *Forfeiture Policy Statement* does not establish a base forfeiture

amount for violating the prohibition on sending unsolicited advertisements to a telephone facsimile machine, we have previously considered $ 4,500 per unsolicited fax advertisement as an appropriate base amount. n44 In addition, we have previously assessed a higher forfeiture of $ 10,000 per unsolicited fax advertisement in instances in which the fax recipient had previously asked the sender to refrain from faxing such materials. n45

n44 See *Get-Aways, Inc., Notice of Apparent Liability For Forfeiture*, 15 FCC Rcd. 1805, 1812 (1999); *see also Carolina Liquidators, Inc., Notice of Apparent Liability for Forfeiture*, 15 FCC Rcd 16837, 16842 (2000) (*Carolina Liquidators NAL*); *Tri-Star Marketing, Notice of Apparent Liability for Forfeiture*, 15 FCC Rcd 11295, 11300 (2000) (*Tri-Star NAL*); *US Notary, Inc. Notice of Apparent Liability for Forfeiture*, 15 FCC Rcd 16999, 17003 (2000).

n45 See *Carolina Liquidators NAL*, 15 FCC Rcd at 16842; *Tri-Star NAL*, 15 FCC Rcd at 11300. **[**28]**

**[*15938]** 19. In the instant case, we believe that the maximum forfeiture amount of $ 11,000 per violation is warranted for each unsolicited advertisement transmitted by Fax.com and documented by the consumer correspondence. It is clear from Fax.com's own promotional materials and its responses to our citations that Fax.com's primary business activity itself constitutes a massive n46 on-going violation of section 227(b)(1)(C) of the Act and section 64.1200(a)(3) of the Commission's rules, and that Fax.com is well aware of this fact. Fax.com's primary commercial offering is a fax broadcasting service that clearly does not comply with federal restrictions governing facsimile advertisements. As outlined above, by its own admission and as demonstrated by the consumer information, Fax.com generally conducts its fax broadcasting without any regard to whether the fax recipient has an established business relationship with either Fax.com or the advertiser, or has otherwise granted express permission for the advertisement to be sent. We conclude that this unlawful undertaking merits maximum forfeitures for each of the violations at issue here. Although we believe that the nature of Fax.com's enterprise **[**29]** by itself warrants imposition of a maximum forfeiture for each violation, we discuss below the particularly egregious aspects of Fax.com's conduct.

n46 Fax.com's website, copyrighted 2000, claims:

> By mid-1999, all systems were in place with an initial broadcasting capacity of two million faxes per day. Following its plan to continue increasing line capacity to three million faxes per day by 2001, Fax.com is well on its way.

http://www.fax.com/company_profile/about.asp (website accessed May 29, 2002).

20. Fax.com's Actions with Respect to Private Suits to Enforce Section 227. We are especially concerned because it appears that Fax.com has acted in a manner that thwarts the unique statutory enforcement mechanism established by section 227 of the Act. Under the statute, the Commission, state attorneys general, or aggrieved consumers may initiate actions to enforce certain prohibitions and restrictions contained in section 227 of the Act, including the prohibition on sending unsolicited fax advertisements. Section 227(b)(3) affords consumers an opportunity to initiate actions in state courts to enjoin violations of, *inter alia*, the prohibition on faxing unsolicited **[**30]** advertisements, and/or to recover damages equivalent to the actual monetary loss caused by such violations or $ 500, whichever is greater, for each violation. Damages may be trebled if a court determines that the violation was "willful and knowing." As we describe below, Fax.com appears to have engaged in a pattern of deception and intimidation to conceal its involvement in sending prohibited faxes n47 and to frustrate

consumers' efforts to exercise the statutory private right of action.

n47 As mentioned above, only one of the 489 faxes that form the basis for this NAL identifies Fax.com in any way. Nonetheless, Fax.com's various toll-free opt-out numbers appear on each advertisement. In fact, the wording of the opt-out notices, and the fact that they are contained on advertisements for individual entities, clearly convey the erroneous impression that opt-out numbers are associated with individual advertisers. See, e.g., Advertisement from Y2 Marketing to D. Leon Taylor (Oct. 16, 2001) ("If you received this fax in error and would like to have your number removed from our database, call toll-free at 800-822-9033; Advertisement from eStock Pick of the Week to Robert Isaac Carr (Jan. 9, 2002) ("To have your name removed from our database, please call our toll free service at: (800)-331-4510); Advertisements from Central Imaging Supply to L. ("Les") R. Docks (Nov. 2 and 8, 2001) ("To have your number removed from our database, please call our automated toll-free center at 800-457-5410). As shown in Tables 2 and 3, however, opt-out numbers are not assigned uniquely to individual advertisers. These tables reveal that a single advertiser may be associated with multiple opt-out numbers and likewise a single opt-out number may be associated with multiple advertisers. [**31]

[*15939] 21. We have obtained evidence that Fax.com employee Charles Martin filed an apparently false statement regarding his employment status before a California court considering a consumer's section 227(b)(3) claim for damages against Fax.com client American Benefit Mortgage. In two statements filed with the Los Angeles Superior Court and signed under penalty of perjury, Mr. Martin falsely identifies himself both as "Compliance Manager for American Benefit Mortgage, Inc." and as "Officer of the Company [American Benefit Mortgage] - Manager of Human Resources." n48 Through Mr. Martin's false claim to be employed by a client, Fax.com subverts the judicial decision-making process and skews the statutory private right of action accorded under section 227 by ensuring that the court does not have an accurate record upon which to base its decision.

n48 "Representative Appearance Declaration Pursuant to CCP 116.540(B)" signed by Charles Martin and filed in Los Angeles Superior Court (Feb. 26, 2001, Apr. 3, 2001). According to Dun & Bradstreet, Charles Martin is not an officer of American Benefit Mortgage. See Dun & Bradstreet Business Information Report (June 7, 2002). In addition, an Enforcement Bureau staff member called American Benefit Mortgage's automated telephone directory, followed instructions to press keypads to spell Mr. Martin's name, and received a message that the name could not be found in the directory. [**32]

22. We have also obtained letters, signed by Mr. Martin, that were received by consumers in response to "demand letters" n49 that the consumers sent to Fax.com clients seeking to obtain monetary damages for unsolicited advertisements. Mr. Martin's letters are labeled "Inadmissible Settlement Communication," and state that the consumers that "fall under . . . exceptions . . . to receiving facsimile messages under 47 U.S.C. Section 227." n50 In addition, Mr. Martin warns the consumers to expect countersuits that if they pursue their private right of action in the state courts where they reside:

If you pursue this matter in Virginia our company will seek civil and criminal charges in California. n51

[*15940] If you think you have an action under the TCPA then file it in New Jersey. I will then pursue civil and criminal actions against you in the California Superior Courts. You can hire local legal counsel and we will litigate these matters with a jury trial. n52

If you pursue this matter in Massachusetts we will then file the appropriate actions in

California Superior Court. n53

Mr. Martin does not identify who "we" or "our company" is, and there is **[\*\*33]** no information on the face of the letters that would reveal the identity of Mr. Martin's employer or the corporate entity he actually represents. n54 In two cases, however, consumers have provided us with photocopies of the envelopes in which Mr. Martin's letters arrived. In each case, the return address shows the name and address of the individual advertisers to which the consumers directed their demand letters. The envelopes also show a metered mail stamp indicating that the letters were mailed from Aliso Viejo, California - Fax.com's corporate headquarters - despite the fact that the return address was in a different location. n55

n49 Demand letters are a popular tool among TCPA advocates and consumers who seek to self-enforce section 227 though the statute's private right of action. In such demand letters, a consumer generally complains about receiving a prohibited advertisement, asserts the private right of action to recover monetary damages, and asks the advertiser to pay a specified amount to avoid being sued in state court. We do not suggest that any advertiser or fax broadcaster is obligated to accede to a demand letter or that failure to do so somehow indicates an alleged violator's bad faith. **[\*\*34]**

n50 *See* Letter from Charles Martin to Terry P. Carter (Oct. 25, 2001) (*Carter Letter*); Letter from Charles Martin to Amy K.C. Goebel (Nov. 2, 2001) (*Goebel Letter*).

n51 *Carter Letter*.

n52 Letter from Charles Martin to Richard M. Zelma (Nov. 9, 2001) (*Zelma Letter*).

n53 *Goebel Letter*.

n54 The line below Mr. Martin's name simply reads, "Compliance Department." *See Carter Letter* (reference line refers to Advanced Communications); *Goebel Letter* (reference line refers to Advanced Communications); Letter *Zelma Letter* (reference line refers to Colorjet, Inc.).

n55 The envelope for the *Zelma Letter* shows a return address for Colojet, Inc. in Louisville, Kentucky and the metered postal stamp, PB8722193, shows that the envelope was mailed from Aliso Viejo, California. Likewise, the envelope for the *Goebel Letter* shows a return address for Advanced Communications in Long Beach, California (located in Los Angeles County) and the identical metered postal stamp number, which shows that the envelope was mailed from Aliso Viejo, California (located in Orange County).

23. Fax.com's letters are troublesome in several respects. First, **[\*\*35]** Fax.com's apparent deception regarding its authorship of the correspondence appears to be part of a concerted effort to discourage private enforcement actions against Fax.com's individual clients while, at the same time, concealing Fax.com's potential liability for the violations. In addition, the letters go beyond valid legal defenses and misrepresent the requirements of section 227(b)(1)(C), n56 again **[\*15941]** in an apparent effort to convince the recipients that they do not have a cause of action. Finally, the letters allude to retaliatory and possible vexatious court actions if recipients exercise the private right of action provided by section 227(b)(3). n57 Fax.com's

obvious attempts to thwart consumers' statutory private right of action threaten the effectiveness of the unique three-pronged enforcement mechanism that Congress created in section 227.

n56 One letter states, "As you are aware there are three exceptions to receiving facsimile messages under 47 U.S.C. Section 227. You fall under two of those exceptions." *Carter Letter*. In reality, there is one exception to the ban on faxing unsolicited advertisements: when the recipient has given prior express permission or invitation to send the advertisement. 47 U.S.C. § 227(b)(1)(C). As noted above, the Commission has determined that an established business relationship between the fax sender and recipient constitutes the requisite permission or invitation to fax. *See* para. 11, *supra*. Other information from consumers also indicates Mr. Martin's deception regarding the section 227(b)(1)(C) of the Act:

> Mr. Martin has continued to attempt to misinform me about the TCPA, stating at various times that Fax.com is exempt from the TCPA, that California law overrides the TCPA, that Fax.com was a non-profit organization and thus exempt from § 227(b)(1)(C), that Fax.com has never lost a case, that the FCC has not cited Fax.com, etc.

Letter from Mark James, Marketing Power, Inc. to Yanic Hardie, FCC (Apr. 2, 2001) (*James Letter*). **[**36]**

n57 One consumer has alleged that he was a victim of such a retaliatory lawsuit. Richard Zelma, a well-known TCPA advocate, claims that Charles Martin falsely swore out a complaint in the state of New Jersey charging Mr. Zelma with harassment. *State of New Jersey v. Richard Zelma*, Norwood Municipal Court Summons No. S-2001-000002-0241, File No. 8875.1000 (Jan. 23, 2001). The case was dismissed for failure to prosecute. The claims made by Mr. Zelma and Mr. Martin are moot, and in any event, would not be properly before this Commission; we therefore take no position on the validity of such claims.

24. Fax.com's Marketing of Its Fax Broadcasting Service. The record indicates that Fax.com does not disclose to its clients the broad prohibition on faxing unsolicited advertisements imposed by section 227 of the Act and our rules and orders. Fax.com's extensive promotional website does not mention section 227 at all. Information on the website creates the erroneous impression that opt-out numbers provide the only recourse for consumers who object to receiving unsolicited fax advertisements. n58 As indicated above, federal law does not address opt-out numbers in any way and even **[**37]** the effective use of such numbers in no way mitigates the fact that every unsolicited fax advertisement violates federal law. n59 In addition to deceiving prospective customers by omitting crucial information, Fax.com apparently has affirmatively misstated federal law governing unsolicited facsimile advertisements. One consumer reports a conversation with a Fax.com salesperson:

> I acted hesitant about the legality of the whole thing, but Mr. Horvat assured me that Fax.com works with the FCC and other agencies to act within the Federal Guidelines. He further stated that Fax.com includes a federally required 'opt-out' number at the bottom of the fax which makes sending the faxes legal. n60

In addition to subjecting consumers to greater numbers of unlawful faxes, Fax.com's deceptive marketing leaves its clients, which include small businesses, vulnerable to federal, state, and private enforcement actions that may involve substantial monetary penalties.

n58 See http://www.fax.com/Customer_support/FAQs.asp (website accessed May 29, 2002) ("Q: Do prospective clients complain about receiving the faxes? A: If someone does not want to receive any more faxes, there is an 800 number at the bottom of each and every fax sent through Fax.com that an individual can call to have the fax number removed from your campaign list.") [**38]

n59 *See* note 25, *supra*. We note that the broad federal prohibition on faxing unsolicited advertisements applies to both interstate and intrastate transmissions. *See* 47 U.S.C. § 152(b) (section 227, *inter alia*, is not subject to the provision that generally excludes Commission jurisdiction over intrastate matters); 47 U.S.C. § 227(e) (section 227 does not preempt state law that imposes *more restrictive* intrastate requirements).

n60 *James Letter*.

[*15942] 25. Fax.com's Dealings with the Commission. Fax.com has not been forthcoming in its dealings with the Commission. The staff's citations directed Fax.com to describe in detail its involvement in "providing, compiling, generating, or editing" distribution lists of telephone facsimile numbers used to transmit advertisements on behalf of clients. Specifically, the staff asked

Does your company employ or compensate any individuals or entities outside the company, including any tax-exempt nonprofit organizations, for any service, activity, assistance, or facilities used in connection with your company's providing, compiling, generating, [**39] or editing of such [distribution] lists? Please describe such arrangements in detail.

Initially, Fax.com suggests that the staff's inquiry "appear[s] to be completely irrelevant and immaterial to the violations alleged in the Citations." n61 The Commission, however, has broad authority and discretion to investigate conduct under its jurisdiction n62 and to "conduct its proceedings in such manner as will best conduce the proper dispatch of business and to the ends of justice." n63 Despite its reservations, Fax.com nonetheless purports to substantively answer the staff's question, summarily stating that it uses "its own research methods" as one means of compiling its facsimile number database. n64 In addition, Fax.com states, "Fax.com does not, to its knowledge, employ or compensate *any tax-exempt non profit organization(s)* in connection with Fax.com's business, including the providing, compiling, generating or editing of distribution list(s) of telephone numbers." n65 By limiting its answer to tax-exempt nonprofit entities, Fax.com has failed to answer the staff's inquiry, which clearly sought information pertaining to "*any* individuals or entities outside the company, *including* [**40] any tax-exempt nonprofit organizations." n66 Despite the staff's warning that the concealment of any material fact is punishable by fine or imprisonment, n67 Fax.com did not disclose to the Commission its remunerative relationship with at least one individual who apparently housed automatic telephone dialing equipment that Fax.com used to "war dial" massive blocks of telephone numbers to determine which numbers belong to telephone facsimile machines. n68

n61 January 31 Response at 29; June 1 Response at 29-30; June 21 Response at 28-29.

n62 47 U.S.C. § 403 provides that "the Commission shall have full authority and power at any

time to institute an inquiry, on its own motion, in any case and as to any matter or thing . . . concerning which any question may arise under any provisions of this Act, or relating to the enforcement of any of the provisions of this Act."

n63 47 U.S.C. § 154(j).

n64 *See* January 31 Response at 29; June 1 Response at 30; June 11 Response at 29.

n65 *Id.* (emphasis added).

n66 *Fax.com Citations* at 2 (emphasis added).

n67 *Id.*

n68 In this context, war dialing uses automated equipment to dial telephone numbers, generally sequentially, and software to determine whether each number is associated with a fax or voice line. In April 2000, the state of Washington entered into a consent decree with Fax.com to settle its complaint alleging that this war-dialing scheme had resulted in a barrage of calls to telephone lines at the University of Washington Medical Center, including lines for emergency services and patient rooms, in violation of section 227(a)(1)(A) of the Act and section 64.1200(a)(1) of our rules. *State of Washington v. Fax.com, Inc.*, No. C01-0369 (W.D. Wash. May 13, 2001) (consent decree permanently enjoining Fax.com from, *inter alia*, using automated dialing equipment to call any hospital patient room or emergency medical telephone number within Washington state and providing for $ 90,000 payment to the state in civil penalties, damages, and attorneys fees). We recognize that although Fax.com has agreed to an injunction and monetary payment, it does not admit the allegations in Washington's complaint. We do not address or pass judgment on all aspects of Fax.com's conduct in this regard, which, in any event, is beyond the statute of limitations set by the Act. Nonetheless, we need not ignore materials that document an arrangement whereby Fax.com paid an individual to house and operate the war-dialing equipment. *See* Participation Agreement between Fax Broadcast Systems and Mike Salvus (Apr. 4, 2000) (providing for Mr. Salvus's agreement to house in his residence war-dialing, or "casting," equipment as part of Fax Broadcast Systems' "Fax Broadcast Placement Program"); "Dear Participant" Form Letter from Paul L. Stanton, Fax Broadcast Systems (Mar. 30, 2000) (informing recipients that Fax.com has taken over from Fax Broadcast Systems, payments to participants in the fax broadcast placement program). In light of this information, it is clear that Fax.com did not honestly answer the staff's questions. We do not address here possible sanctions against Fax.com for its concealment. [**41]

[*15943] 26. Maximum Forfeiture Is Warranted. Fax.com's pervasive and egregious pattern of deception confirms our determination that the maximum forfeiture amount is warranted for each violation set forth in Table 1. The record here shows that even after the staff notified Fax.com that its actions violated the Act and the Commission's rules and orders, Fax.com continued its massive unlawful enterprise. The *Forfeiture Policy Guidelines* provide for upward adjustments to the maximum statutory forfeiture amount in cases such as this which involve egregious misconduct and intentional violation. n69 Accordingly, based on the nature and gravity of Fax.com's conduct and the continued need to ensure compliance with section 227(b)(1)(C) of the Act, we find Fax.com apparently liable in the amount of $ 11,000 for each of 489 violations. This results in a proposed total forfeiture of $ 5,379,000. Fax.com shall have the opportunity to submit evidence and arguments in response to this NAL to show that no forfeiture should be imposed or that some lesser amount should be assessed. n70

n69 *Forfeiture Policy Statement*, 12 FCC Rcd at 17,101.

n70 *See* 47 U.S.C. § 503(b)(4)(C); 47 C.F.R. § 1.80(f)(3). **[**42]**

## IV. CONCLUSION AND ORDERING CLAUSES

27. We have determined that Fax.com apparently violated section 227 of the Act and the Commission's rules and orders by using a telephone facsimile machine, computer, or other device to send the 489 unsolicited advertisements identified in Table 1 and discussed above. We have further determined that Fax.com is apparently liable for forfeitures in the amount of $ 5,379,000.

28. Accordingly, IT IS ORDERED, pursuant to section 503(b)(5) of the Act, as amended, 47 U.S.C. § 503(b)(5), and section 1.80 of the Commission's rules, 47 C.F.R. § 1.80, that Fax.com, Inc. IS HEREBY NOTIFIED of an Apparent Liability for Forfeiture in the amount of $ 5,379,000 for willful or repeated violations of section 227(b)(1)(C) of the Act, 47 U.S.C. **[*15944]** § 227(b)(1)(C), and section 64.1200(a)(3) of the Commission's rules, 47 C.F.R. § 64.1200(a)(3), and the related orders described in the paragraphs above.

29. IT IS FURTHER ORDERED, pursuant to section 1.80 of the Commission's rules, 47 C.F.R. § 1.80, that within thirty (30) days of the release of this Notice, Fax.com, Inc. SHALL PAY the full amount of **[**43]** the proposed forfeiture n71 OR SHALL FILE a response showing why the proposed forfeiture should not be imposed or should be reduced.

n71 The forfeiture amount should be paid by check or money order drawn to the order of the Federal Communications Commission. Reference should be made on Fax.com, Inc.'s check or money order to "NAL/Acct/No. 200232170004." Such remittances must be mailed to Forfeiture Collection Section, Finance Branch, Federal Communications Commission, P.O. Box 73482, Chicago, Illinois 60673-7482.

30. IT IS FURTHER ORDERED that a copy of this Notice of Apparent Liability for Forfeiture SHALL BE SENT by certified mail to Kevin Katz, President, Fax.com, Inc., 120 Columbia Street, Suite 500, Aliso Viejo, California 92656.

Marlene H. Dortch

Secretary

**CONCUR BY:**
ABERNATHY

**CONCUR:**
**[*15945]**

## SEPARATE STATEMENT OF COMMISSIONER KATHLEEN Q. ABERNATHY

*Re: Fax.com Apparent Liability for Forfeiture, File No. EB-02-TC-120, NAL/Acct. No. 200232170004*

I strongly support this Notice of Apparent Liability and hope that other fax broadcasters will take notice that the Commission will strictly enforce the Telephone Consumer Protection Act. As set forth in detail in the NAL, Fax.com appears to have founded **[**44]** its business on the practice of sending unsolicited faxes in flagrant violation of the TCPA. The record also suggests that Fax.com deliberately misled consumers regarding the company's requirements and

consumers' rights under the TCPA. Despite repeated warnings from the Commission and numerous consumer complaints, the company appears to have made no effort to mend its ways. As a result, many consumers have been harassed in their homes and had their businesses disrupted by unwanted fax solicitations--and, adding insult to injury, were forced to pay for this privilege.

This NAL makes clear that the Commission will not tolerate such conduct; indeed, we propose to punish Fax.com to the maximum extent of our statutory authority. When I became a Commissioner, I pledged to protect consumers by stringently enforcing the Communications Act and the Commission's rules. I am proud that the Commission is taking this responsibility seriously and sending such a strong signal that companies cannot violate the law with impunity.

## APPENDIX:
## TABLE 1

**Unsolicited Advertisements Transmitted by Fax.com and Subject to Forfeiture Pursuant to FCC 02-226**

**(Fax.com, Inc., Notice of Apparent Liability for Forfeiture) [**45]**

| FAX RECIPIENT | NUMBER OF FAXES | DATE FAX RECEIVED | ADVERTISER (Bold type denotes advertiser that is not identified by fax text) | FAX.COM OPT-OUT NUMBER |
|---|---|---|---|---|
| Thomas W. Bell, Jr. (Accredo Health, Inc.) | | 12/10/01 | Vacation Getaway Travel, Inc. | 800-822-9033 |
| | | 12/12/01 | Mortgage Market | 800-443-7628 |
| | 3 | 1/7/002 | Tower Group | 800-457-5410 |
| Cappy Caplan (MRO Electronic Distributors, Inc.) | 1 | 1/15/02 | Stock Traders Alert | 800-785-8505 |
| Lucretia A. Cartharius (Rosenbaum Investments) | | 11/20/01 | Stockscape Network Group (Small Cap Central) | 800-443-7628 |
| | | 11/26/01 | Media Broadcast Solutions (Wall Street Examiner) | 800-443-7628 |
| | | 11/27/01 | Central Imaging Supply | 800-457-5410 |
| | | 12/7/01 | Vacation Getaway Travel, Inc | 800-822-9033 |
| | 5 | 2/22/02 | Vacation Getaway Travel, Inc. | 800-822-9033 |
| Robert Isaac Carr | | 12/10/01 | Advanced Communications | 800-785-6698 |
| | | 12/17/01 | Media Broadcast | 800-443-7628 |

|  |  |  |  |  |
|---|---|---|---|---|
|  |  |  | Solutions (Wall Street Examiner) |  |
|  |  | 12/27/01 | Cell Direct | 800-965-7235 |
|  |  | 12/27/01 | Vacation Getaway Travel, Inc | 800-822-9033 |
|  |  | 1/6/02 | Y2 Marketing | 800-822-9033 |
|  |  | 1/9/02 | eStock Pick of the Week | 800-331-4510 |
|  |  | 1/12/02 | Y2 Marketing | 800-822-9033 |
|  |  | 1/15/02 | Advanced Communications | 800-785-6698 |
|  |  | 1/16/02 | Office Warehouse | 800-822-9033 |
|  |  | 1/17/02 | Union Trust Mortgage | 800-443-7628 |
|  |  | 1/17/02 | Office Warehouse | 800-822-9033 |
|  |  | 1/18/02 | Investors Today | 800-331-4510 |
|  |  | 1/23/02 | Wireless Center | 800-822-9033 |
|  |  | 1/28/02 | Office Warehouse | 800-766-0816 |
|  |  | 1/29/02 | Axin Corporation | 800-822-9033 |
|  |  | 2/1/02 | Vacation Showroom ("Corporate Travel Division") | 800-822-9033 |
|  |  | 2/10/02 | Y2 Marketing | 800-766-0816 |
|  |  | 2/13/02 | Vacation Getaway Travel, Inc. | 800-822-9033 |
|  |  | 2/14/02 | Bentley Mortgage | 800-822-9033 |
|  |  | 2/19/02 | Vacation Warehouse | 800-443-7628 |
|  |  | 2/27/02 | Advanced Communications | 800-785-6698 |
|  |  | 3/4/02 | National Communications | 800-822-9033 |
|  |  | 3/6/02 | Vacation Warehouse | 800-822-9033 |
|  |  | 3/14/02 | Altimate Marketing | 800-976-3734 |
|  |  | 3/19//02 | LifeQuotes of America, Inc. | 800-976-3734 |
|  |  | 3/28/02 | Apollo Transportation | 800-822-9033 |
|  | 27 | 3/28/02 | Partnership for Education | 800-976-3734 |
| Terry Powell Carter | 1 | 10/10/01 | Advanced Communications | 800-785-6698 |
| Gary Chou (United States Department of the Treasury, Internal Revenue Service) |  | 10/3/01 | Advanced Communications | 800-785-6698 |
|  |  | 10/6/01 | Y2 Marketing | 800-822-9033 |
|  |  | 10/11/01 | Central Imaging Supply | 800-457-5410 |

| | | | | |
|---|---|---|---|---|
| | | (1:51 p.m.) | | |
| | | 10/11/01 | Central Imaging Supply | 800-457-5410 |
| | | (2:00 p.m.) | | |
| | | 10/16/01 | Media Broadcast Solutions (Wall Street Examiner) | 800-766-0816 |
| | | 10/30/01 | Moneyline Report | 800-364-0216 |
| | | 11/1/01 | First Chartered Investments | 800-443-5716 |
| | | 11/2/01 | Businesscoach.com | 800-766-0816 |
| | | 12/10/01 | Call Center Network - The Wireless Center | 800-822-9033 |
| | | 1/7/02 | Y2 Marketing | 800-766-0816 |
| | | 1/9/02 | Elite Communications | 800-822-9033 |
| | | 1/15/02 | Equity Market Watch | 800-766-0816 |
| | | 1/23/02 | Call Center Network | 800-822-9033 |
| | | 2/6/02 | Tallclocks, Inc. | 800-457-5410 |
| | | 2/7/02 | Elite Communications | 800-766-0816 |
| | 16 | 3/7/02 | Y2 Marketing | 800-663-8758 |
| Sally Collins | | 12/11/01 | First Chartercd Investments | 800-443-5716 |
| | 2 | 12/13/01 | Media Broadcast Solutions (Wall Street Examiner) | 800-443-7628 |
| Elkins Cox | 1 | 9/5/01 | Florida Reservations | 877-276-1974 |
| George D. Demet | | 9/6/01 | LifeQuotes of America, Inc. | 800-443-7628 |
| (Palantir.net) | | | | |
| | | 9/27/01 | Axin Corporation | 800-822-9033 |
| | | 9/28/01 | American Cellular Inc. | 800-822-9033 |
| | | 10/11/01 | Cell Direct | 800-822-9033 |
| | | 10/11/01 | Wall Street Alert | 800-785-6698 |
| | | 10/16/01 | Moneyline Report | 800-364-0216 |
| | | 10/24/01 | Axin Corporation | 800-822-9033 |
| | | 10/26/01 | Cell Direct | 800-822-9033 |
| | | 10/30/01 | Moneyline Report | 800-364-0216 |
| | | 11/13/01 | Stock Traders Alert | 800-785-8505 |
| | | 11/28/01 | Kit Stuff Wireless | 800-822-9033 |
| | | 11/29/01 | Telecommservices.net (Fine Telecommunications, Inc.) | 800-965-7235 |
| | | 11/29/01 | Office Warehouse | 800-822-9033 |
| | | 11/29/01 | Media Broadcast Solutions (Wall Street Examiner) | 800-443-7628 |

|  |  | 12/5/01 | Bullish Report | 800-331-4510 |
|  |  | 12/10/01 | Media Broadcast Solutions (Wall Street Examiner) | 800-443-7628 |
|  |  | 12/21/01 | eStock Pick of The Week | 800-331-4510 |
|  |  | 12/26/01 | Cell Direct | 800-822-9033 |
|  |  | 1/3/02 | Office Warehouse | 800-766-0816 |
|  |  | 1/8/02 | Y2 Marketing | 800-766-0816 |
|  |  | 1/10/02 | Altimate Marketing | 800-976-3734 |
|  |  | 1/10/02 | Bullish Report | 800-331-4510 |
|  |  | 1/22/01 | Cell Direct | 800-822-9033 |
|  |  | 1/24/02 | Axin Corporation | 800-822-9033 |
|  |  | 1/27/02 | Y2 Marketing | 800-766-0816 |
|  |  | 1/29/02 | Telecommservices.net (Fine Telecommunications, Inc.) | 800-965-7235 |
|  |  | 2/2/02 | Y2 Marketing | 800-766-0816 |
|  |  | 2/7/02 | Bridge 21/Financial Management Solutions | 800-766-0816 |
|  | 29 | 2/12/02 | Office Warehouse | 800-822-9033 |
| James Allan Dobbins | 1 | 10/24/01 | Ticket Solutions | 800-822-9033 |
| L. ("Les") R. Docks |  | 10/31/01 | Absolute Wireless | 800-443-7628 |
|  |  | 11/2/01 | Central Imaging Supply | 800-457-5410 |
|  |  | 11/8/01 | Central Imaging Supply | 800-457-5410 |
|  |  | 11/13/01 | Dr. Roger Arredondo | 800-443-7628 |
|  |  | 11/14/01 | Advanced Communications | 800-785-6698 |
|  |  | 11/19/01 | Central Imaging Supply | 800-457-5410 |
|  |  | 11/20/01 | Stock Traders Alert | 800-785-8505 |
|  |  | 11/20/01 | Satellite Country | 800-766-0816 |
|  |  | 11/30/01 | Y2 Marketing | 800-822-9033 |
|  |  | 12/5/01 | Dr. Roger Arredondo | 800-822-9033 |
|  |  | 12/11/01 | Absolute Wireless | 800-822-9033 |
|  |  | 12/18/01 | Absolute Wireless | 800-822-9033 |
|  |  | 12/28/01 | Cell Direct | 800-965-7235 |
|  |  | 12/30/01 | Y2 Marketing | 800-822-9033 |
|  |  | 1/2/02 | Union Trust Mortgage | 800-766-0816 |
|  |  | 1/4/02 | Axin Corporation | 800-822-9033 |
|  |  | 1/6/02 | Y2 Marketing | 800-822-9033 |
|  |  | 1/7/02 | Vacation Getaway Travel, Inc. | 800-822-9033 |
|  |  | 1/7/02 | Tallclocks, Inc. | 800-457-5410 |

| | | Date | Name | Phone |
|---|---|---|---|---|
| | | 1/9/02 | Holiday Orlando ("Travel News Release") | 800-457-5410 |
| | | 1/15/02 | Dr. Roger Arredondo | 800-822-9033 |
| | | 1/17/02 | Holiday Orlando ("Travel News Release") | 800-457-5410 |
| | | 1/26/02 | Y2 Marketing | 800-766-0816 |
| | 24 | 1/29/02 | Cell Direct | 800-965-7235 |
| Richard Don | | 10/11/01 | Wall Street Alert | 800-785-6698 |
| | 2 | 10/16/01 | Moneyline Report | 800-364-0216 |
| Robert R. Dzimidas | | 10/30/01 | Moneyline Report | 800-364-0216 |
| | | 11/1/01 | Strategic Stock Intelligence, Inc. | 800-443-7628 |
| | | 11/1/01 | Investor's Business Report (The Wall Street Alert) | 800-785-6698 |
| | | 11/6/01 | Wall Street Alert | 800-785-6698 |
| | | 11/13/01 | American Cellular Inc. | 800-822-9033 |
| | | 11/14/01 | Wall Street Investment Alert | 800-443-7628 |
| | | 11/14/01 | DSC Inc. (Digital Systems Concepts, Inc.). | 800-822-9033 |
| | | 11/14/01 | Wall Street Outlook | 800-443-7628 |
| | | 11/19/01 | Stock Traders Alert | 800-785-8505 |
| | | 11/27/01 | JWP | 800-822-9033 |
| | | 11/28/01 | Media Broadcast Solutions (Wall Street Examiner) | 800-443-7628 |
| | | 11/30/01 | Advanced Communications | 800-785-6698 |
| | | 12/4/01 | Wall Street Investment Alert | 800-331-4510 |
| | | 12/4/01 | Investors Today | 800-331-4510 |
| | | 12/5/01 | Bullish Report | 800-331-4510 |
| | | 12/6/01 | Moneyline Report | 800-364-0216 |
| | | 12/6/01 | Wireless Connections | 800-822-9033 |
| | | 12/9/01 | Y2 Marketing | 800-822-9033 |
| | | 12/11/01 | NBM Information | 800-331-4510 |
| | | 12/17/01 | American Cellular Inc. | 800-822-9033 |
| | 21 | 1/15/02 | Stock Traders Alert | 800-785-8505 |
| Cheryl Edmondson (Applied Communication Systems, Inc.) | | 10/8/01 | LifeQuotes of America, Inc. | 800-443-7628 |

| | | | |
|---|---|---|---|
| | | 10/10/01 (1:03 a.m.) | Wall Street Alert | 800-785-6698 |
| | 3 | 10/10/01 (9:31 p.m.) | Wall Street Alert | 800-785-6698 |
| Lori Frayne (Hasty Air Freight, Inc.) | | 9/13/01 | Wireless Connections | 800-822-9033 |
| | | 10/2/01 | DSC Inc. (Digital Systems Concepts, Inc.) | 800-766-0816 |
| | | 10/3/01 | Wall Street Alert | 800-785-6698 |
| | 4 | 10/5/01 | Wireless Telecom | 800-822-9033 |
| Allan Howard Frey | | 11/28/01 | Media Broadcast Solutions (Wall Street Examiner) | 800-443-7628 |
| | | 11/29/01 | Central Imaging Supply | 800-457-5410 |
| | | 12/12/01 | Media Broadcast Solutions (Wall Street Examiner) | 800-443-7628 |
| | | 1/4/02 | Holiday Management Group | 800-457-5410 |
| | | 1/10/02 | Advanced Communications | 800-785-6698 |
| | | 2/9/02 | Y2 Marketing | 800-766-0816 |
| | | 2/11/02 | Vacation Warehouse | 800-663-8758 |
| | | 2/14/02 | Stock Traders Alert | 800-785-8505 |
| | | 2/15/02 | Vacation Showroom ("Corporate Travel Division") | 800-822-9033 |
| | | 2/17/02 | Y2 Marketing | 800-766-0816 |
| | | 2/20/02 | DreamQuest International Travel | 800-766-0816 |
| | | 2/22/02 | Vacation Getaway Travel, Inc. | 800-457-5410 |
| | | 2/27/02 | Advanced Communications | 800-785-6698 |
| | | 3/4/02 | Futuredreams | 800-822-9033 |
| | | 3/4/02 | Bridge 21/American Financial Services | 800-976-3834 |
| | | 3/6/02 | Vacation Center | 800-822-9033 |
| | | 3/11/02 | Vacation Getaway Travel, Inc. | 800-822-9033 |
| | | 3/20/02 | Vacation Getaway Travel, Inc. | 800-457-5410 |
| | | 3/26/02 | Vacation Center | 800-822-9033 |
| | | 3/28/02 | Cell Direct | 800-766-0816 |
| | 21 | 4/3/02 | Greater Orlando | 800-822-9033 |

| | | | Vacation | |
|---|---|---|---|---|
| Richard V. N. Ginn | | 3/6/02 | Y2 Marketing | 800-663-8758 |
| | 2 | 3/15/02 | Vacation Center | 800-822-9033 |
| Charles L. Gomes | 1 | 10/12/01 | Y2 Marketing | 800-822-9033 |
| Dora Wong Goto | | 9/25/01 | Tallclocks, Inc. | 800-822-9033 |
| | 2 | 9/28/01 | Advanced Communications | 800-785-6698 |
| Steven M. Greenberg | 1 | 12/7/01 | Media Broadcast Solutions (Wall Street Examiner) | 800-443-7628 |
| Bathsheba L. Grossman (Protoshape) | | 1/30/02 | Vacation Getaway Travel, Inc. | 800-822-9033 |
| | | 2/6/02 | Elite Communications | 800-766-0816 |
| | 3 | 2/7/02 | Global Key Holiday International a.k.a.Fantasy Marketing and Research | 800-443-7628 |
| Andrew Hansis | | 10/4/01 | Call Center Network | 800-822-9033 |
| | 2 | 10/5/01 | Elite Communications | 800-822-9033 |
| Heather Ann Hartnett | | 10/5/01 | Central Imaging Supply | 800-457-5410 |
| | | 10/9/01 | Rosenbaum Chiropractic and Carpal Tunnel Clinic | 800-965-7235 |
| | | 10/29/01 | Strategic Stock Intelligence, Inc. | 800-443-7628 |
| | | 11/1/01 | South Cooper Auto Mart | 800-443-7628 |
| | | 11/1/01 | Advanced Communications | 800-785-6698 |
| | | 11/2/01 | Infinity Communications | 800-822-9033 |
| | | 11/6/01 | Strategic Stock Intelligence, Inc. | 800-443-7628 |
| | | 11/6/01 | Rosenbaum Chiropractic and Carpal Tunnel Clinic | 800-965-7235 |
| | | 11/20/01 | Strategic Stock Intelligence, Inc. | 800-443-7628 |
| | | 11/28/01 | Quality Auto Mart | 800-443-7628 |
| | | 11/30/01 | South Cooper Auto Mart | 800-443-7628 |
| | | 12/3/01 | Advanced Communications | 800-785-6698 |

|  |  | 12/4/01 | Union Trust Mortgage | 800-766-0816 |
|  |  | 12/5/01 | Holiday Management Group | 800-457-5410 |
|  |  | 12/12/01 | Infinity Communications | 800-822-9033 |
|  |  | 12/12/01 | Rosenbaum Chiropractic and Carpal Tunnel Clinic | 800-965-7235 |
|  |  | 12/13/01 | South Cooper Auto Mart | 800-822-9033 |
|  |  | 12/17/01 | Cell Direct | 800-965-7235 |
|  |  | 12/19/01 | South Cooper Auto Mart | 800-822-9033 |
|  |  | 12/21/01 | Holiday Management Group | 800-457-5410 |
|  |  | 12/31/01 | Fax.com | 800-443-7628 |
|  |  | 1/8/02 | Advanced Communications | 800-785-6698 |
|  |  | 1/16/02 | American Marble Liquidators | 800-822-9033 |
|  |  | 1/17/02 | Vacation Getaway Travel, Inc. | 800-457-5410 |
|  |  | 1/28/02 | Vacation Center | 800-822-9033 |
|  |  | 2/6/02 | Holiday Management Group | 800-457-5410 |
|  |  | 2/7/02 | Vacation Center | 800-822-9033 |
|  |  | 2/11/02 | Advanced Communications | 800-785-6698 |
|  |  | 2/18/02 | Holiday Management Group | 800-457-5410 |
|  | 30 | 2/19/02 | Carpal Tunnel Injury Center | 800-766-0816 |
| Norman B. Jensen, III |  | 10/2/01 | Orlando Promotions, Inc. | 800-443-7628 |
|  |  | 12/12/01 | Office Warehouse | 800-822-9033 |
|  | 3 | 1/31/02 | DreamQuest Travel | 800-766-0816 |
| Suzie Johnson |  | 11/5/01 | Advanced Communications | 800-785-6698 |
|  |  | 11/9/01 | Stockscape Network Group (Small Cap Central) | 800-443-7628 |
|  |  | 11/19/01 | Infinity Communications | 800-822-9033 |
|  |  | 12/3/01 | Advanced Communications | 800-785-6698 |
|  |  | 12/11/01 | Media Broadcast Solutions (Wall Street Examiner) | 800-443-7628 |

| | | | |
|---|---|---|---|
| | 12/11/01 | Cell Direct | 800-965-7235 |
| | 12/19/01 | Vacation Getaway Travel, Inc. | 800-822-9033 |
| | 1/4/02 | Advanced Communications | 800-785-6698 |
| | 1/7/02 | Cell Direct | 800-965-7235 |
| | 1/10/02 | Infinity Communications | 800-822-9033 |
| 11 | 1/16/02 | Vacation Getaway Travel, Inc. | 800-822-9033 |
| John Koltun (Geographic Resources Solutions | 12/14/01 | Bagoba | 800-443-7620 |
| | 1/10/01 | Accounting Solutions | 800-822-9033 |
| 3 | 1/15/01 | Vacation Getaway Travel, Inc. | 800-457-5410 |
| Nathaniel Kramer | 1 | 5/2/02 | Advanced Communications | 800-785-6698 |
| Anne McCarten-Gibbs (Words That Work) | 12/6/01 | Call Center Network | 800-822-9033 |
| | 12/7/01 | Central Imaging Supply | 800-457-5410 |
| | 12/7/01 | Y2 Marketing | 800-822-9033 |
| | 12/14/01 | Veb Tickets | 800-822-9033 |
| | 12/20/01 | Call Center Network | 800-822-9033 |
| | 12/20/01 | Vacation Getaway Travel, Inc. | 800-822-9033 |
| 7 | 12/27/01 | Call Center Network | 800-822-9033 |
| Douglas M. McKenna - residential line | 9/17/01 | Burt Custom Finance | 800-443-7628 |
| | 9/20/01 | Central Imaging Supply | 800-457-5410 |
| | 10/15/01 | Burt Custom Finance | 800-443-7628 |
| | 10/16/01 | Vacation Getaway Travel, Inc. | 800-822-9033 |
| | 10/17/01 | Advanced Communications | 800-785-6698 |
| | 10/24/01 | Investor's Business Report | 800-785-6698 |
| | 10/30/01 | Moneyline Report | 800-364-0216 |
| | 11/5/01 | Burt Custom Finance | 800-443-7628 |
| | 11/6/01 | Vacation Getaway Travel, Inc. | 800-822-9033 |
| | 11/14/01 | Infinity Communications | 800-822-9033 |

| | | | | |
|---|---|---|---|---|
| | 11/14/01 | Y2 Marketing | 800-822-9033 |
| | 11/19/01 | Choice Wireless | 800-822-9033 |
| | 11/21/01 | Central Imaging Supply | 800-457-5410 |
| | 11/28/01 | Central Imaging Supply | 800-457-5410 |
| | 11/29/01 | Advanced Communications | 800-785-6698 |
| | 12/2/01 | Y2 Marketing | 800-822-9033 |
| | 12/4/01 | Strategic Stock Intelligence, Inc. | 800-331-4510 |
| | 12/7/01 | Vacation Getaway Travel, Inc. | 800-822-9033 |
| | 12/26/01 | Holiday Management Group | 800-457-5410 |
| | 1/2/02 | Advanced Communications | 800-785-6698 |
| | 1/17/02 | eStock Pick of The Week | 800-331-4510 |
| | 2/13/02 | eStock Pick of The Week | 800-331-4510 |
| | 2/17/02 | Y2 Marketing | 800-822-9033 |
| | 2/20/02 | Vacation Getaway Travel, Inc. | 800-457-5410 |
| | 2/27/02 | New Century Mortgage Corporation | 800-443-7628 |
| | 2/28/02 | Stockscape Network Group (Small Cap Central) | 800-364-0216 |
| | 2/28/02 | Travel To Go | 800-822-9033 |
| 28 | 3/6/02 | Burt Custom Finance | 800-822-9033 |
| Douglas M. McKenna (President, Mathemaesthetics, Inc.) - business line | 9/4/01 | Vacation Getaway Travel, Inc. | 800-443-7628 |
| | 9/7/01 | MBA Financial Group | 800-443-7628 |
| | 9/10/01 | Central Imaging Supply | 800-457-5410 |
| | 9/13/01 | Advanced Communications | 800-785-6698 |
| | 9/24/01 | Rocky Mountain Financial | 800-443-5716 |
| | 9/28/01 | Burt Custom Finance | 800-443-7628 |
| | 10/8/01 | Central Imaging Supply | 800-457-5410 |
| | 10/17/01 | Vacation Getaway | 800-822-9033 |

| | Travel, Inc. | |
|---|---|---|
| 10/22/01 | Advanced Communications | 800-785-6698 |
| 10/25/01 | Market Wizard Alerts | 800-331-3622 |
| 10/29/01 | Burt Custom Finance | 800-443-7628 |
| 10/29/01 | Central Imaging Supply | 800-457-5410 |
| 11/5/01 | Vacation Getaway Travel, Inc. | 800-822-9033 |
| 11/7/01 | Wall Street Reporter | 800-364-0216 |
| 11/7/01 | Investor's Business Report | 800-785-6698 |
| 11/13/01 | Kit Stuff Wireless/Keep In Touch Stuff | 800-822-9033 |
| 11/14/01 | Choice Wireless | 800-822-9033 |
| 11/14/01 | Y2 Marketing | 800-822-9033 |
| 11/15/01 | Infinity Communications | 800-822-9033 |
| 11/16/01 | Wall Street Outlook | 800-443-7628 |
| 11/20/01 | Stockscape Network Group (Small Cap Central) | 800-443-7628 |
| 11/26/01 | Media Broadcast Solutions (Wall Street Examiner) | 800-443-7628 |
| 11/27/01 | Strategic Stock Intelligence, Inc. | 800-443-7628 |
| 11/28/01 | Advanced Communications | 800-785-6698 |
| 11/29/01 | Market Advisors | 800-331-4510 |
| 12/2/01 | Y2 Marketing | 800-822-9033 |
| 12/4/01 | Wall Street Reporter | 800-364-0216 |
| 12/5/01 | Media Broadcast Solutions (Wall Street Examiner) | 800-443-7628 |
| 12/7/01 | Bullish Report | 800-331-4510 |
| 12/10/01 | Bullish Report | 800-331-4510 |
| 12/11/01 | Media Broadcast Solutions (Wall Street Examiner) | 800-443-7628 |
| 12/18/01 | DMGI, Inc. (NAVADA) | 800-443-7620 |
| 12/20/01 | Advanced Communications | 800-785-6698 |
| 1/15/02 | Stock Traders Alert | 800-785-8505 |
| 1/15/02 | Holiday Management Group | 800-457-5410 |
| 1/16/02 | Equity Market Watch | 800-766-0816 |

|       |         |                                                         |              |
| ----- | ------- | ------------------------------------------------------- | ------------ |
|       | 1/22/02 | Equity Market Watch                                     | 800-822-9033 |
|       | 1/23/02 | A2Z Financial                                           | 800-965-7235 |
|       | 1/23/02 | Equity Market Watch                                     | 800-766-0816 |
|       | 1/28/02 | IDC Solutions (Independent Dish Contractors Solutions)  | 800-822-9033 |
|       | 2/5/02  | Wall Street Equity Report                               | 800-331-4510 |
|       | 2/5/02  | Central Imaging Supply                                  | 800-976-3734 |
|       | 2/7/02  | Equity Market Watch                                     | 800-976-3734 |
|       | 2/8/02  | Equity Market Watch                                     | 800-766-0816 |
|       | 2/13/02 | eStock Pick of The Week                                 | 800-331-4510 |
|       | 2/16/02 | Y2 Marketing                                            | 800-822-9033 |
|       | 2/22/02 | Financial Freedom Report                                | 800-331-4510 |
|       | 2/27/02 | New Century Mortgage Corporation                        | 800-443-7628 |
|       | 2/27/02 | Bullish Report                                          | 800-331-4510 |
|       | 3/1/02  | Travel To Go                                            | 800-822-9033 |
|       | 3/14/02 | Vacation Getaway Travel, Inc.                           | 800-457-5410 |
|       | 3/18/02 | Premium Ink                                             | 800-766-0816 |
|       | 3/26/02 | Advanced Communications                                 | 800-785-6698 |
|       | 3/30/03 | Y2 Marketing                                            | 800-822-9033 |
|       | 4/9/02  | Travel To Go                                            | 800-822-9033 |
|       | 4/9/02  | Tallclocks, Inc.                                        | 800-457-5410 |
|       | 4/9/02  | Wall Street OTC                                         | 800-331-4510 |
|       | 4/17/02 | Strategic Stock Intelligence, Inc.                      | 800-976-3734 |
|       | 4/18/02 | Toner Zone                                              | 800-976-3734 |
|       | 4/21/02 | Wall Street Watch                                       | 800-766-0816 |
|       | 4/22/02 | eStock Pick of The Week                                 | 800-331-4510 |
|       | 4/23/02 | Wall Street Watch                                       | 800-766-0816 |
|       | 4/29/02 | Great West Funding                                      | 800-965-7235 |
|       | 4/29/02 | Wall Street Watch                                       | 800-766-0816 |
|       | 4/29/02 | Bull Run Report                                         | 800-822-9033 |
|       | 4/30/02 | Wall Street Watch                                       | 800-766-0816 |
| 67    | 5/1/02  | DSC Inc. (Digital Systems Concepts, Inc.)               | 800-822-9033 |

Robert R. McMeekin, M.D.

|         |                        |              |
| ------- | ---------------------- | ------------ |
| 10/2/01 | Advanced Communications | 800-785-6698 |

|  |  | 10/31/01 | Central Imaging Supply | 800-457-5410 |
|---|---|---|---|---|
|  |  | 12/31/01 | Cell Direct | 800-766-0816 |
|  |  | 1/3/02 | Holiday Management Group | 800-457-5410 |
|  |  | 1/11/02 | Advanced Communications | 800-785-6698 |
|  |  | 1/16/02 | Vacation Center | 800-822-9033 |
|  |  | 1/30/02 | Axin Corporation | 800-822-9033 |
|  |  | 2/4/02 | Central Imaging Supply | 800-976-3734 |
|  | 9 | 4/3/02 | Tallclocks, Inc. | 800-457-5410 |
| Karl Narveson | 1 | 1/15/02 | Tallclocks, Inc. | 800-457-5410 |
| Nancy North |  | 9/26/01 | Satellite Country | 800-443-7628 |
|  |  | 9/28/01 | Central Imaging Supply | 800-457-5410 |
|  | 3 | 10/2/01 | Dr. Roger Arredondo | 800-443-7628 |
| Elena C. Rau | 1 | 11/1/01 | American Cellular Inc. | 800-822-9033 |
| Cheryl S. Sandor | 1 | 11/15/01 | Central Imaging Supply | 800-457-5410 |
| (K.C. Enterprises of Vero Beach d.b.a. Vero Glass And Mirror) |  |  |  |  |
| David Schoeller (Independent Medical Evaluations, Inc.) |  | 10/18/01 | Infinity Communications | 800-822-9033 |
|  |  | 10/25/01 | Infinity Communications | 800-822-9033 |
|  |  | 11/27/01 | Cell Direct | 800-766-0816 |
|  |  | 1/7/02 | Cell Direct | 800-766-0816 |
|  |  | 1/10/02 | Advanced Communications | 800-785-6698 |
|  | 6 | 1/20/02 | Cell Direct | 800-766-0816 |
| Vernon Schryver (Rhyolite Software) |  | 9/5/01 | Vacation Getaway Travel, Inc. | 800-443-7628 |
|  |  | 9/6/01 | Burt Custom Finance | 800-443-7628 |
|  |  | 10/15/01 | Vacation Getaway Travel, Inc. | 800-822-9033 |
|  |  | 10/24/01 | Investor's Business Report | 800-785-6698 |
|  |  | 10/31/01 | Burt Custom Finance | 800-443-7628 |
|  |  | 11/6/01 | Vacation Getaway Travel, Inc. | 800-822-9033 |
|  |  | 1/15/02 | 4 B's Ventures, Inc. | 800-443-7628 |
|  |  | 1/17/02 | eStock Pick of The Week | 800-331-4510 |

|  | 1/23/02 | Clarion Mortgage | 800-965-7235 |
|---|---|---|---|
|  | 1/28/02 | IDC Solutions (Independent Dish Contractors Solutions) | 800-822-9033 |
|  | 1/29/02 | IDC Solutions (Independent Dish Contractors Solutions) | 800-822-9033 |
|  | 1/30/02 | Advanced Communications | 800-785-6698 |
|  | 2/1/02 | Equity Market Watch | 800-766-0816 |
|  | 2/6/02 | Jerve Dominguez d.b.a. AAAOpp.com | 800-822-9033 |
| 15 | 2/7/02 | Central Imaging Supply | 800-766-0816 |
| Gene Sellards | 10/2/01 | Orlando Promotions, Inc. | 800-443-7628 |
|  | 10/10/01 | Wall Street Alert | 800-785-6698 |
|  | 10/11/01 | Wall Street Alert | 800-785-6698 |
|  | 10/15/01 | Vacation Getaway Travel, Inc. | 800-822-9033 |
|  | 10/15/01 | Advanced Communications | 800-785-6698 |
|  | 10/22/01 | Central Imaging Supply | 800-457-5410 |
|  | 11/2/01 | Y2 Marketing | 800-822-9033 |
|  | 11/8/01 | Strategic Stock Intelligence, Inc. | 800-443-7628 |
|  | 11/9/01 | Y2 Marketing | 800-822-9033 |
| 10 | 11/13/01 | Central Imaging Supply | 800-457-5410 |
| John C. Steinberger | 5/23/02 | Advanced Communications | 800-785-6698 |
| 2 | 6/10/02 | Vacation Center of Delaware | 800-822-9033 |
| John P. Strang | 9/11/01 | Lexington Chiropractic Associates | 877-276-1974 |
|  | 10/16/01 | Moneyline Report | 800-364-0216 |
|  | 10/17/01 | Advanced Communications | 800-785-6698 |
|  | 10/29/01 | Wall Street Alert | 800-785-6698 |
|  | 10/29/01 | Dr. John Jurcisin | 877-276-1974 |
|  | 11/2/01 | Central Imaging Supply | 800-457-5410 |
|  | 11/6/01 | Lexington Chiropractic Associates | 877-276-1974 |

|  |  |  |  |
|---|---|---|---|
|  | 11/8/01 | Tallclocks, Inc. | 800-822-9033 |
|  | 11/14/01 | Dr. John Jurcisin | 877-276-1974 |
|  | 11/15/01 | Vacation Getaway Travel, Inc. | 800-822-9033 |
|  | 11/19/01 | Advanced Communications | 800-785-6698 |
|  | 11/27/01 | Legacy Quote | 800-443-7628 |
|  | 11/28/01 | Lexington Chiropractic Associates | 877-276-1974 |
|  | 11/29/01 (5:14) | Stockscape Network Group (Small Cap Central) | 800-443-7628 |
|  | 11/29/01 (8:39) | Stockscape Network Group (Small Cap Central) | 800-443-7628 |
|  | 12/5/01 | Kit Stuff Wireless/Elephant Wireless | 800-822-9033 |
|  | 12/7/01 | Media Broadcast Solutions (Wall Street Examiner) | 800-443-7628 |
|  | 12/14/01 | Advanced Communications | 800-785-6698 |
|  | 12/17/01 | Media Broadcast Solutions (Wall Street Examiner) | 800-443-7628 |
|  | 1/9/02 | Lexington Chiropractic Associates | 877-276-1974 |
|  | 1/10/02 | Discount Funding Associates, Inc. | 800-822-9033 |
|  | 1/15/02 | Media Broadcast Solutions (The Stock Bulletin) | 800-766-0816 |
|  | 1/15/02 | Dr. John Jurcisin | 877-276-1974 |
|  | 1/18/02 | Lana Rozenberg, DDS | 800-443-7628 |
|  | 1/29/02 | Wall Street Equity Report | 800-331-4510 |
|  | 2/1/02 | Vacation Center | 800-822-9033 |
|  | 2/3/02 | Y2 Marketing | 800-766-0816 |
|  | 2/7/02 | Financial Freedom Report | 800-331-4510 |
|  | 2/11/02 | Midtown Medical and Health Offices, P.C. | 800-766-0816 |
| 30 | 2/12/02 | Quote Master USA Ltd. | 800-443-7628 |
| Wayne George Strang | 10/1/01 | Elite Communications | 800-822-9033 |

| 10/5/01 | Call Center Network - The Wireless Center | 800-822-9033 |
|---|---|---|
| 10/16/01 | Wall Street Alert | 800-785-6698 |
| 10/17/01 | Elite Communications | 800-822-9033 |
| 10/22/01 | Creative Solutions | 800-443-7628 |
| 10/23/01 | Dishmaster | 800-822-9033 |
| 10/23/01 | Elite Communications | 800-822-9033 |
| 10/24/01 | Central Imaging Supply | 800-457-5410 |
| 10/25/01 | Infinity Communications | 800-822-9033 |
| 1/14/02 | IDC Solutions (Independent Dish Contractors Solutions) | 800-822-9033 |
| 1/16/02 | Tallclocks, Inc. | 800-457-5410 |
| 1/19/02 | Y2 Marketing | 800-822-9033 |
| 1/22/02 | Elite Communications | 800-976-3734 |
| 1/31/02 | Holiday Management Group | 800-457-5410 |
| 2/7/02 | American Benefit Mortgage, Inc. | 800-992-5329 |
| 2/8/02 | Elite Communications | 800-822-9033 |
| 2/14/02 | Central Imaging Supply | 800-457-5410 |
| 2/16/02 | Y2 Marketing | 800-766-0816 |
| 2/19/02 | Elite Communications | 800-766-0816 |
| 2/24/02 | Y2 Marketing | 800-766-0816 |
| 2/25/02 | DreamQuest International Travel | 800-766-0816 |
| 3/6/02 | Elite Communications | 800-766-0816 |
| 3/7/02 | Holiday Management Group | 800-457-5410 |
| 3/12/02 | Holiday Management Group | 800-457-5410 |
| 3/15/02 | Vacation Center of Delaware | 800-822-9033 |
| 3/15/02 | American Benefit Mortgage, Inc. | 800-992-5329 |
| 3/22/02 (3:51 p.m.) | Elite Communications | 800-822-9033 |
| 3/22/02 (5:47 p.m.) | Elite Communications | 800-822-9033 |
| 3/22/02 | Telecommservices.net (Fine Telecommunications, Inc.) | 800-965-7235 |

|  |  |  |  |
|---|---|---|---|
|  | 4/10/02 | Vacation Getaway Travel, Inc. | 800-457-5410 |
|  | 4/16/02 | Elite Communications | 800-822-9033 |
|  | 4/22/02 | Partnership for Education | 800-976-3734 |
|  | 4/24/02 | Holiday Management Group | 800-457-5410 |
|  | 4/26/02 | 1st Capital Lending & Realty | 800-766-0816 |
|  | 4/29/02 | Bull Run Report | 800-822-9033 |
|  | 4/29/02 | Free Digital Phone Center | 800-766-0816 |
|  | 5/5/02 | Stock Pick of the Month Report | 800-331-4510 |
|  | 5/7/02 | Vacation Center of Delaware | 800-822-9033 |
|  | 5/9/02 | Wall Street Stock Alerts | 800-766-0816 |
|  | 5/9/02 | Free Digital Phone Center | 800-766-0816 |
|  | 5/13/02 | Mortgage Lending Group | 800-822-9033 |
|  | 5/20/02 | Vacation Getaway Travel, Inc. | 800-457-5410 |
|  | 5/21/02 | Free Digital Phone Center | 800-766-0816 |
|  | 5/29/02 | Wall Street Watch | 800-766-0816 |
|  | 6/7/02 | Holiday Management Group | 800-457-5410 |
|  | 6/10/02 | Vacation Getaway Travel, Inc. | 800-457-5410 |
|  | 6/17/02 | Vacation Getaway Travel, Inc. | 800-822-9033 |
| 48 | 6/19/02 | Free Digital Phone Center | 800-766-0816 |
| D. Leon Taylor (Dethloff & Associates) | 10/15/01 | Wall Street Alert | 800-785-6698 |
|  | 10/16/01 | Y2 Marketing | 800-822-9033 |
| 3 | 10/22/01 | Moneyline Report | 800-364-0216 |
| Craig C. Truitt (Truitt, Brown & Truitt) | 1/7/02 | eStock Pick of The Week | 800-331-4510 |
|  | 1/8/02 | Y2 Marketing | 800-766-0816 |
|  | 1/14/02 | Media Broadcast Solutions (The Stock Bulletin) | 800-766-0816 |
|  | 1/16/02 | Financial Freedom | 800-331-4510 |

| | | | | |
|---|---|---|---|---|
| | | | Report | |
| | | 1/18/02 | Stock Traders Alert | 800-785-8505 |
| | | 1/22/02 | Axin Corporation | 800-822-9033 |
| | | 1/23/02 | Equity Market Watch | 800-822-9033 |
| | | 1/25/02 | Telecommservices.net (Fine Telecommunications, Inc.) | 800-965-7235 |
| | | 1/27/02 | Y2 Marketing | 800-766-0816 |
| | | 1/28/02 | Wall Street Equity Report | 800-331-4510 |
| | | 1/31/02 | Equity Market Watch | 800-976-3734 |
| | | 2/2/02 | Y2 Marketing | 800-766-0816 |
| | | 2/4/02 | Investors Today | 800-331-4510 |
| | 14 | 2/6/02 | Equity Market Watch | 800-766-0816 |
| Andrew Neill Vollmer | | 11/14/01 | Cell Direct | 800-766-0816 |
| | | 11/28/01 | Media Broadcast Solutions (Wall Street Examiner) | 800-443-7628 |
| | | 12/7/01 | Advanced Communications | 800-785-6698 |
| | | 12/17/01 | Vacation Getaway Travel, Inc. | 800-822-9033 |
| | | 12/31/01 | Cell Direct | 800-766-0816 |
| | | 2/14/02 | Vacation Center | 800-822-9033 |
| | | 2/17/02 | Y2 Marketing | 800-766-0816 |
| | 8 | 2/25/02 | Advanced Communications | 800-785-6698 |
| William Robert White (Regency Sales, Inc.) | | 12/11/01 | Bagoba | 800-443-7620 |
| | | 12/17/01 | Elite Communications | 800-822-9033 |
| | | 12/17/01 | Lou Gaudio's Health Club & Day Spa | 800-443-7628 |
| | | 12/17/01 | South Coast Optometry | 800-992-5329 |
| | | 12/17/01 | Call Center Network - The Wireless Center | 800-822-9033 |
| | | 1/16/02 | Free Digital Phone Center | 800-976-3734 |
| | | 1/17/02 | Dale Carnegie Training | 800-822-9033 |
| | | 1/17/02 | Call Center Network - The Wireless Center | 800-822-9033 |
| | | 1/30/02 | Central Imaging Supply | 800-976-3734 |
| | | 1/31/02 | Elite Communications | 800-822-9033 |

|  |  | 2/5/02 | Vacation Getaway Travel, Inc. | 800-822-9033 |
|  | 12 | 2/12/02 | Wall Street Alert | 800-785-6698 |
| Richard M. Zelma |  | 10/29/01 | LifeQuotes of America, Inc. | 800-443-7628 |
|  |  | 10/30/01 | Investor's Business Report (The Wall Street Alert) | 800-785-6698 |
|  |  | 10/30/01 | 2 For 1 Inkjet | 800-822-9033 |
|  | 4 | 10/31/01 | Keep in Touch Stuff/Kit Stuff Wireless | 800-822-9033 |
|  | 489 |  |  |  |

[**46]

## TABLE 2

**Fax.com Advertisers and Associated Opt-Out Numbers**

**(Fax.com, Inc., Notice of Apparent Liability for Forfeiture, FCC 02-226)**

| ADVERTISER (Bold type denotes advertiser that is not identified by fax text) | NUMBER OF FAXES | FAX.COM OPT-OUT NUMBER(S) |
|---|---|---|
| 1st Capital Lending & Realty | 1 | 800-766-0816 |
| 2 For 1 Inkjet | 1 | 800-822-9033 |
| 4 B's Ventures, Inc. | 1 | 800-443-7628 |
| A2Z Financial | 1 | 800-965-7235 |
| Absolute Wireless | 3 | 800-443-7628 |
|  |  | 800-822-9033 |
| Accounting Solutions | 1 | 800-822-9033 |
| Advanced Communications | 37 | 800-785-6698 |
| Altimate Marketing | 2 | 800-976-3734 |
| American Benefit Mortgage, Inc. | 2 | 800-992-5329 |
| American Cellular Inc. | 4 | 800-822-9033 |
| American Marble Liquidators | 1 | 800-822-9033 |
| Apollo Transportation | 1 | 800-822-9033 |
| Axin Corporation | 7 | 800-822-9033 |
| Bagoba | 2 | 800-443-7620 |
| Bentley Mortgage | 1 | 900-822-9033 |
| Bridge 21/American Financial Services | 1 | 800-976-3834 |
| Bridge 21/Financial Management Solutions | 1 | 800-766-0816 |
| Bull Run Report | 2 | 800-822-9033 |
| Bullish Report | 6 | 800-331-4510 |
| Burt Custom Finance | 8 | 800-443-7628 |
|  |  | 800-822-9033 |
| Businesscoach.com | 1 | 800-766-0816 |

| | | |
|---|---|---|
| Call Center Network/The Wireless Center | 9 | 800-822-9033 |
| Carpal Tunnel Injury Center | 1 | 800-766-0816 |
| Cell Direct | 17 | 800-766-0816 |
| | | 800-822-9033 |
| | | 800-965-7235 |
| Central Imaging Supply | 27 | 800-457-5410 |
| | | 800-766-0816 |
| | | 800-976-3734 |
| Choice Wireless | 2 | 800-822-9033 |
| Clarion Mortgage | 1 | 800-965-7235 |
| Creative Solutions | 1 | 800-443-7628 |
| Dale Carnegie Training | 1 | 800-822-9033 |
| Digital Systems Concepts, Inc. (DSC, Inc.) | 3 | 800-766-0816 |
| | | 800-822-9033 |
| Discount Funding Associates, Inc. | 1 | 800-822-9033 |
| Dishmaster | 1 | 800-822-9033 |
| DMGI, Inc. (NAVADA) | 1 | 800-443-7620 |
| Dr. John Jurcisin | 3 | 877-276-1974 |
| Dr. Roger Arredondo | 4 | 800-443-7628 |
| | | 800-822-9033 |
| DreamQuest Travel/DreamQuest International Travel | 3 | 800-766-0816 |
| Elite Communications | 16 | 800-766-0816 |
| | | 800-822-9033 |
| | | 800-976-3734 |
| Equity Market Watch | 10 | 800-766-0816 |
| | | 800-822-9033 |
| | | 800-976-3734 |
| eStock Pick of the Week | 8 | 800-331-4510 |
| Fax.com | 1 | 800-443-7628 |
| Financial Freedom Report | 3 | 800-331-4510 |
| First Chartered Investments | 2 | 800-443-5716 |
| Florida Reservations | 1 | 877-276-1974 |
| Free Digital Phone Center | 5 | 800-766-0816 |
| | | 800-976-3734 |
| Futuredreams | 1 | 800-822-9033 |
| Global Key Holiday International a.k.a. Fantasy Marketing and Research | 1 | 800-443-7628 |
| Great West Funding | 1 | 800-965-7235 |
| Greater Orlando Vacation | 1 | 800-822-9033 |
| Holiday Management Group | 13 | 800-457-5410 |
| Holiday Orlando ("Travel News Release") | 2 | 800-457-5410 |
| Independent Dish Contractors Solutions (IDC Solutions) | 4 | 800-822-9033 |
| Infinity Communications | 9 | 800-822-9033 |

| | | |
|---|---|---|
| Investor's Business Report | 5 | 800-785-6698 |
| Investors Today | 3 | 800-331-4510 |
| Jerve Dominguez d.b.a. AAAOpp.com | 1 | 800-822-9033 |
| JWP | 1 | 800-822-9033 |
| Kit Stuff Wireless/Keep In Touch Stuff/Elephant Wireless | 4 | 800-822-9033 |
| Lana Rozenberg, DDS | 1 | 800-443-7628 |
| Legacy Quote | 1 | 800-443-7628 |
| Lexington Chiropractic Associates | 4 | 877-276-1974 |
| LifeQuotes of America, Inc. | 4 | 800-443-7628 |
| | | 800-976-3734 |
| Lou Gaudio's Health Club & Day Spa | 1 | 800-443-7628 |
| Market Advisors | 1 | 800-331-4510 |
| Market Wizard Alerts | 1 | 800-331-3622 |
| MBA Financial Group | 1 | 800-443-7628 |
| Media Broadcast Solutions (The Stock Bulletin/Wall Street Examiner) | 19 | 800-766-0816 |
| | | 800-443-7628 |
| Midtown Medical and Health Offices, P.C. | 1 | 800-766-0816 |
| Moneyline Report | 9 | 800-364-0216 |
| Mortgage Lending Group | 1 | 800-822-9033 |
| Mortgage Market | 1 | 800-443-7628 |
| National Communications | 1 | 800-822-9033 |
| NBM Information | 1 | 800-331-4510 |
| New Century Mortgage Corporation | 2 | 800-443-7628 |
| Office Warehouse | 7 | 800-766-0816 |
| Orlando Promotions, Inc. | 2 | 800-443-7628 |
| Partnership for Education | 2 | 800-976-3734 |
| Premium Ink | 1 | 800-766-0816 |
| Quality Auto Mart | 1 | 800-443-7628 |
| Quote Master USA Ltd. | 1 | 800-443-7628 |
| Rocky Mountain Financial | 1 | 800-443-5716 |
| Rosenbaum Chiropractic and Carpal Tunnel Clinic | 3 | 800-965-7235 |
| Satellite Country | 2 | 800-443-7628 |
| | | 800-766-0816 |
| South Coast Optometry | 1 | 800-992-5329 |
| South Cooper Auto Mart | 4 | 800-443-7628 |
| | | 800-822-9033 |
| Stock Pick of the Month Report | 1 | 800-331-4510 |
| Stock Traders Alert | 8 | 800-785-8505 |
| Stockscape Network Group (Small Cap Central) | 6 | 800-364-0216 |
| | | 800-443-7628 |
| Strategic Stock Intelligence, Inc. | 8 | 800-443-7628 |
| | | 800-331-4510 |

|  |  | 800-976-3734 |
| Tallclocks, Inc. | 8 | 800-457-5410 |
|  |  | 800-822-9033 |
| Telecommservices.net (Fine Telecommunications, Inc.) | 4 | 800-965-7235 |
| Ticket Solutions | 1 | 800-822-9033 |
| Toner Zone | 1 | 800-976-3734 |
| Tower Group | 1 | 800-457-5410 |
| Travel To Go | 3 | 800-822-9033 |
| Union Trust Mortgage | 3 | 800-443-7628 |
|  |  | 800-766-0816 |
| Vacation Center | 8 | 800-822-9033 |
| Vacation Center of Delaware | 3 | 800-822-9033 |
| Vacation Getaway Travel, Inc. | 34 | 800-457-5410 |
|  |  | 800-822-9033 |
|  |  | 800-443-7628 |
|  |  | 800-457-5410 |
| Vacation Showroom ("Corporate Travel Division") | 2 | 800-822-9033 |
| Vacation Warehouse | 3 | 800-443-7628 |
|  |  | 800-663-8758 |
|  |  | 800-822-9033 |
| Veb Tickets | 1 | 800-822-9033 |
| Wall Street Alert | 12 | 800-785-6698 |
| Wall Street Equity Report | 3 | 800-331-4510 |
| Wall Street Investment Alert | 2 | 800-331-4510 |
|  |  | 800-443-7628 |
| Wall Street OTC | 1 | 800-331-4510 |
| Wall Street Outlook | 2 | 800-443-7628 |
| Wall Street Reporter | 2 | 800-364-0216 |
| Wall Street Stock Alerts | 1 | 800-766-0816 |
| Wall Street Watch | 5 | 800-766-0816 |
| Wireless Center | 1 | 800-822-9033 |
| Wireless Connections | 2 | 800-822-9033 |
| Wireless Telecom | 1 | 800-822-9033 |
| Y2 Marketing | 37 | 800-663-8758 |
|  |  | 800-766-0816 |
|  |  | 800-822-9033 |
|  | 489 |  |

[**47]

**TABLE 3**

**Fax.com Opt-Out Numbers and Associated Advertisers**

**(Fax.com, Inc., Notice of Apparent Liability for Forfeiture, FCC 02-226)**

| FAX.COM OPT-OUT NUMBER | ADVERTISER |
| --- | --- |
| 877-276-1974 | Dr. John Jurcisin |

Florida Reservations
Lexington Chiropractic Associates
800-331-3622 Market Wizard Alerts
800-331-4510 Bullish Report
eStock Pick of The Week
Financial Freedom Report
Investors Today
Market Advisors
NMB Information
Stock Pick of the Month Report
Strategic Stock Intelligence, Inc.
Wall Street Equity Report
Wall Street Investment Alert
Wall Street OTC
800-364-0216 Moneyline Report
Stockscape Network Group (Small Cap Central)
Wall Street Reporter
800-443-5716 First Chartered Investments
Rocky Mountain Financial
800-443-7620 Bagoba
DMGI, Inc. (NAVADA)
800-443-7628 4 B's Ventures, Inc.
Absolute Wireless
Burt Custom Finance
Creative Solutions
Dr. Roger Arredondo
Fax.com
Global Key Holiday International
  a.k.a.Fantasy Marketing and Research
Lana Rozenberg, DDS
Legacy Quote
LifeQuotes of America, Inc.
Lou Gaudio's Health Club & Day Spa
MBA Financial Group
Media Broadcast Solutions (Wall Street
Examiner)
Mortgage Market
New Century Mortgage Corporation
Orlando Promotions, Inc.
Quality Auto Mart
Quote Master USA Ltd.
Satellite Country
South Cooper Auto Mart
Stockscape Network Group (Small Cap Central)
Strategic Stock Intelligence, Inc.
Union Trust Mortgage
Vacation Getaway Travel, Inc.
Vacation Warehouse

Get a Document - by Citation 1:08-cv-02960 927 Document 12-4   https//web.06/23/2008 search...ecui20?...296c7124313c078b1e...

Case 1:08-cv-02960   Document 12-4   Filed 06/23/2008   Page 20 of 22

|              | Wall Street Investment Alert |
|              | Wall Street Outlook |
| 800-457-5410 | Central Imaging Supply |
|              | Holiday Management Group |
|              | Holiday Orlando ("Travel News Release") |
|              | Tallclocks, Inc. |
|              | Tower Group |
|              | Vacation Getaway Travel, Inc. |
| 800-663-8758 | Vacation Warehouse |
|              | Y2 Marketing |
| 800-766-0816 | 1st Capital Lending & Realty |
|              | Bridge 21/Financial Management Solutions |
|              | Businesscoach.com |
|              | Carpal Tunnel Injury Center |
|              | Cell Direct |
|              | Central Imaging Supply |
|              | Digital Systems Concepts, Inc. (DSC, Inc.) |
|              | DreamQuest International Travel |
|              | Elite Communications |
|              | Equity Market Watch |
|              | Free Digital Phone Center |
|              | Media Broadcast Solutions (Wall Street Examiner) |
|              | Midtown Medical and Health Offices, P.C. |
|              | Office Warehouse |
|              | Premium Ink |
|              | Satellite Country |
|              | Union Trust Mortgage |
|              | Wall Street Stock Alerts |
|              | Wall Street Watch |
|              | Y2 Marketing |
| 800-785-6698 | Advanced Communications |
|              | Investor's Business Report |
|              | Wall Street Alert |
| 800-785-8505 | Stock Traders Alert |
| 800-822-9033 | 2 For 1 Inkjet |
|              | Absolute Wireless |
|              | Accounting Solutions |
|              | American Cellular Inc. |
|              | American Marble Liquidators |
|              | Apollo Transportation |
|              | Axin Corporation |
|              | Bentley Mortgage |
|              | Burt Custom Finance |
|              | Bull Run Report |
|              | Call Center Network - The Wireless Center |
|              | Cell Direct |
|              | Choice Wireless |

Dale Carnegie Training
Digital Systems Concepts, Inc. (DSC, Inc.)
Discount Funding Associates, Inc.
Dishmaster
Dr. Roger Arredondo
Equity Market Watch
Futuredreams
Greater Orlando Vacation
Independent Dish Contractors Solutions/IDC Solutions
Infinity Communications
Jerve Dominguez d.b.a. AAAOpp.com
JWP
Kit Stuff Wireless/Keep In Touch Stuff/Elephant Wireless
Mortgage Lending Group
National Communications
Office Warehouse
South Cooper Auto Mart
Tallclocks, Inc.
Ticket Solutions
Travel To Go
Vacation Center
Vacation Center of Delaware
Vacation Getaway Travel, Inc.
Vacation Showroom
Vacation Warehouse
Veb Tickets
Wireless Center
Wireless Connections
Wireless Telecom
Y2 Marketing

800-965-7235 A2Z Financial
Cell Direct
Clarion Mortgage
Great West Funding
Rosenbaum Chiropractic and Carpal Tunnel Clinic
Telecommservices.net (Fine Telecommunications, Inc.)

800-976-3734 Altimate Marketing
Bridge 21/American Financial Services
Central Imaging Supply
Elite Communications
Equity Market Watch
Free Digital Phone Center
LifeQuotes of America
Partnership for Education

Strategic Stock Intelligence, Inc.
Toner Zone
800-992-5329 American Benefit Mortgage, Inc.
South Coast Optometry
877-276-1974 Dr. John Jurcisin
Florida Reservations
Lexington Chiropractic Associates

**[**48]**

## Legal Topics:

For related research and practice materials, see the following legal topics:
Communications Law > Broadcasting > Sponsorship Identifications
Communications Law > Federal Acts > General Overview
Communications Law > Privacy > Telephone Consumer Protection Act

Service: **Get by LEXSEE®**
Citation: **2002 FCC LEXIS 3853**
View: Full
Date/Time: Monday, June 23, 2008 - 1:26 PM EDT

LexisNexis® | About LexisNexis | Terms & Conditions | Contact Us
Copyright © 2008 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

# EXHIBIT D

**DISPOSAL MANAGEMENT SYSTEMS, INC.**
*Recycling For The Future*

Dispatch
847-640-9777
877-4-CONTAINER

670 Carboy Mill Lane · Schaumburg, Illinois 60193
www.disposalmanagement.com

Billing
847-640-9778
Fax: 847-640-9783

Date:

DOUG Kenny

Dear Mr.          ,

Disposal Management Systems (DMS) is a family-owned union business and has been in operation for 25 years and still growing. We recognize the increasing recycling and disposal needs of the construction industry.   We would like the opportunity to provide construction waste recycling and removal service for your company.

DMS provides same-day service in a fast and efficient way. We carry 15, 20, and 30 yard open containers and 30, 35, and 40 yard compactors. We offer competitive pricing.

We have recycled drywall, steel, non-ferrous metals, cardboard, wood, brick, and concrete. Last year, we recycled enough steel to build 500 automobiles, 4000 tons of brick and concrete enough to build one mile of road, 5000 cubic yards of wood for landscaping chips, and 200 tons of cardboard for corrugated boxes and over 1000 tons of drywall.

Enclosed is a brochure and completed quotation form. If you need additional information or have any questions, please call. Your time is greatly appreciated. We hope we can develop a business relationship.

Sincerely,

Kenneth Cook
Operations Manager

# DISPOSAL MANAGEMENT SYSTEMS, INC.

## *Recycling For The Future*

**Dispatch**                          420 Cutters Mill Lane  •  Schaumburg, Illinois 60195                          **Billing**
847-640-9777                          www.disposalmanagement.com                          847-640-9799
877-4-CONTAINER                                                                          Fax: 847-640-9797

# 20 & 30 YARD

# DUMPSTERS

# $310.00

### $55.00 PER TON OVER 4

## FUEL SURCHARGES MAY APPLY
## WE RECYCLE
## C&D
## 9 TRUCKS 300 DUMPSTERS TO SERVE
## YOU IN CHICAGO AND SUBURBS FOR
## OVER 23 YEARS

# EXHIBIT E

*Brill v. Becktold Ent., Inc.*, 2006 TCPA Rep. 1494 (Ill. Cir. Oct. 26, 2006).     | Page: 1

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| JAMES BRILL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     06 CH 1520 |
| | ) |
| BECKTOLD ENTERPRISES, INC., | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

This cause comes before the court on Defendant Becktold Enterprises, Inc.'s motion to dismiss Plaintiff James Brill's Class Action Complaint pursuant to 735 ILCS 5/2-619.1. The court has been fully advised of the premises herein.

Brill's case is one of more than 50 related cases currently assigned to this Calendar which involve claims for violations of the Telephone Consumers Protection Act of 1991 ("TCPA"), the Illinois Consumer Fraud Act, and for common law conversion. The cases have been divided into Groups A, B, and C. Becktold's motion to dismiss has been designated as the "Master Motion" for Group A and all the Group A cases have joined in the Master Motion. A list of the Group A cases is attached at Exhibit A. Defendant International Card Establishment, Inc. has filed a Supplemental Memorandum of Law in support of the Master Motion raising additional grounds for dismissal of the consumer fraud claims.

TCPA Claims

*Private Right of Action under TCPA:*

Plaintiffs allege that Defendants violated the federal Telephone Consumer Protection Act ("TCPA"), 47 USCS §227 (2004), which prohibits using any telephone facsimile machine, computer, or other device to send an unsolicited advertisement to another telephone facsimile machine. Section 227 allows for state jurisdiction over private causes of action under the TCPA and reads as follows:

(3) Private right of action. A person or entity may, if otherwise permitted by the
law or rules of court of a State, bring in an appropriate court of that State –
(A) an action based on a violation of this subsection or the regulations
prescribed under this subsection to enjoin such violation,
(B) an action to recover for actual monetary loss from such a violation, or
to receive $500 in damages for each such violation, whichever is
greater, or

Obtained from
**TCPALAW.COM**
The leading source for TCPA legal research

Copyright © 2008. No claim to text of U.S. Government works. This file is property of TCPALaw.com. Acquisition and use of this document is subject to subscriber agreement. All rights reserved. Contact subscriptions@TCPALaw.com for more information.

(C) both such actions.

47 USCS §227 (2004).

Defendants argue that the individual States are required to pass an enabling statute before a claim can be brought pursuant to the TCPA in state court. Of the numerous courts that have considered this issue, only one court, a Texas appellate court, <u>Autoflex Leasing, Inc. v. Manufacturers Auto Leasing, Inc.</u>, 16 S.W.3d 815 (Tex. App.. 2000), held that it was necessary for States to pass enabling legislation. This decision was later rejected by a different Texas appellate court, <u>The Chair King, Inc. v. GTE Mobilnet of Houston, Inc.</u>, 135 S.W.3d 365 (Tex. App. 2004). The "opt in" approach is illogical given the wording of §227.

Rejecting the "opt in" approach, several State courts have found that the language "if otherwise permitted by the law or rules of court of a State" acknowledges the principle that States have the right to structure their courts as desired and are not obligated to change the structure of their courts or their procedural rules to accommodate TCPA claims. *E.g.*, <u>R.A. Ponte Architects. Ltd. v. Investors' Alert, Inc.</u>, 857 A.2d 1, 11 (Md. 2004); <u>Condon v. Office Depot, Inc.</u>, 855 So.2d 644 (Fla. App. 2003); <u>Schulman v. Chase Manhattan Bank</u>, 268 A.D.2d 174 (N.Y. App. Div. 2000). This interpretation is in keeping with the language of the statute and the legislative history and takes into account constitutional requirements. <u>R.A. Ponte</u>, 857 A.2d at 7, 13. "[I]f the exercise of a State court's ordinary jurisdiction under established local laws is 'appropriate to the occasion and is invoked in conformity with those laws,' a state court may not refuse jurisdiction over a claim based on Federal law." <u>Schulman</u>, 268 A.2d at 179, <u>citing</u>, <u>Mondou v. New York, New Haven & Hartford R.R. Co.</u>, 223 U.S. 1, 57.

Other State courts have found that the language "if otherwise permitted by the law or rules of court of a State" supports an "opt out" approach where states may pass legislation prohibiting such actions in their State courts, but otherwise must hear these actions. *E.g.*, <u>The Chair King, Inc. v. GTE Mobilnet of Houston, Inc.</u>, 135 S.W.3d 365 (Tex. App. 2004); <u>Hooters of Augusta, Inc. v. Nicholson</u>, 537 S.E.2d 468 (Ga. App. 2000).

Regardless of whether the "acknowledgement" or "opt out" approach is used, and the "acknowledgment" approach is the better reasoned one, it is clear that Illinois is not required to pass enabling legislation in order for suits to be brought pursuant to the TCPA in Illinois courts. This court is a court of general jurisdiction and has the ability to hear TCPA claims without further legislation.

Defendants argue that Illinois has opted out of the TCPA. Defendants, however, have not cited to any statute expressly opting out of the TCPA. Defendants point to 720 ILCS 5/26-3, passed one year *before* the enactment of the TCPA. A statute passed prior to the enactment of the TCPA cannot constitute an "opt out." Defendants also contend that Illinois has impliedly opted out of the TCPA by making unsolicited fax advertising a petty criminal offense and by not amending consumer fraud laws to take into account fax

Obtained from
**TCPALAW.COM**
The leading source for TCPA legal research

Copyright © 2008. No claim to text of U.S. Government works. This file is property of TCPALaw.com. Acquisition and use of this document is subject to subscriber agreement. All rights reserved. Contact subscriptions@TCPALaw.com for more information.

*Brill v. Becktold Ent., Inc.*, 2006 TCPA Rep. 1494 (Ill. Cir. Oct. 26, 2006).    Page: 3

solicitations. This argument is illogical and without merit. This court has the jurisdiction to hear TCPA cases unless hearing such cases would be prohibited by the laws or rules of this court. Defendants have not pointed to any law or rule which prohibits this court from exercising jurisdiction over TCPA claims. Such a prohibition cannot be "implied" from the circumstances relied upon by Defendants.

Plaintiffs can pursue a private right of action under the TCPA in this court.

*Constitutional Arguments*:

Excessive Penalties:

Defendants first contend that the TCPA is unconstitutional as it violates the Fifth and Fourteenth Amendments of the U.S. Constitution. Defendants argue that the TCPA's statutory fines are unconstitutionally excessive in violation of the Due Process clause of the Fifth and Fourteenth Amendments. This argument has been soundly rejected by the courts which have considered the issue.

The TCPA allows an individual to recover the actual monetary loss for each violation of the TCPA or $500 in damages, whichever is greater. 47 U.S.C. §227(b)(3)(2006). Defendants claim that this penalty violates due process, but a statutory penalty violates due process ". . .'only where the penalty prescribed is so severe and oppressive as to be wholly disproportional to the offense and obviously unreasonable.'" United States v. Citrin, 972 F.2d 1044, 1051 (9th Cir. 1992)(citation omitted). The TCPA penalty does not rise to this level.

As noted by the court in Kenro, Inc. v. Fax Daily, Inc., 962 F. Supp. 1162, 1165 (S.D. Ind. 1997), "[t]he fact that the TCPA establishes as a remedy a damages award of $500, even when actual monetary damage is less than $500, does not itself make the award excessive and unreasonable." The penalty fashioned by Congress was concerned with more than the actual cost of fax paper and toner, the remedy was fashioned to take into account "the difficult to quantify business interruption costs imposed upon recipients of unsolicited fax advertisements, effectively deter the unscrupulous practice of shifting these costs to unwitting recipients of 'junk faxes,' and 'provide adequate incentive for an individual plaintiff to bring suit on his own behalf.'" Id. at 1166. The TCPA's $500 penalty "when measured against the overall harms of unsolicited fax advertising and the public interest in deterring such conduct, is not 'so severe and oppressive as to be wholly disproportioned to the offense or obviously unreasonable.'" State of Texas v. American Blast Fax, Inc., 121 F. Supp. 2d 1085, 1091 (W.D. Tex. 2000)(citation omitted).

First Amendment:

Defendants next contend that the TCPA violates the First Amendment. This argument has been just as soundly rejected. The test for whether regulations of commercial speech violate the First Amendment has been set forth by the U.S. Supreme Court in Central Hudson Gas & Electric Corp. v. Public Service Corp., 447 U.S. 557

3

Obtained from
**TCPALAW.COM**
The leading source for TCPA legal research

Copyright © 2008. No claim to text of U.S. Government works. This file is property of TCPALaw.com. Acquisition and use of this document is subject to subscriber agreement. All rights reserved. Contact subscriptions@TCPALaw.com for more information.

(1980). Under Central Hudson, regulations of commercial speech are valid as long as they involve a substantial governmental interest, directly advance that interest, and are narrowly tailored to serve that interest. Id. at 563.

It is clear that the TCPA involves a substantial governmental interest contrary to Defendants' argument. There is a substantial governmental interest "in restricting unsolicited fax advertisements in order to prevent the cost shifting and interference such unwanted advertising places on the recipient." State of Missouri ex. rel. Nixon v. American Blast Fax, Inc., 323 F.3d 649, 655 (8th Cir. 2000); see also, State of Texas v. American Blast Fax, Inc., 121 F. Supp. 2d at 1092 ("Congress' interests in passing the TCPA – preventing 'unwitting customers' from bearing the brunt of advertising costs and preventing unwanted fax machine interference – are substantial and real."); Destination Ventures, Ltd. v. Federal Communications Comm'n, 46 F.3d 54, 56 (9th Cir. 1995). Defendants claim that Congress lacked the necessary "findings" to establish a significant governmental interest, but this claim has been previously, and correctly, rejected. State of Missouri ex. rel. Nixon v. American Blast Fax, Inc., 323 F.3d at 654.

The TCPA also clearly meets the requirement that regulations of commercial speech directly advance the governmental interest. Like other defendants before them, the Defendants before this court claim that the TCPA does not directly advance the government's interest. Defendants argue that the TCPA fails to meet this requirement by banning only commercial speech. Defendants' argument is without merit. As set forth in Destination Ventures, 46 F.3d at 56, "[b]ecause Congress's goal was to prevent the shifting of advertising costs, limiting its regulation to faxes containing advertising was justified." "By placing restrictions on those responsible for a large portion of the problem, the TCPA directly and materially advances the congressional goal of limiting the harm arising from unsolicited fax advertisements. State of Missouri ex. rel. Nixon v. American Blast Fax, Inc., 323 F.3d at 655.

Defendants' contention that the TCPA's ban of unsolicited fax advertisements is not narrowly tailored is also without merit. Congress was not required to use the "least restrictive means" necessary to address the problem of unsolicited fax advertisements. Board of Trustees of the State Univ. of N.Y. v. Fox, 492 U.S. 469, 480 (1989). Rather, Congress was required to employ "a means narrowly tailored to achieve the desired objective." Id. Given the fact that Congress's desired objective in enacting the TCPA was to protect consumers from the cost shifting and interference imposed by unsolicited fax advertisements, the TCPA's ban on such faxes is narrowly tailored. E.g., State of Missouri ex. rel. Nixon v. American Blast Fax, Inc., 323 F.3d at 659; Destination Ventures, 46 F.3d at 56; State of Texas v. American Blast Fax, Inc., 121 F. Supp. 2d at 1091-92; Kenro, Inc. v. Fax Daily, Inc., 962 F. Supp. at 1168-69.

Defendants next claim that the TCPA violates the First Amendment because it unconstitutionally imposes "strict liability" by failing to include a knowledge requirement. Defendants claim that an advertiser could have permission to send a fax but mistakenly dial the wrong number subjecting the advertiser to a $500 fine. In effect,

4

Obtained from
**TCPALAW.COM**
The leading source for TCPA legal research

Copyright © 2008. No claim to text of U.S. Government works. This file is property of TCPALaw.com. Acquisition and use of this document is subject to subscriber agreement. All rights reserved. Contact subscriptions@TCPALaw.com for more information.

*Brill v. Becktold Ent., Inc.*, 2006 TCPA Rep. 1494 (Ill. Cir. Oct. 26, 2006).                Page: 5

Defendants are making an "overbreadth" argument contending that the TCPA would punish advertisers who did not intend to violate the TCPA.

Unfortunately for Defendants, the Plaintiffs before this court all allege that Defendants engaged in mass campaigns of sending unsolicited fax advertisements and Defendants have not presented any evidence to this court that the faxes they sent to Plaintiffs were solicited by others and Defendants merely misdialed. As noted by Plaintiffs, "facial invalidity" does not apply to commercial speech, Central Hudson, 447 U.S. at 565, n. 8; Board of Trustees of the State of N.Y., 492 U.S. at 481, and Defendants must show that the TCPA is unconstitutional as applied to them. They cannot do so.

Vagueness:

Defendants next argue that the TCPA is unconstitutionally vague. This argument is wholly lacking in credibility. The TCPA's language is plain and clear and does not meet the standard of unconstitutional vagueness. E.g., Roberts v. United States Jaycees, 468 U.S. 609, 629 (1984)(A statute is unconstitutionally vague when it is so unclear that two different individuals "must necessarily guess at its meaning").

Tenth Amendment:

Finally, Defendants argue that the TCPA is unconstitutional because the Tenth Amendment to the U.S. Constitution precludes Congress from conferring exclusive jurisdiction over a Federal claim upon State courts. Federal courts, however, have held that they do have jurisdiction over TCPA claims. E.g., 427 F.3d 446 (7th Cir. 2005). Defendants' argument is without merit.

The TCPA is constitutional.

Illinois Consumer Fraud Act

Preemption:

In its Supplemental Memorandum, Defendant International Card Establishment, Inc. ("ICE") argues that any claims under the Illinois Consumer Fraud Act ("ICFA") are preempted by the TCPA because Illinois lacks jurisdiction over interstate telecommunication transmissions. Initially, Plaintiffs Linda Hoppa and Jeffrey Brown argue that ICE's preemption argument is premature because the Class Action Complaint directed toward ICE does not allege that ICE sent the offending faxes from out-of-state. This argument is disingenuous. The Class Action Complaint alleges that ICE, a California corporation, sent faxes into Illinois. (Brown Complaint, ¶¶4-6). There are no facts alleged in the Class Action Complaint which indicate that ICE sent any intrastate faxes.

The TCPA contains no express preemption of state laws on the same subject. The TCPA contains only the following provision which provides as follows:

5

Obtained from
**TCPALAW.COM**
The leading source for TCPA legal research

Copyright © 2008. No claim to text of U.S. Government works. This file is property of TCPALaw.com. Acquisition and use of this document is subject to subscriber agreement. All rights reserved. Contact subscriptions@TCPALaw.com for more information.

*Brill v. Becktold Ent., Inc.*, 2006 TCPA Rep. 1494 (Ill. Cir. Oct. 26, 2006).    Page: 6

(1) STATE LAW NOT PREEMPTED. Except for the standards prescribed under subsection (d) and subject to paragraph (2) of this subsection, nothing in this section or in the regulations prescribed under this section shall preempt any State law that imposes more restrictive intrastate requirements of regulations on or which prohibits –

 (A) the use of telephone facsimile machines or other electronic devices to send unsolicited advertisements . . .

47 USC §227(e)(1).

"In areas of traditional state regulation, [the U.S. Supreme Court] assume[s] that a federal statute has not supplanted state law unless Congress has made such an intention 'clear and manifest.'" Bates v. Dow Agrosciences LLC, 544 U.S. 431, 449 (2005). The above language does not, contrary to ICE's arguments, clearly and manifestly express an intention to preempt consumer fraud claims for interstate fax solicitations.

The cases cited by ICE, Klein v. Vision Lab Telecommunications, Inc., 399 F. Supp. 2d 528 (S.D. N.Y. 2005), and Chamber of Commerce of the United States of America v. Lockyer, 2006 WL 462482 (E.D. Cal. 2006), do not support ICE's preemption argument. In both Lockyer and Klein, the courts considered state laws which specifically regulated the unsolicited sending of fax advertisements. In Lockyer, the regulation at issue was more restrictive than the TCPA and in Klein the regulation at issue was less restrictive. The purpose of the ICFA, unlike the statutes at issue in Klein and Lockyer, is not to regulate interstate fax advertisements but to address deceptive and unfair practices in general. Nothing in the ICFA is in direct conflict with the TCPA and there is nothing in the language of the TCPA which clearly and manifestly shows an intention to preempt general state consumer laws which provide an additional remedy for the sending of unsolicited fax advertisements. Bates, 544 U.S. at 449; Klein, 399 F. Supp. 2d at 541.

Plaintiffs' ICFA claims are not preempted by the TCPA.

*Failure to State a Claim*:

Defendants first argue that Plaintiffs have failed to state a claim under the ICFA because the allegations do not satisfy the test for whether conduct amounts to an unfair practice set forth in Robinson v. Toyota Motor Credit Corp., 201 Ill. 2d 403 (2002). This court has already considered, and rejected, this argument in a written memorandum and order issued in Telecommunications v. Bach, 03 CH 9246.

The ICFA allows for claims for unfair practices as well as deceptive acts. In determining whether conduct is unfair, a court should consider: (1) whether the conduct offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; and (3) whether it causes substantial injury to consumers. Id. at 417-18. All three prongs do not have to be satisfied to support a finding of unfairness. Id. at 418. "'A

6

Obtained from
**TCPALAW.COM**
The leading source for TCPA legal research

Copyright © 2008. No claim to text of U.S. Government works. This file is property of TCPALaw.com. Acquisition and use of this document is subject to subscriber agreement. All rights reserved. Contact subscriptions@TCPALaw.com for more information.

*Brill v. Becktold Ent., Inc.*, 2006 TCPA Rep. 1494 (Ill. Cir. Oct. 26, 2006).                          | Page: 7

practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Id.*

It is clear that the conduct alleged by Plaintiffs offends the public policy of both the Federal government, as evidenced by the passage of the TCPA, and of Illinois which has criminalized Defendants' conduct. Defendants argue, however, that their conduct is not oppressive and Plaintiff has not shown substantial injury. While it is true that there is no substantial injury to any one individual Plaintiff before this court, the alleged conduct is unscrupulous and greatly offends the public policy of Illinois which has criminalized this conduct. The public policy prong alone justifies a finding of an unfair act. Robinson is clear that it is not necessary for a plaintiff to satisfy all criteria and that meeting one criterion can be sufficient.

Defendants also argue that Plaintiffs cannot state claims under the ICFA because they cannot show the existence of actual damages. Defendants' theory is that each Plaintiff sustained only *de minimis* damages of a few cents as a result of Defendants' conduct. Any argument regarding the actual amount of damages is not only premature, but also ignores the fact that the cases before the court are class actions. Finding that Plaintiffs were not damaged because each plaintiff was only damaged in small amounts would allow Defendants to escape any consequences for their alleged conduct "by committing many small violations that were not worth the time and effort of individual plaintiffs to redress or were beyond their ability or resources to remedy." Christakos v. Intercounty Title Co., 196 F.R.D. 496, 502 (N.D. Ill. 2000). Defendants rely on Judge Patrick McGann's opinion in Whiting Corp. v. MSI Marketing, Inc., 02 CH 6332, which addressed the substantiality of damages with regard to the Robinson factors. Judge McGann offered no opinion on whether Plaintiffs could show the existence of actual damages.

Defendants have not cited a single case on point which supports their argument. Defendants are of the opinion that Plaintiffs have not suffered any cognizable damage. The court disagrees.

Plaintiffs have sufficiently stated claims under the ICFA.

<u>Conversion</u>

Defendants argue that Plaintiff cannot state a claim for conversion. Conversion is an unauthorized deprivation of property from a person entitled to its possession." IOS Capital, Inc. v. Phoenix Printing, Inc., 348 Ill. App. 3d 366, 370 (4th Dist. 2004). "To prove conversion, the plaintiff must establish (1) a right in the property; (2) a right to immediate possession; (3) wrongful control by the defendant, and (4) a demand for the property." *Id.*

Defendants first argue that Plaintiffs have not alleged a wrongful or unauthorized deprivation of property. This argument is wholly without merit. The sending of unsolicited fax advertisements is prohibited under the TCPA and Illinois has criminalized

Obtained from
**TCPALAW.COM**
The leading source for TCPA legal research

Copyright © 2008. No claim to text of U.S. Government works. This file is property of TCPALaw.com. Acquisition and use of this document is subject to subscriber agreement. All rights reserved. Contact subscriptions@TCPALaw.com for more information.

this conduct. Defendants cannot credibly argue that their conduct was not wrongful or unauthorized.

Defendants next argue that Plaintiffs cannot allege a right to immediate possession of their toner and paper used by the fax machine. While the owner of a fax machine does expect that paper and toner will be used, the owner reasonably expects that the fax machine and supplies will be used for the business purposes of the owner. Plaintiffs allege that Defendants hijacked their machines for their own advertising purposes without consent using Plaintiffs' toner and paper. Plaintiffs had an immediate right of possession of their toner and paper.

Defendants also argue that Plaintiffs do not allege that they were dispossessed of their property, but this argument is disingenuous. Once Defendants' advertisements were printed with Plaintiffs' paper and toner, Plaintiffs were dispossessed of the paper and toner.

Defendants next argue that Plaintiffs have not alleged that they made any demand upon Defendants to return the toner and paper. Again, this argument is disingenuous. Once the advertisements were printed out by the fax machines, the paper and toner were irretrievably lost. Plaintiffs were not required to demand the return of property permanently converted by Defendants.

Finally, Defendants argue that Plaintiff cannot plead substantial damages, but this is not an element of a conversion claim. Plaintiffs have alleged that Defendants converted their property and they are not required to do more.

**IT IS HEREBY ORDERED** that the Master Motion to Dismiss for Group A is denied in its entirety.



Judge David R. Donnersberger

8

Obtained from
**TCPALAW.COM**
The leading source for TCPA legal research

Copyright © 2008. No claim to text of U.S. Government works. This file is property of TCPALaw.com. Acquisition and use of this document is subject to subscriber agreement. All rights reserved. Contact subscriptions@TCPALaw.com for more information.

<u>Exhibit A:</u>

### <u>Group A</u>

| | |
|---|---|
| 06 CH 1803- | Clearbrook v. First Guaranty |
| 05 CH 21230- | Western Railway v. Addison |
| 06 CH 1439- | Brill v. Card Service |
| 06 CH 2613- | Hoppe v. Int'l Card Est. |
| 06 CH 4478- | Hoppe v. Abba Bonding |
| 06 CH 14740- | Ballard v. Intek |
| 06 CH 12462- | Shah v. EProfit |
| 05 CH 21845- | Sadowski v. Easy Drop |

Obtained from
**TCPALAW.COM**
The leading source for TCPA legal research

Copyright © 2008.  No claim to text of U.S. Government works. This file is property of TCPALaw.com. Acquisition and use of this document is subject to subscriber agreement. All rights reserved. Contact subscriptions@TCPALaw.com for more information.

# EXHIBIT F

*Rossario's Fine Jewelry, Inc. v. Jurgens Fine Jewelry, Inc.*, 2007 TCPA Rep. 1720, 2007 WL 1961779 (Ill.Cir. Jan 19, 2007)

### County Department, Chancery Division.
### Cook County.
### ROSSARIO'S FINE JEWELRY, INC., Plaintiff,
### v.
### JURGENS FINE JEWELRY, INC., et al., Defendants.
### No. 06 CH 6677.
### January 19, 2007.

NOTICE: The rules of some jurisdictions may impose limitations on the use of materials not designated for publication in certain officially sanctioned reporters. Consult the rules of the applicable jurisdiction regarding use and citation of this opinion.

**RESULT:**

Motion to dismiss denied.

**SYNOPSIS:**

[under review]

**SUBSEQUENT HISTORY:**

none found

**PRIOR HISTORY:**

none found

**APPEARANCES:**


**JUDGES:**

Andrew Berman, Judge.

**HEADNOTES:**

[under review]

**OPINION:**

Memorandum and Order

[**\*1**] This cause comes before the court on Defendants Jurgens Fine ?? Maria C. Pooch, Jurgens Enterprises L.L.C., and Jurgen W. Pooch's motion to dismiss pursuant to 735 ILCS 5/2-615 and 5/2-619. The court has been fully advised of the premises herein.

Plaintiff Rossario Fine Jewelry, Inc. has filed a Class Action Complaint against Defendants Jurgens Fine Jewelry, Inc., Maria C. Pooch, Jurgen Enterprises, L.L.C., and Jurgen W. Pooch. Rossario's case is one of many related cases currently assigned to this Calendar which involve claims for violations of the Telephone Consumers Protection Act of 1991 ("TCPA"), the Illinois Consumer Fraud Act, and for common law conversion. The Plaintiffs in these cases allege that the Defendants have engaged in mass-faxing of unsolicited advertisements.

The cases have been divided into Groups A, B, and C. The Group A "Master Motion" to dismiss brought by Becktold Industries, Inc. was previously denied by Judge David R. Donnersberger. The Jurgen Defendants' motion to dismiss has been designated as the "Master Motion" for Group B and all the Group B cases have joined in this Master Motion. A list of the Group B cases is attached as Exhibit A.

The Group B master motion to dismiss filed by the Jurgen Defendants is practically identical to the Group A master motion to dismiss. In addition to Rossario's Response to the Group B master motion, the Group B Plaintiffs have adopted the

Group A Response filed by James Brill as their supplemental response.

*TCPA Claims (§2-615 and §2-619)*

*Private Right of Action under TCPA* (§2-615):

Plaintiffs allege that Defendants violated the federal Telephone Consumer Protection Act ("TCPA"), 47 USCS §227 (2004), which prohibits using any telephone facsimile machine, computer, or other device to send an unsolicited advertisement to another telephone facsimile machine. Section 227 allows for state jurisdiction over private causes of action under the TCPA and reads as follows:

(3) Private right of action. A person or entity may, if otherwise permitted by the law or rules of court of a State, bring in an appropriate court of that State -

(A) an action based on a violation of this subsection or the regulations prescribed under this subsection to enjoin such violation,

(B) an action to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater, or

(C) both such actions.

47 USCS §227 (2004).

Defendants seek to dismiss Plaintiff's TCPA claim pursuant to §2-615. As with the Group A motion to dismiss, Defendants argue that the individual States are required to pass an enabling statute before a claim can be brought pursuant to the TCPA in state court and Illinois has not passed such a statute. Defendants' position, however, is not supported by the vast majority of case law. Of the numerous courts that have considered this issue, only two Texas courts, *Autoflex Leasing, Inc. v. Manufacturers Auto Leasing,* Inc., 16 S.W.3d 815 (Tex. App.. 2000), and *The Chair King, Inc. v. GTE Mobilnet* of Houston, Inc., 184 S.W.3d (Tex. 2006), have held that it was necessary for States to pass enabling legislation and the decisions were not well-reasoned. The adoption of the "opt in" approach is illogical given the language of §227.

Several State courts which have rejected the "opt in" approach have found that the language "if otherwise permitted by the law or rules of court of a State" acknowledges the principle that States have the right to structure their courts as desired and are not obligated to change the structure of their courts or their procedural rules to accommodate TCPA claims. *E.g., Condon v. Office Depot, Inc.,* 855 So.2d 644 (Fla. App. 2003); *R.A. Ponte Architects, Ltd. v. Investors' Alert, Inc.,* 857 A.2d 1, 11 (Md. 2004); *Schulman v. Chase Manhattan Bank,* 268 A.D.2d 174 (N.Y. App. Div. 2000). The "acknowledgement" approach is in keeping with the language of the statute and the legislative history while also taking into account constitutional requirements. *R.A. Ponte,* 857 A.2d at 7, 14. "[I]f the exercise of a State court's ordinary jurisdiction under established local laws is 'appropriate to the occasion and is invoked in conformity with those laws,' a state court may not refuse jurisdiction over a claim based on Federal law." *Schulman,* 268 A.2d at 179, *citing, Mondou v. New York, New Haven & Hartford R.R. Co.,* 223 U.S. 1, 57.

Other State courts have found that the language "if otherwise permitted by the law or rules of court of a State" supports an "opt out" approach where States may pass legislation prohibiting such actions in their State courts, but otherwise must hear these actions. *E.g., Hooters of Augusta, Inc. v. Nicholson,* 537 S.E.2d 468 (Ga. App. 2000).

The "acknowledgment" approach is based upon sounder reasoning. However, regardless of whether the "acknowledgement" or "opt out" approach is used, it is clear that Illinois is not required to pass enabling legislation in order for suits to be brought pursuant to the TCPA in Illinois courts. This court is a court of general jurisdiction and has the ability to hear TCPA claims without further legislation. Illinois does not need to "opt in" to the TCPA.

Defendants further argue that Illinois has opted out of the TCPA. There is no

http://www.tcpalaw.com/case-law/pp.php?caseno=1720

Illinois statute, however, that expressly opts out of the TCPA. As with the previous Group A motion, Defendants argue that 720 ILCS 5/26-3, passed prior to the enactment of the TCPA, constitutes an opting out of the TCPA. It is obvious that a statute passed prior to the enactment of the TCPA cannot constitute an "opt out." Defendants also assert, as in the Group A motion, that Illinois has impliedly opted out of the TCPA by making unsolicited fax advertising a petty criminal offense and by not amending consumer fraud laws to address fax solicitations. This argument is without merit. Trial courts have the jurisdiction to hear TCPA cases unless hearing such cases would be prohibited by the laws or rules of the court. As with the Group A Defendants, the Group B Defendants have not identified any law or rule prohibiting this court from exercising jurisdiction over TCPA claims.

Finally, Defendants argue that requiring States to "opt out" of the TCPA violates the Tenth Amendment to the U.S. Constitution. This argument presumes that Congress conferred exclusive jurisdiction over TCPA claims upon State courts. The Seventh Circuit, however, has held that federal courts do have jurisdiction over TCPA claims. *Brill v. Countrywide Home Loans, Inc.,* 427 F.3d 446, 450-51 (7th Cir. 2005).

Plaintiffs are entitled to pursue a private right of action under the TCPA in this court.

*Constitutional Arguments* (§2-619):

Defendants also contend, pursuant to §2-619, that the TCPA is unconstitutional because it violates the First, Fifth, and Eighth Amendments of the U.S. Constitution. These arguments are without merit.

First Amendment:

Defendants first argue that the TCPA violates the First Amendment. This argument has been soundly rejected by the courts which have considered it. The test for whether regulations of commercial speech violate the First Amendment has been set forth by the U.S. Supreme Court in *Central Hudson Gas & Electric Corp. v. Public Service* Corp., 447 U.S. 557 (1980). Under *Central Hudson*, regulations of commercial speech are valid as long as they involve a substantial governmental interest, directly advance that interest, and are narrowly tailored to serve that interest. *Id.* at 564.

It is clear that the TCPA involves a substantial governmental interest contrary to Defendants' argument. There is a substantial governmental interest "in restricting unsolicited fax advertisements in order to prevent the cost shifting and interference such unwanted advertising places on the recipient." *State of Missouri ex. rel. Nixon v. American Blast Fax, Inc.,* 323 F.3d 649, 655 (8th Cir. 2000); see also, *State of Texas v. American Blast Fax, Inc.,* 121 F. Supp. 2d 1085, 1092 ("Congress' interests in passing the TCPA - preventing 'unwitting customers' from bearing the brunt of advertising costs and preventing unwanted fax machine interference - are substantial and real."); *Destination Ventures, Ltd. v. Federal Communications Comm'n,* 46 F.3d 54, 56 (9th Cir. 1995). It is not necessary to establish the reality of harm by empirical studies "and Congress used acceptable alternative bases when enacting the TCPA." *Phillips Randolph* Enterprises, LLC v. Fields, 2007 U.S. Dist. LEXIS 3027, *9 (N.D. Ill. Jan. 11, 2007).

The TCPA also clearly meets the requirement that regulations of commercial speech directly advance the governmental interest. Defendants argue that the TCPA fails to meet this requirement by banning only commercial speech, but this argument is without merit. "Because Congress's goal was to prevent the shifting of advertising costs, limiting its regulation to faxes containing advertising was justified." *Destination* Ventures, 46 F.3d at 56. "By placing restrictions on those responsible for a large portion of the problem, the TCPA directly and materially advances the congressional goal of limiting the harm arising from unsolicited fax advertisements." *State of Missouri ex. rel.* Nixon v. American Blast Fax, Inc., 323 F.3d at 655.

Defendants' contention that the TCPA's ban of unsolicited fax advertisements is not narrowly tailored is also without merit. Congress was not required to use the "least restrictive means" necessary to address the problem of unsolicited fax advertisements. *Board of Trustees of the State Univ. of N.Y. v. Fox,* 492 U.S. 469, 480 (1989). Rather, Congress was required to employ "a means narrowly tailored to achieve the desired objective." *Id.* Given the fact that Congress's desired objective in enacting the TCPA was to protect consumers from the cost shifting and interference imposed by unsolicited fax advertisements, the TCPA's ban on such faxes is narrowly tailored. *E.g., State of* Missouri ex. rel. Nixon v. American Blast Fax, Inc., 323 F.3d at 659; *Destination* Ventures, 46 F.3d at 56; *State of Texas v. American Blast Fax, Inc.,* 121 F. Supp. 2d at 1091-92; *Kenro, Inc. v. Fax Daily, Inc.,* 962 F. Supp. 1162, 1168-69 (S.D. Ind. 1997).

The TCPA does not violate the First Amendment.

**Excessive Penalties:**

As with the Group A motion, Defendants argue that the TCPA unconstitutionally imposes excessive penalties. Defendants argue that the TCPA's statutory fines are unconstitutionally excessive in violation of the Fifth and Eighth Amendments to the U.S. Constitution. These arguments are without merit.

The TCPA allows an individual to recover the actual monetary loss for each violation of the TCPA or $500 in damages, whichever is greater. 47 U.S.C. §227(b)(3)(2006). Defendants contend that this penalty violates due process, but a statutory penalty violates due process "...'only where the penalty prescribed is so severe and oppressive as to be wholly disproportional to the offense and obviously unreasonable.' " *United States v. Citrin,* 972 F.2d 1044, 1051 (9th Cir. 1992)(citation omitted). The TCPA penalty does not rise to this level.

In *Kenro, Inc. v. Fax Daily, Inc.,* 962 F. Supp. at 1165, the court found that "[t]he fact that the TCPA establishes as a remedy a damages award of $500, even when actual monetary damage is less than $500, does not itself make the award excessive and unreasonable." The penalty fashioned by Congress was not aimed at compensating plaintiffs for the actual cost of fax paper and toner; the remedy was fashioned to take into account "the difficult to quantify business interruption costs imposed upon recipients of unsolicited fax advertisements, effectively deter the unscrupulous practice of shifting these costs to unwitting recipients of 'junk faxes,' and 'provide adequate incentive for an individual plaintiff to bring suit on his own behalf.' " *Id.* at 1166.

The TCPA's $500 penalty "when measured against the overall harms of unsolicited fax advertising and the public interest in deterring such conduct, is not 'so severe and oppressive as to be wholly disproportioned to the offense or obviously unreasonable.' " *State of Texas v. American Blast Fax, Inc.,* 121 F. Supp. 2d at 1091 (W.D. Tex. 2000)(citation omitted). As recently noted by the Northern District of Illinois, "the Due Process clause of the 5th Amendment does not impose upon Congress an obligation to make illegal behavior affordable ..." *Phillips,* 2007 U.S. Dist. LEXIS at *7-8.

Defendants further argue that the TCPA violates the Eighth Amendment. The Eighth Amendment's prohibition against the imposition of excessive fines, however, "does not constrain an award of money damages in a civil suit when the government neither has prosecuted the action nor has received any right to receive a share of the damages awarded." *Browning-Ferris Industries v. Kelco Disposal,* 492 U.S. 257, 263-64 (1989). The TCPA allows private causes of action for money damages. As such, the Eighth Amendment has no application.

The TCPA is constitutional.

*Illinois Consumer Fraud Act (§2-615)*

Defendants contend that Plaintiffs' claims under the Illinois Consumer Fraud Act

("ICFA") fail to state a cause of action. Defendants are mistaken.

Defendants first argue that Plaintiffs have failed to state a claim under the ICFA because the allegations do not show conduct amounting to an unfair practice actionable under the ICFA. The ICFA allows for claims for unfair practices as well as deceptive acts. _Robinson v. Toyota Motor Credit Corp.,_ 201 Ill. 2d 403 (2002). In determining whether conduct is unfair, a court should consider: (1) whether the conduct offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; and (3) whether it causes substantial injury to consumers. _Id._ at 417-18. All three prongs do not have to be satisfied to support a finding of unfairness. _Id._ at 418. " 'A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." _Id._

Contrary to Defendants' arguments, the conduct alleged by Plaintiffs does offend the public policy of both the Federal government, as evidenced by the passage of the TCPA, and of Illinois which has criminalized Defendants' conduct. Like the Defendants in the Group A motion to dismiss, Defendants argue that their conduct was not oppressive and Plaintiffs have not shown substantial injury. While it is true that there is no substantial monetary injury to any one individual Plaintiff before this court, the alleged conduct of conducting mass faxing of unsolicited advertisements shows a pattern of unscrupulous conduct which greatly offends the public policy of Illinois which has criminalized this conduct. _Robinson_ is clear that it is not necessary for a plaintiff to satisfy all three criteria and that meeting even one criterion can be sufficient to show the existence of an unfair practice. In the instant case, Plaintiffs have alleged conduct which meets two of the criteria.

Defendants also argue, like the Group A Defendants before them, that Plaintiffs cannot state claims under the ICFA because they cannot show the existence of actual damages. Defendants' theory is that each Plaintiff sustained only _de minimis_ damages of a few cents as a result of Defendants' conduct. This argument ignores the fact that the cases before the court were filed as class actions. Finding that Plaintiffs were not damaged because each plaintiff was only damaged in small amounts would allow Defendants to escape any consequences for their alleged conduct "by committing many small violations that were not worth the time and effort of individual plaintiffs to redress or were beyond their ability or resources to remedy." _Christakos v. Intercounty Title Co.,_ 196 F.R.D. 496, 502 (N.D. Ill. 2000). Defendants rely on Judge Patrick McGann's opinion in _Whiting Corp. v. MSI Marketing, Inc.,_ 02 CH 6332, which addressed the substantiality of damages with regard to the _Robinson_ factors. Judge McGann offered no opinion on whether Plaintiffs could show the existence of actual damages.

Plaintiffs have sufficiently stated claims under the ICFA.

_Conversion_

Finally, Defendants contend, again as the Group A Defendants before them, that Plaintiffs cannot state a claim for conversion. Conversion is the unauthorized deprivation of property from a person entitled to its possession." _IOS Capital, Inc. v. Phoenix_ Printing, Inc., 348 Ill. App. 3d 366, 370 (4th Dist. 2004). "To prove conversion, the plaintiff must establish (1) a right in the property; (2) a right to immediate possession; (3) wrongful control by the defendant, and (4) a demand for the property." _Id._

Defendants contend that Plaintiffs have not alleged a wrongful or unauthorized deprivation of property. The sending of unsolicited fax advertisements, however, is prohibited under the TCPA and Illinois has criminalized this conduct. Despite Defendants' argument to the contrary, the sending of an unsolicited fax advertisement is "inherently wrongful."

Defendants next claim that Plaintiffs have not alleged a right to immediate possession of their toner and paper used by the fax machine. Defendants are mistaken. The owner of a fax machine reasonably expects that the fax machine and supplies will be used for the business purposes of the owner. Plaintiffs allege that

Defendants hijacked their machines for their own advertising purposes without consent using Plaintiffs' toner and paper. Plaintiffs had an immediate right of possession to their toner and paper.

Defendants also argue that Plaintiffs do not allege that they were dispossessed of their property, but this argument is disingenuous. Once Defendants' advertisements were printed with Plaintiffs' paper and toner, Plaintiffs were dispossessed of the paper and toner.

Defendants further contend that Plaintiffs have not alleged that they made any demand upon Defendants to return the toner and paper. Plaintiffs were not required to demand the impossible. Once the advertisements were printed out by the fax machines, the paper and toner were irretrievably converted and any demand for their return would be futile.

Finally, Defendants argue that they did not "seriously interfere" with Plaintiffs' property by sending a short advertisement. "Serious interference" is not an element of a conversion claim. Plaintiffs have alleged that Defendants converted their property and they are not required to do more.

Plaintiffs have sufficiently stated claims for conversion.

*Trespass (specific to Rossario v. Jurgens)*

In their Reply brief, the Jurgen Defendants argue for the first time that Rossario has not stated a claim for trespass. This argument is without merit. First, an argument cannot be raised for the first time in a Reply. Second, and more importantly, Rossario's Class Action Complaint does not allege a claim for trespass.

IT IS HEREBY ORDERED that Defendants' Group B master motion to dismiss is denied in its entirety.

Judge Andrew Berman

# # #

Printed on Monday, June 23, 2008.

Copyright © 2008. No claim to text of U.S. Government works. This file is property of TCPALaw.com. Acquisition and use of this document is subject to subscriber agreement. All rights reserved. Contact subscriptions@TCPALaw.com for more information.

# EXHIBIT G

(Rev. 9/13/04) CCG 0002

Order

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

TELECOMMUNICATIONS NETWORK DESIGN,
INC.

v.

BACH BUSINESS CREDIT, INC

No.  03 CW ~~09246~~

9246

5246D

JUDGE DAVID R. DONNERSBERGER  4234B

JAN 26 2005    4247B

Circuit Court - 1541

### ORDER

THIS MATTER COMING TO BE HEARD ON DEFENDANTS'
MOTION TO DISMISS DUE NOTICE HAVING BEEN GIVEN
AND THIS COURT BEING FULLY ADVISED IT IS SO ORDERED THAT:

1) DEFENDANTS' MOTION TO DISMISS IS DENIED THE COURT
   WILL ISSUE A MEMORANDUM ON ITS RULING;

2) DEFENDANTS' HAVE 28 DAYS TO ANSWER PLAINTIFF'S
   COMPLAINT; AND

3) ~~THIS~~ STATUS HEARING IS SO FOR MARCH 8, 2005
   AT ~~SET~~ 10:00 AM

Atty. No.: 6270758
LITCHFIELD CAVO
Name: STEPHANIE TIPTON
Atty. for: DEFENDANTS
Address: 303 W MADISON SUITE 300
City/State/Zip: CHICAGO, IL 60622
Telephone: 312 781 6656

ENTERED:

_____
Judge                    Judge's No.

MC

DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

# EXHIBIT H

IN THE CIRCUIT COURT OF THE SIXTEENTH JUDICIAL CIRCUIT
KANE COUNTY, ILLINOIS

MARK CHAIR COMPANY,                    )
                                       )
        Plaintiff,                     )
                                       )
    vs.                                )        Case No. 02 LK 247
                                       )
MORTGAGE MANAGERS, INC.                )
                                       )
        Defendants.                    )

Clerk of the Circuit Court
Kane County, IL

DEC 2 0 2002

FILED:        0 41
ENTERED

## ORDER

THIS CAUSE coming on for the Court's ruling on the Defendant's 2-619 and 2-515

Motion to Dismiss, the Court having considered said motion as well as the Response, Reply and

Surreply filed in conjunction therewith, along with the Brief of the Intervenor, United States of

America, the arguments of counsel and applicable case-law, and now being fully advised in the

premises,

MAKES THE FOLLOWING FINDINGS OF FACT/CONCLUSIONS OF LAW:

A.    The *Telephone Consumer Protection Act* (TPCA) is a federal statute prohibiting

      the transmission of commercial advertising by fax to parties who have not

      previously consented to the receipt of same.

B.    The standard applicable for the determination of the constitutionality of a

      restriction on commercial speech as protected by the First Amendment is set forth

      in *Central Hudson Gas & Electric Corporation v. Public Service Commission of*

      *New York, 447 U.S. 557(1980):*

1

C.    In applying the _Central Hudson_ test to the facts of the case at bar, the Court determines as follows:

1.    That the commercial speech in question concerns lawful activity and is not misleading.

2.    That the government interest in obviating the cost shifting of unsolicited fax advertising from the sender to the recipient thereof and preemption of the recipient's use of its fax machine is substantial for the protection of fax machine owners against the expense of unwanted advertising as well as the attendant interruption of fax capabilities during such transmissions.

3.    That unsolicited fax advertising requires those undesirous of it to become unwilling participants in the sender's advertising processes.

4.    That alternative means are available at the sender's expense to publish its intended commercial message.

5.    That the principal thrust of the TCPA is as a restriction of the mode of transmission rather than of commercial speech itself.

6.    That a single fax transmission in violation of the TCPA is not _de minimus_ in nature when viewed in the context of a larger advertising program and the potential proliferation of unsolicited fax advertising generally.

7.    That the TCPA directly advances the government interest of reducing the aforementioned cost shifting effects and disruption of fax services.

8.    That the regulation set forth in the TCPA is not more extensive than is necessary to further the government interest asserted and that lesser

2

restrictive means would likely diminish its regulatory effectiveness and, further, burden the recipient rather than the sender of fax advertising.

9. For the foregoing reasons, the Court finds that the TCPA is not violative of the Constitution.

D. That Illinois courts, as courts of general jurisdiction, possess the authority to hear all justiciable claims under state law or by authority conferred by federal law and, as such, require no separate and distinct legislation as contemplated by the drafters of the TCPA, as may be required in states with courts of limited jurisdiction, to avail litigants with the right to private actions provided therein.

E. That Count II of plaintiff's complaint states a cause of action sounding in conversion.

F. That Count III of plaintiff's complaint states a statutory cause of action under the provisions of the *Illinois Consumer Fraud Act.*

IT IS, THEREFORE, HEREBY ORDERED:

1. Defendant's 2-619 and 2-615 Motion to Dismiss is denied.

2. Defendant is allowed 21 days to file its Answer to the Complaint herein.

ENTER: December 20, 2002

_____
JUDGE

3

# EXHIBIT I

2116 (Rev. 02/05)

ORDER

UNITED STATES OF AMERICA

STATE OF ILLINOIS          COUNTY OF DU PAGE
IN THE CIRCUIT COURT OF THE EIGHTEENTH JUDICIAL CIRCUIT

American Title Ins Co.

-VS-

American Telephone &
Data

CASE NUMBER

04 L 974

File Stamp Here

## ORDER

This matter coming on to be heard, the Court being fully advised in the premises and having jurisdiction of the subject matter, IT IS ORDERED HEREBY: _____

_Defendant's motion to dismiss is denied based on the reasoning set forth in Kabrossi, Sowell v. Tier One Telecom? Mgmt. Group, case no. 03 L 425 (DuPage Co. Cir. Ct. Aug. 4, 2004)_

_Case management and status set for April 28, 2005 at 9:00 AM_

_Plaintiff's motion for class certification is entered and continued until April 28, 2005 at 9:00 AM_

_Defendant's responses to plaintiff's discovery requests is due on or before April 7th, 2005._

COPY

Name: _Goldman Gould Attorneys' Goodwin, LLC,_  ENTER: _____

DuPage Attorney No.: _9425_

JUDGE

Attorney for: _Plaintiff_           DATE: _24 March 2005_

Address: _120 S. La Salle St 18 flr,_

City/State/Zip: _Chicago, Il 60603_

Telephone: _312 739 4200_

CHRIS KACHIROUBAS, CLERK OF THE 18TH JUDICIAL CIRCUIT COURT ©
WHEATON, ILLINOIS 60189-0707

# EXHIBIT J

STATE OF ILLINOIS       )
                           )   ss
COUNTY OF LAKE       )

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
LAKE COUNTY, ILLINOIS

| | | |
|---|---|---|
| Eclipse Manufacturing Co.,<br>     Plaintiff, | ) ) ) | |
| v. | ) | 03 CH 1344 |
| T.J. Copy Products, Inc. and<br>Tracy J. Wertz,<br>     Defendants | ) ) ) | Judge David M. Hall |

FILED
APR 2 3 2004
CIRCUIT CLERK

## ORDER

Before this court is a motion by the Defendants to dismiss the complaint brought by Eclipse Manufacturing Company ("Eclipse") concerning the propriety of unsolicited facsimile transmissions sent by the Defendants. Defendants assail the complaint on several fronts. They contend that the Telephone Consumer Protection Act ("TCPA") violates numerous constitutional rights and must be invalidated by this court. Defendants also assert that several of Eclipse's claims fail to state a cause of action. Defendants' contentions will be addressed in turn.

1. Sections 2-615 and 2-619

Defendants move this court to dismiss or strike "portions" of Plaintiff's Complaint or to move this court for judgment on the pleadings. Defendants rely on 735 ILCS 5/2-615 and 735 ILCS 5/2-619 in support of these proposed actions. A Section 2-619 motion raises certain defects or defenses and questions whether judgment should be entered as a matter of law. *Illinois Graphics Co. v. Nickum*, 159 Ill.2d 469, 494 (Ill. 1994). In turn, a

section 2-615 motion questions whether a complaint states a valid cause of action. *Id.* at 488.

As an initial matter, this court will consider the threshold issues before it, addressing Plaintiff's standing and statutory right to bring this suit.

2. Defendants' Jurisdictional Arguments are Without Merit

Plaintiff has adequately demonstrated in its complaint that it received a commercial facsimile from T.J. Copy Products, allegedly in violation of the TCPA. The TCPA provides a statutorily conferred cause of action, enabling Plaintiff to bring suit in this court. Since Plaintiff has alleged that the Defendants have acted in contravention of federally established law, it would appear that there is a viable case before this court.

A statutory challenge under the Illinois Constitution requires a direct injury from the enforcement of a statute that is: (1) distinct and palpable; (2) fairly traceable to defendant's actions; and (3) substantially likely to be redressed by granting the relief requested. *Glisson v. City of Marion*, 188 Ill.2d 211, 221 (Ill. 1999). Plaintiff has adequately pleaded a distinct and palpable injury - the transmission of the unsolicited, commercial fax. The transmission was fairly traceable to the Defendants' actions because it originated from T.J. Products, Inc. Lastly, the relief requested should provide Plaintiff with redress because an injunction would serve to stop the actual injury and a monetary award would compensate the public harm caused by unfettered, unsolicited, commercial faxes. The court finds that Plaintiff has standing to maintain this action.

Defendants suggest that Illinois provides no private right of action enabling the Plaintiff to bring suit. This view has been conclusively rejected by courts nationwide. *See, e.g., Murphey v. Lanier*, 204 F.3d 911, 914 (9th Cir. 2000); *International Science &*

2

*Technology Institute, Inc. v. Inacom Communications, Inc.*, 106 F.3d 1146 (4th Cir. 1997); *Erienet, Inc. v. Velocity Net*, 156 F.3d 513, 515 (3rd Cir. 1998). The TCPA expressly creates a private cause of action for violations of the Act to be had in state courts. 47 U.S.C. § 227(b)(3). States *may* choose to prevent their courts from hearing private actions under the TCPA. *See International Science*, 106 F.3d at 1156. There is no indication that Illinois has done so here. As a result, the court finds that Plaintiff has presented a viable private claim before this court.

Defendants' final attack on the procedural posture of Plaintiff's claim centers on the fact that the TCPA prohibits "persons" from making unsolicited, commercial facsimile transmissions and not "entities." A brief review of the United States Code reveals that "persons" includes "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." 1 U.S.C. § 1 (2004). The court finds that Plaintiff is a person under the Act.

3.  The TCPA has Been Upheld as Universally Constitutional

Without regard to numerous judicial determinations upholding the constitutionality of the TCPA, Defendants assail the constitutional propriety of the TCPA. Defendants assert that the TCPA violates the First, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. A wide variety of federal and state courts have thoroughly examined the constitutionality of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227. In addition to satisfying general constitutional concerns, the universal consensus among the courts is that the TCPA easily satisfies concerns raised under the First Amendment relating to the regulation of commercial speech pursuant to *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980).

Defendants have not presented any new bases to support their argument that the prohibition of unsolicited, commercial speech, in the form of facsimile transmissions, is unconstitutional.

This court will individually address the array of Defendants' constitutional challenges.

### a. The First Amendment Challenge

Illinois courts employ the well-accepted *Central Hudson Gas* analysis when determining whether restrictions on commercial speech are constitutional. *See, e.g.,* *Vuagniaux v. Department of Professional Regulation*, 802 N.E.2d 1156 (Ill. 2003). To pass constitutional muster under the *Central Hudson Gas* analysis, the court must consider four factors. First, it must be determined whether the speech concerns unlawful activity, or whether it is misleading. *Id.* at 1167. Commercial speech which advocates unlawful activity or is misleading in nature receives no First Amendment protection. *Id.* Second, the court must analyze whether the asserted governmental interest in regulating the speech is substantial. *Id.* Third, the court must determine "whether the regulation directly advances the governmental interest asserted." *Id.* Lastly, it must be examined whether the regulation is more extensive than necessary to serve the governmental interest. *Id.*

Since *Central Hudson Gas* is controlling authority on this matter and has been employed by all courts considering this issue, it is appropriate for this court to do the same here. This is because the TCPA, by its plain meaning, prohibits the solicitation of commercial speech only. Moreover, the speech in question here, the unsolicited fax sent to Eclipse, is undoubtedly commercial in nature. It includes phrases such as:

4

"Unbelievable Deals!" and "Limited Inventory!! Call Now." As such, it is apparent that the communication at issue, and the statutory reach of the TCPA, are clearly limited to commercial speech. The TCPA easily passes the factors announced under the *Central Hudson Gas* analysis.

### i. The Speech at Issue is not Unlawful or Misleading

Because the first factor, whether the speech is unlawful or misleading, is not at issue in this litigation, it is considered satisfied for purposes of this analysis. The court finds that the speech in question is not unlawful or misleading.

### ii. There is a Substantial Interest in Eliminating Unwanted Commercial Faxes

In enacting the TCPA, Congress found that there was a substantial national interest in eliminating the ability of commercial fax marketers to shift the costs of advertisers to individuals through unsolicited, commercial facsimile transmissions. Further, there are also substantial interests in eliminating interruptions and interference commonly associated with unwanted faxes. Federal courts considering this issue have routinely held these interests as substantial or compelling. *See, e.g., Missouri v. American Blast Fax, Inc.*, 323 F.3d 649, 655 (8th Cir. 2003); *Destination Ventures, Ltd. v. FCC*, 46 F.3d 54, 55 (9th Cir. 1995). Moreover, three sister Illinois Circuit Courts have found a substantial interest in the TCPA as well. *See, e.g., Whiting Corp. v. MSI Marketing, Inc.*, No. 02 CH 6332 (Cook County, Illinois April 3, 2003) ("[I]t appears to this Court that the government has a substantial interest in preventing the cost shifting of advertising and the unwanted disruption of economic activity"); *Robin Hill Development Co. v. JD&T Enterprises, Inc.*, No. 01 L 527 (DuPage County, Illinois, October 3, 200) (upholding the substantial interest analysis); *Mark Chair Co. v. Mortgage Managers, Inc.*, No. 02 LK

247 (Kane County, Illinois, December 20, 2002) (explaining that the "government interest in obviating the cost shifting of unsolicited fax advertising from the sender to the recipient thereof and preemption of the recipient's use of its fax machine is substantial").

A well-documented legislative history underscores the fact that explosive growth in unsolicited facsimile advertising posed a realistic threat of economic harm to Americans with facsimile machines. This court will not belabor this well-established fact. Since unrestricted, unsolicited, commercial faxes cause considerable, demonstrated economic injury, the State has a strong interest in protecting fax owners and preventing these unsolicited transmissions.

It is manifestly clear that both the United States of American and Illinois have a substantial interest in protecting unwitting owners of facsimile machines from bearing the costs of unwanted, commercial fax advertising. The TCPA is undoubtedly directed towards preventing the unjustified cost-shifting associated with unsolicited facsimile transmissions and the business disruptions and delays common in the practice of "junk faxes." Like many courts before, this court holds that the TCPA easily passes the substantial governmental interest analysis.

   iii. The TCPA Directly Advances the Interest in Prohibiting
       Unsolicited, Commercial Facsimile Transmissions

A properly tailored restriction "focuses on the source of the evils the [government] seeks to eliminate . . . and eliminates them without at the same time banning or significantly restricting a substantial quantity of speech that does not create the same evils." *Ward v. Rock Against Racism*, 491 U.S. 781, 799 n. 7 (1989). Plaintiffs have the burden of demonstrating that the restriction imposed by the TCPA will not only advance the governmental interest but will do so to a material degree. *44 Liquormart, Inc. v.*

*Rhode Island*, 517 U.S. 484, 505 (1996).  Since unsolicited, commercial facsimile transmissions are responsible for the bulk of advertising cost shifting, banning *unsolicited*, commercial facsimiles is a reasonable method to achieve Congress' goal of reducing cost shifting.  *See, e.g., Destination Ventures*, 46 F.3d at 56.  The TCPA is a narrow response to the "evil" that prompted it - unsolicited, commercial facsimile transmissions.  It prohibits no more communication than is necessary because it proscribes the very activity that causes the economic harm at issue here and extends no further.

The TCPA directly advances the government's interest of protecting consumers from bearing the costs of unwanted advertising.  By carefully prohibiting only unsolicited, commercial faxes, it satisfies the third *Central Hudson Gas* analysis.

### iv.  The TCPA is not More Expansive Than Necessary

The last inquiry to be made involves whether the regulation is more extensive than necessary to serve the governmental interest.  *Vuagniaux*, 802 Ill.2d at 1167.  It should be first noted that the "least restrictive means" test has no role in the commercial speech context.  *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 628 (1995).  The test employed here is not whether Congress used the least restrictive means, but rather whether there:

is a 'fit' between the legislature's ends and the means chosen to accomplish those ends, a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is 'in proportion to the interest served,' that employs not necessarily the least restrictive means but . . . a means narrowly tailored to achieve the desired objective.

*American Blast Fax, Inc.*, 323 F.3d at 659 (internal quotations and citations omitted).

In this case, the TCPA leaves open ample alternative means of communication for commercial advertisers to engage in.  Those who wish to communicate advertisements by

7

facsimile transmission are still allowed to do so as fax advertising is permissible with the prior consent of recipients. *See id.* Those impacted by the law are, of course, also still free to advertise in other media formats, such as television or newspaper, where the advertiser bears the cost of publishing the advertisement. The TCPA is not excessively expansive; instead, it protects the owners of facsimile machines from the very evil that prompted the legislation.

The central inquiry here is whether the scope of the TCPA's speech restriction is proportionate to the interests served. *Board of Trustees of the State University of New York v. Fox*, 492 U.S. 469, 480 (1989). The interests here include the burdensome shift of costs from the advertiser to the consumer and the disruption of the use of facsimile machines. It is apparent that Congress' decision to prohibit only those facsimile transmissions that caused the economic injuries described represents a reasonable fit between the "legislature's ends" and the "means chosen to accomplish those ends" – the implementation of the TCPA. *American Blast Fax, Inc.*, 323 F.3d at 659 (internal quotations and citations omitted).

"It was not unreasonable for Congress to choose a system that protects those who would otherwise be forced to bear unwanted burdens over those who wish to send and receive unsolicited fax advertising." *Id.* The restriction employed by the TCPA is adequately tailored to protect consumers from the unwanted burdens of receiving unsolicited faxes. This is not a case where a complete ban of speech is in place. Rather, several alternative channels of communication remain open to commercial speakers. Because it has already been determined that the TCPA directly advances the substantial interest of protecting consumers from unwanted commercial faxes, and that it leaves open

alternative channels of communication, the court finds that the TCPA achieves a reasonable fit between the means adopted and the ends it seeks to serve.

The court finds that, as written, the TCPA satisfies all four elements of the *Central Hudson Gas* analysis.

### b. Vagueness Challenges

Defendants assert that the TCPA is void for vagueness because it "does not define what constitutes prior express invitation or permission nor what would constitute a facsimile." Mot. to Dismiss at 4. Because of this, Defendants assert, they cannot know what is necessary to avoid liability. Memo. in Support of Mot. to Dismiss at 10. Criminal laws may be deemed unconstitutionally vague when they "fail to provide the kind of notice that would enable a person of ordinary intelligence to understand what conduct is prohibited." *People v. Law*, 202 Ill.2d 578, 582 (Ill. 2002) (citing *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999)). Criminal laws may also be declared unconstitutionally vague when they fail to provide explicit standards of enforcement. *Id.*

Before this court can conduct a vagueness analysis, it must first turn its attention to the conduct of the Defendants challenging the law. *Village of Hoffman Estates v. The Flipside*, 455 U.S. 489, 495 (1981). "A Plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Id.* In this case, the Defendants have allegedly sent an unsolicited, commercial facsimile transmission to the Plaintiff. As a result, their conduct is "clearly proscribed" by the TCPA and they are not proper parties to contest its alleged vagueness. Nor is it possible for Defendants to assert a facial challenge against the statute, where the statute clearly applies to their conduct, because the overbreadth doctrine does not apply to

9

commercial speech. *See Waters v. Churchill*, 511 U.S. 661, 670 (1994). <u>The court finds that the Defendants lack standing to make a vagueness challenge to the TCPA.</u>

Defendants also assert that 720 ILCS 5/26-3, an Illinois criminal provision prohibiting unsolicited, commercial facsimile transmissions, is unconstitutionally vague. Plaintiff, however, has not based its causes of action on this statute and Defendants' challenge is, accordingly, not ripe. Hypothetical cases or controversies, challenging laws that are not being enforced against the Defendants, do not satisfy the requirements of the ripeness doctrine. *Simcox v. Simcox*, 131 Ill.2d 491, 498 (citing *Poe v. Ulman*, 367 U.S. 497, 507 (1961)).

Even if Defendants could properly raise the issue of vagueness, the terms "prior express invitation or permission" and "facsimile" do not suffer from the constitutional malady of vagueness. To guide the Defendants, this court looks to Funk & Wagnall's New International Dictionary of the English Language for assistance. Funk & Wagnall's Dictionary defines "prior" as "preceding in time, order, or importance." Funk & Wagnall's New International Dictionary of the English Language 1002 (2003). It defines "express" as "to put (thought or opinion) into spoken or written words." *Id.* at 448. Funk & Wagnall's defines "invitation" as "the act of inviting; courteous solicitation to come to some place or to do some act; especially a requesting of another's company: a standing *invitation* to dinner." *Id.* at 670. "Permission" is defined as "the act of permitting or allowing; license granted; formal authorization; consent." *Id.* at 941. Lastly, "facsimile" is defined as "an exact copy or reproduction, often differing in scale but always identical or closely imitative in detail, material, etc." *Id.* at 453. These are hardly unfamiliar words or phrases with uncertain meaning.

To be successful in their void for vagueness claim, Defendants must be able to illustrate why the challenged phrases "fail to provide the kind of notice that would enable a person of ordinary intelligence to understand what conduct is prohibited." *Law*, 202 Ill.2d at 582. Instead, Defendants make vague and conclusory allegations. The court finds that the challenged terms share a common and well-understood meaning which would otherwise deny the Defendants' vagueness challenge.

    c.    The TCPA Does not Violate Due Process or Provide for Excessive Fines

Defendants next argue that the TCPA violates their right to Due Process and that the award of statutory damages would violate the Eighth Amendment's prohibition against excessive fines. The Due Process Clause of the Fifth and Fourteenth Amendments prohibits governments from imposing "grossly excessive" punishments. *TXO Production Corp. v. Alliance Resource Corp.*, 509 U.S. 443, 454 (1993). The TCPA provides that a defendant, if found liable, must compensate the plaintiff for actual monetary loss per violation or $500 in damages, whichever is greater. *See* 47 USC § 227(b)(3). Defendants explain that allowing damages of $500 per violation of the TCPA is "wholly disproportionate to the offense and completely unreasonable."

A statutory penalty violates due process "only where the penalty prescribed is so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable." *St. Louis, Iron Mt. & S. Ry. Co. v. Williams*, 251 U.S. 63 (1919). At least two federal courts have upheld the damages provided by the TCPA under similar challenges. *See, e.g., Texas v. American Blast Fax, Inc.*, 121 F.Supp.2d 1085, 1090 (W.D. Texas 2000); *Kenro, Inc. v. Fax Daily, Inc.*, 962 F.Supp. 1162, 1167 (S.D. Ind. 1997). As the *American Blast Fax, Inc.* court explained:

> [T]he TCPA damages provision was not designed solely to compensate each private injury caused by unsolicited fax advertisements, but also to address and deter the overall public harm caused by such conduct. As the court stated in Kenro, the TCPA was meant to take into account the difficulty to quantify business interruption costs imposed upon recipients of unsolicited fax advertisements, effectively deter the unscrupulous practice of shifting these costs to unwitting recipients of junk faxes, and provide adequate incentive for an individual plaintiff to bring suit on his own behalf. The Supreme Court has stated that statutory damages designed to address such public wrongs need not be confined or proportioned to [actual] loss or damages; for, as it is imposed as a punishment for the violation of a public law, the Legislature may adjust its amount to the public wrong rather than the private injury, just as if it were going to the state.

121 F.Supp.2d at 1090 (internal quotations omitted).  The propriety of a penalty must be tested "with due regard for the interests of the public, the numberless opportunities for committing the offense, and the need for securing uniform adherence" to the law. *Williams*, 251 U.S. at 67.

The $500 minimum damages provision withstands constitutional scrutiny when measured against the overall public harm attributed to unsolicited, commercial faxes. These identified harms include substantial interference with facsimile machines and the shifting of advertising costs from the advertiser to the consumer. *American Blast Fax, Inc.*, 121 F.Supp.2d at 1091. <u>Minimum damage clauses that are addressed to remedying a public wrong do not violate the Due Process Clause.  The court finds that the TCPA passes constitutional muster under the Due Process Clause.</u>

With regard to the Eighth Amendment excessive fine issue, fines are valid unless they are grossly disproportionate to the nature of the violation. *United States v. Bajakajian*, 524 U.S. 321 (1998).  However, in *Browning-Ferris Indus. Of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 264 (1989), the Supreme Court explained that the excessive

12

fine provision of the Eighth Amendment "does not constrain an award of money damages in a civil suit when the government neither has prosecuted the action nor has any right to receive a share of the damages awarded." The excessive fines provision was concerned with the prosecutorial power of the state, not the extent or purposes of civil damages. Since the TCPA has allowed for private causes of actions, as demonstrated here, that provides for money damages, it does not implicate the Eighth Amendment. Accordingly, the court finds that the TCPA's monetary damages do not amount to excessive fines prohibited by the Eighth Amendment.

### 4. Conversion

Plaintiff alleges that the Defendants used Plaintiff's paper, ink, or toner for Defendants' advertising purposes. That rendered the paper, ink, and toner unusable by Plaintiff. Defendants, in turn, suggest that Plaintiff has failed to plead a sufficient cause of action for the tort of conversion. Specifically, Defendants attack Plaintiff's alleged failure to plead that the Defendants assumed control, dominion, or ownership of the paper and ink or toner. Several considerations are helpful in making the determination of whether a proper cause of action for conversion has been pleaded.

"The essence of conversion is not acquisition by the wrongdoer, but a wrongful deprivation of the owner thereof." *Dickson v. Riebling*, 30 Ill.App.3d 965, 967 (1st Dist. 1981). In fact, all that is required to demonstrate a successful showing of conversion is that the Defendants exercised control over the chattel "in a manner inconsistent with the plaintiff's right of possession." *Jensen v. Chicago & W.I.R. Co.*, 94 Ill.App.3d 915, 932 (1st Dist. 1981). In general, four factors must be established to succeed on a conversion claim: (1) the defendant wrongfully and without permission assumed control, dominion,

or ownership over the property; (2) the plaintiff has a right to the property; (3) plaintiff has an absolute and unconditional right to the immediate possession of the property; (4) the plaintiff made a demand for possession. *Western States Ins. Co. v. Louis E. Olivero & Assoc.*, 283 Ill.App.3d 307, 310 (3d Dist. 1996).

At least one other court has already held that the first three factors of conversion are met when a defendant sends unsolicited, commercial faxes to another's facsimile machine because it shifts the costs of advertising onto the recipient. *See, e.g., Whiting Corp. v. MSI Marketing, Inc.*, 02 CH 6332 at 14-15 (Cook County, Illinois April 3, 2003). This court adopts the reasoning of *Whiting Corp.* as persuasive. The Plaintiff has an unqualified possessory ownership interest in its facsimile machine, paper, ink, and toner. Beyond that, Defendants assumed control of the property when they sent unsolicited facsimile transmissions to the Plaintiff. These facts alone satisfy the first three factors of conversion. *See id.* Also, under established Illinois case law, Plaintiff need not make a demand for conversion where there is another independent act of conversion that can be demonstrated. *Jensen v. Chicago & Western Indiana R.R. Co.*, 94 Ill.App.3d 915, 933 (1st Dist. 1981). Since paper, toner, and ink would be consumed while the facsimile machine was overtaken by Defendants' facsimile transmission, other independent acts of conversion are reasonably found here, thus eliminating the requirement that the Plaintiff need make a demand for possession for there to be a proper claim of conversion. *See Whiting Corp.*, 02 CH 6332 at 15 (Cook County, Illinois April 3, 2003). The court finds that conversion has been sufficiently plead.

5.   The Illinois Consumer Fraud and Deceptive Business Practices Act

The Defendants have asked that Plaintiff's Consumer Fraud claim be dismissed because it fails to state a cognizable cause of action.  The Act protects consumers against any deceptive or unfair acts.  815 ILCS 505/2.  In *Robinson v. Toyota Motor Credit Corp.*, 201 Ill.2d 403 (2002), the Supreme Court of Illinois laid forth the elements for a successful claim under the Consumer Fraud Act.  To determine whether a business practice is unfair or deceptive, a court must consider: (1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive or unscrupulous; and (3) whether it causes substantial injury to consumers.  *Id.* at 417-18.  It is not required that all three factors be met for a successful Consumer Fraud action to be illustrated.  *Id.* at 418. Rather, a "practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three."  *Id.* (quoting *Chesire Mortgage Services, Inc. v. Montes*, 223 Conn. 80, 106 (Conn. 1992)).

In analyzing the first factor, transmitting unsolicited, commercial facsimile transmissions violates established Illinois public policy.  The public policy of Illinois is found in its Constitution, its statutes, and its judicial decisions.  *Reed v. Farmers Ins. Group.*, 188 Ill.2d 168, 174-75 (Ill. 1999) (citing *O'Hara v. Ahlgren, Blumenfeld & Kempster*, 127 Ill.2d 333, 341 (Ill. 1989)).  The Illinois Legislature has prohibited the transmission of unsolicited, commercial facsimiles, pursuant to 720 ILCS 5/26-3(b), and this reflects the public policy of Illinois by prohibiting the unsolicited facsimile transmission of commercial advertisements.  Thus, the act of sending unsolicited, commercial facsimile transmissions violates recognized public policy of Illinois, satisfying the first factor in *Robinson*.

The second factor this court must analyze in determining whether a violation of the Consumer Fraud Act exists is whether the act in question is immoral, unethical, oppressive or unscrupulous. *Robinson*, 201 Ill.2d at 417-18. In this instance, the Plaintiff has attached one facsimile to its Complaint as a demonstration of the communications sent by the Defendants. From the allegations contained in Plaintiff's Complaint, this court must determine whether Defendants' actions are immoral, unethical, oppressive or unscrupulous. Yet, it remains to be seen, by means of the discovery process, whether additional evidence will be produced evidencing conduct that is oppressive in this case. Certainly the transmission of one unsolicited, facsimile communication is annoying, but hardly oppressive. Yet, Plaintiff brings a class action complaint, alleging that Defendants may be engaged in a pattern of sending excessive amounts of faxes, thus amounting to an oppressive practice. The determination of this factor will require further evidence and development of the class action in this suit. As a result, it would be improper to dismiss this count at such a preliminary stage.

Considering the third factor, the Plaintiff must allege a substantial injury as a result of the Defendants' actions. There is no basis for the award of nominal or presumed damages under the Consumer Fraud Act. *Duran v. Leslie Oldsmobile, Inc.*, 229 Ill.App.3d 1032, 1041 (2d Dist. 1992). And there are not initial facts before the court from which it could make a determination about whether the aggregate injuries sustained are substantial. As a result, dismissing this class action count on this accord would be premature at this stage.

16

The court finds that Plaintiff has pleaded the minimum requirements for a claim under the Consumer Fraud Act.

6.  *De Minimis Non Curat Lex*

Defendants also buttress their claims supporting the dismissal of Plaintiff's Complaint with assertions that the damages are so infinitesimal that damages should not be awarded. T.J. Copy Products cites the doctrine of *de minimus non curat lex* as a maxim that precludes relief in this case. Illinois recognizes the rule that where a party has established the infringement of a right, damages are presumed. *Ainsworth v. Century Supply Co.*, 295 Ill.App.3d 644, 649-50 (2d Dist. 1998) (citing *Leslie Oldsmobile, Inc.*, 229 Ill.App.3d at 1040). This presumption entitles parties to nominal damages. In this case, the TCPA demonstrates that Plaintiff's rights may have been infringed, allowing for the award of, at minimum, nominal damages. Thus, no basis for dismissal is apparent as a result of Defendants' assertions

Furthermore, Plaintiff correctly notes that both Illinois and the United States have a firmly established public policy against the transmission of unsolicited, commercial facsimile transmissions. In fact, the TCPA itself provides for damages to be awarded up to $500 per violation of the Act. 47 U.S.C. § 227(c). The TCPA was born out of a concern about the impact of unwanted, commercial faxes being sent to fax machines. The TCPA addresses this concern and creates a financial disincentive for this to occur. Thus, because the TCPA provides for statutorily conferred damages to compensate for the public wrongs addressed by the Act, it cannot be said that the damages at issue are *de minimis*.

## FINDINGS

The court makes the following findings that:

1. Defendants' Jurisdictional Arguments are Without Merit.

   a. Plaintiff has standing to maintain this action.
   b. Plaintiff has presented a viable private claim before this court.
   c. Plaintiff is a person under the TCPA.

2. The TCPA is Constitutional.

   a. The TCPA Satisfies First Amendment Concerns
      i. The speech at issue is not unlawful or misleading.
      ii. The TCPA easily passes the substantial governmental interest analysis.
      iii. The TCPA directly advances the government's interest of protecting consumers from bearing the costs of unwanted advertising.
      iv. The TCPA achieves a reasonable fit between the means adopted and the ends it seeks to serve.

   b. The TCPA Satisfies the Vagueness Analysis
      i. The Defendants lack standing to make a vagueness challenge to the TCPA.
      ii. The challenged terms share a common and well-understood meaning which would otherwise deny the Defendants' vagueness challenge.

   c. The TCPA passes constitutional muster under the Due Process Clause.

   d. The TCPA's monetary damages do not amount to excessive fines prohibited by the Eighth Amendment.

3. Conversion has been sufficiently pleaded.

4. Plaintiff has pleaded the minimum requirements for a claim under the Consumer Fraud Act.

5. The damages at issue are not *De Minimis*.

18

The court finds that the Defendant has not demonstrated that the TCPA is unconstitutional under the First, Fifth, Eighth or Fourteenth Amendment to the United States Constitution. The court also finds that the Plaintiff has adequately pleaded legally cognizable causes of action.

## HOLDING

It is therefore hereby ordered that Defendants' motion to dismiss is denied in its entirety. Defendants shall answer or otherwise plead within 28 days.

ENTER: _____ DAVID M. HALL
JUDGE DAVID M. HALL

Dated this _____ April 2004 at Waukegan, Illinois

19

# EXHIBIT K

04/14/2005

CIRCUIT COURT FOR THE 19th JUDICIAL CIRCUIT

PAGE 82/82

STATE OF ILLINOIS
COUNTY OF McHENRY } SS

GEN. NO. ___ 04 CH 455

☐ Jury   ☐ Non-Jury

Zoes                              vs.              Fann

FILED
McHenry County, Illinois
JAN 12 2005
VERNON W. KAYS, JR.
Clerk of the Circuit Court

Date __1/12/05__    Plaintiff's
Attorney __Edelman__    Defendant's
Attorney __Bielfke__

ORDER

1. Defendant's motion to dismiss is denied.

2. Defendant's have 28 days to answer.

3. This matter is continued for status on plaintiffs' class certification motion, to March 16, 2005 at 9 am, Rm C 320.

prepared by: __Dan Edelman__

Attorney for: __Plaintiff__

Attorney Registration No.: __00712054__    Judge __[signature]__

# EXHIBIT L

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS | ) | FILED |
| | ) | |
| Plaintiff, | ) | FEB 14 2000 |
| | ) | |
| v. | ) | JOHN M. WATERS, Clerk |
| | ) | U.S. DISTRICT COURT |
| | ) | CENTRAL DISTRICT OF ILLINOIS |
| DISCOVERY MARKETING, INC., and SOURCE MARKETING, INC., d/b/a/ Fax Source, | ) | No. 99-3243 |
| | ) | |
| Defendants. | ) | |

## ORDER

JEANNE E. SCOTT, U.S. District Judge:

This matter comes before the Court on Defendant Source Marketing, Inc., d/b/a/ Fax Source's (Fax Source) Motion to Dismiss. The Plaintiff People of the State of Illinois (Illinois) claims Fax Source violated the Telephone Consumer Protection Act, 47 U.S.C. §227 et seq. (TCPA), and the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq. (CFA). The Complaint alleges that Fax Source is a fax broadcaster that distributed Defendant Discovery Marketing, Inc.'s (Discovery) advertisements to consumer fax machines in Illinois. Count IV

Obtained from
**TCPALAW.COM**
The leading source for TCPA legal research

Copyright © 2008. No claim to text of U.S. Government works. This file is property of TCPALaw.com. Acquisition and use of this document is subject to subscriber agreement. All rights reserved. Contact subscriptions@TCPALaw.com for more information.

alleges Fax Source sent unsolicited fax advertisements in violation of the TCPA. Count V alleges Fax Source sent faxes without including in the message (1) the date and time the message was sent, and (2) the identification of the sender. Count VI alleges that Fax Source sent deceptive messages in violation of the CFA.

Count V states a claim under the TCPA because Fax Source failed to identify the source of Discovery's faxes. The Federal Communication Commission's (FCC) interpretation of the TCPA requires fax broadcasters to identify the sender of the fax on the transmission. The failure to identify the source of the communication may also be a deceptive practice under the CFA. Thus, Count VI states a claim. Fax broadcasters, however, are not liable for the content of the messages they transmit unless they have either (1) a high degree of involvement in the plan to send prohibited messages, or (2) actual notice that the message is prohibited and then fail to take steps to stop the transmission. Count IV fails to allege that Fax Source had either actual notice or a high degree of involvement in the plan to send illegal advertising. Count IV therefore fails to state a claim and is dismissed.

For purposes of this motion, the Court must accept as true all well-

2

Obtained from
**TCPALAW.COM**
The leading source for TCPA legal research

Copyright © 2008. No claim to text of U.S. Government works. This file is property of TCPALaw.com. Acquisition and use of this document is subject to subscriber agreement. All rights reserved. Contact subscriptions@TCPALaw.com for more information.

pleaded factual allegations contained in the Complaint and draw all inferences in the light most favorable to the non-moving party. <u>Hager v. City of West Peoria</u>, 84 F.3d 865, 868-69 (7th Cir. 1996); <u>Covington Court, Ltd. v. Village of Oak Brook</u>, 77 F.3d 177, 178 (7th Cir. 1996). A complaint should not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts that would entitle it to relief. <u>Doherty v. City of Chicago</u>, 75 F.3d 318, 322 (7th Cir.1996).

According to the Complaint, Discovery sent advertisements via fax to Illinois citizens. The recipients did not authorize Discovery to send the advertisements. At least some of the advertisements did not identify either Discovery or Fax Source as the sender of the messages. Rather, the messages appeared to be internal office memoranda addressed to all employees. The ads offered discounted Bahama Cruises to the first 50 or 100 individuals who called an 800 telephone number listed in the messages. From the appearance of the advertisements one could conclude that the recipient's employer either sent or authorized the advertisements. Some of the faxes stated at the bottom that recipients could call a separate 800 number to remove their names from the list of recipients. Some of the faxes also contained a fax identification number.

3

Obtained from
**TCPALAW.COM**
The leading source for TCPA legal research

Copyright © 2008. No claim to text of U.S. Government works. This file is property of TCPALaw.com. Acquisition and use of this document is subject to subscriber agreement. All rights reserved. Contact subscriptions@TCPALaw.com for more information.

Discovery used Fax Source's services to send the advertisements. Fax Source is a fax broadcaster.[1]  It can send a fax message virtually simultaneously to many different fax telephone numbers. It advertises that it has a data base containing 500,000 fax telephone numbers.  The fax identification number on some of Discovery's faxes was Fax Source's reference number. Fax Source's 800 telephone number was listed on some of the faxes as the number to call to remove the recipient from the faxing list. Fax Source also modified its equipment to omit from the message the date and time the message was sent and the source of the message.[2]

The Complaint does not allege: (1) that Fax Source knew the content of Discovery's fax messages or participated in the preparation of the content; (2) that Fax Source provided the fax telephone numbers of the recipients of the Discovery faxes; or (3) that Fax Source knew whether the recipients authorized Discovery to send them the faxed messages.

The TCPA, and its accompanying regulations, prohibit sending

---

[1] The Complaint alleges no other affiliation between Discovery and Fax Source. Discovery is located in Florida. Fax Source is located in Colorado.

[2] Illinois alleges that FCC regulations require all faxing equipment manufactured after December 20, 1992, to mark messages with such identifying information. When read in the light most favorable to Illinois, this fact implies that Fax Source modified its equipment to omit this information.

4

Obtained from
**TCPALAW.COM**
The leading source for TCPA legal research

Copyright © 2008.  No claim to text of U.S. Government works. This file is property of TCPALaw.com. Acquisition and use of this document is subject to subscriber agreement. All rights reserved. Contact subscriptions@TCPALaw.com for more information.

unsolicited advertisements by fax. 47 U.S.C. §227(b)(1)(C); 47 C.F.R. §64.1200(a)(3). The sender must have the prior express consent of the recipient before sending the advertisement. Id.; 47 U.S.C. §227(a)(4). The TCPA and its regulations further require senders to state on the message: (1) the source of the message, and (2) the date and time the message was sent. 47 U.S.C. §227(d)(1) and (d)(2); 47 C.F.R. §68.318(d).

The TCPA, however, does not define who is the "sender". The FCC addressed that question in a number of enforcement opinions. The FCC concluded that the entity on whose behalf a message is sent is principally liable for compliance with the TCPA. <u>In the Matter of Rules and Regulations Implementing the TCPA</u>, 10 F.C.C. Rcd. 12,391, 1995 WL 464817 at page 11 (1995).

The FCC considered the fax broadcaster generally to be subject to the same rules as common carriers, such as the telephone companies transmitting the fax signal. Common carriers are only liable for illegal transmissions if they have a high degree of involvement in the illegal activity or have actual notice of the illegal message and fail to take steps to prevent the transmission. <u>In the Matter of Rules and Regulations Implementing the TCPA</u>, 7 F.C.C. Rcd. 8752, 1992 WL 690928 at 19

Obtained from
**TCPALAW.COM**
The leading source for TCPA legal research

Copyright © 2008. No claim to text of U.S. Government works. This file is property of TCPALaw.com. Acquisition and use of this document is subject to subscriber agreement. All rights reserved. Contact subscriptions@TCPALaw.com for more information.

(1992), <u>citing In the Matter of Enforcement of Prohibitions Against the Use of Common Carriers for the Transmission of Obscene Materials</u>, 2 F.C.C. Rcd. 2819, 1987 WL 344925 at 3 (1987).

The FCC did not conclude that fax broadcasters were equivalent to common carriers, however. As the actual operator of the equipment transmitting the message, the FCC concluded that the fax broadcaster must place the required identifying information on the message. 7 F.C.C. Rcd. 8752, 1992 WL 690928 at 19 (1992). The FCC later decided that the fax broadcaster must only identify the entity on whose behalf it sent the transmission. It need not identify itself as the broadcaster of the message. <u>In the Matter of Rules and Regulations Implementing the TCPA</u>, 12 F.C.C. Rcd. 4609, 1997 WL 177258 at 2 (1997) ("we require that a facsimile broadcast service provider ensure that the identifying information of the entity on whose behalf the provider sent the messages appear on the facsimile message").

Count V of the Complaint, therefore, alleges a claim against Fax Source for violation of the TCPA. Fax Source failed to identify Discovery as the entity on whose behalf the faxes were sent. Count IV, however, does not state a claim against Fax Source for sending unsolicited advertising.

6

Obtained from
**TCPALAW.COM**
The leading source for TCPA legal research

Copyright © 2008. No claim to text of U.S. Government works. This file is property of TCPALaw.com. Acquisition and use of this document is subject to subscriber agreement. All rights reserved. Contact subscriptions@TCPALaw.com for more information.

The Complaint does not allege either that Fax Source (1) had a high degree of involvement in the illegal advertising, or (2) had actual notice of the illegal conduct and failed to stop the transmission. None of the allegations say that Fax Source either knew the content of the messages or participated in creating the messages.

The TCPA does not prohibit all unsolicited messages, only unsolicited advertising. A Fax Source customer may wish to send out political messages, religious messages, educational messages, or a myriad of other types of messages that do not violate the TCPA. The Court agrees with the FCC that fax broadcasters should not be obligated to censor customers' speech. To state a claim, Illinois must allege that Fax Source either participated in the plan to send unsolicited advertising or had actual notice Discovery was attempting to use its services to send unsolicited advertising by fax.

The Complaint does not allege either involvement by Fax Source in the plan to advertise by fax. The Complaint does not allege that Fax Source had any knowledge or involvement in producing the advertising content of the Discovery messages. The Complaint alleges that Fax Source had a data base of 500,000 fax numbers, but does not allege that Fax Source either

7

Obtained from
**TCPALAW.COM**
The leading source for TCPA legal research

Copyright © 2008. No claim to text of U.S. Government works. This file is property of TCPALaw.com. Acquisition and use of this document is subject to subscriber agreement. All rights reserved. Contact subscriptions@TCPALaw.com for more information.

selected the recipients of Discovery's messages or knew whether the recipients requested the information. Without some allegations of notice or knowing participation, Count IV of the Complaint fails to state a claim.

Illinois urges the Court to reject the FCC interpretations of the TCPA. It argues that Fax Source violated the plain meaning of the statute. The TCPA declares that it shall be unlawful, "to use any telephone facsimile machine, computer, or other device to send an unsolicited advertisement to a telephone facsimile machine." 47 U.S.C. §227(b)(1)(C). Fax Source used a machine to send advertising; the advertising was unsolicited; thus, Fax Source must be liable.

This logic would impose an obligation on every retail copy store, hotel, or other establishment that offers fax services to the public, to read every message customers wish to send, to decide whether a message is advertising, and if so, to determine whether the advertising is unsolicited. The Court agrees with the FCC that Congress did not intend to put such a burden on businesses who offer communications services to the public; Congress intended to put the burden on the entity that desires to advertise. The transmission service provider should not be a censor; it should only be liable if it is knowingly involved in the illegal conduct or has actual notice

8

Obtained from
**TCPALAW.COM**
The leading source for TCPA legal research

Copyright © 2008. No claim to text of U.S. Government works. This file is property of TCPALaw.com. Acquisition and use of this document is subject to subscriber agreement. All rights reserved. Contact subscriptions@TCPALaw.com for more information.

that the communication is illegal and fails to prevent the transmission. Count IV fails to state a claim.

Illinois states a supplemental state claim in Count VI for violation of the CFA. The CFA prohibits unfair and deceptive practices in commerce. 815 ILCS 505/2. Sending Discovery's messages in Illinois is clearly a commercial practice. 815 ILCS 505/1(f) (1996). The practice becomes deceptive if it creates a likelihood of deception or has a capacity to deceive. People ex rel. Hartigan v. Knecht Services, Inc., 216 Ill.App.3d 843, 857, 575 N.E.2d 1378, 1387, 159 Ill.Dec. 318, 327 (1991). Here, Fax Source modified its sending equipment to remove that information. Omitting this information could cause recipients to believe their employers either sent the message or authorized the message. Creating such an impression could create a likelihood of deception or have a capacity to deceive. Count VI therefore states a claim.

Fax Source argues again that only Discovery should be liable under the CFA because it is responsible for the content of the message. Fax Source cites Zekman v. Direct American Marketers, Inc., 182 Ill.2d 359, 369, 695 N.E.2d 853, 859, 231 Ill.Dec. 80, 86 (1998), in support of this argument. The Zekman Court held that the telephone company cannot

9

Obtained from
**TCPALAW.COM**
The leading source for TCPA legal research

Copyright © 2008. No claim to text of U.S. Government works. This file is property of TCPALaw.com. Acquisition and use of this document is subject to subscriber agreement. All rights reserved. Contact subscriptions@TCPALaw.com for more information.

violate the CFA simply because a customer uses a 900 telephone number deceptively. Rather, a party must actively participate in the deceptive practice to be liable under the CFA. Fax Source, unlike the telephone company, did participate. Fax Source is required to identify the source of the message; it did not do that. In fact, it took steps to omit this information from the message. It thus participated in the alleged deceptive practice. Count VI states a claim.

Therefore, the Motion of Source Marketing, Inc., d/b/a/ Fax Source to Dismiss (d/e 9) is ALLOWED in part and DENIED in part. Count IV is dismissed. The motion is denied in all other respects. Should Illinois determine, either now or through discovery, that it has a good faith basis to file an amended Count IV that would state a claim against Fax Source for sending unsolicited fax advertisements, it may seek leave to amend the Complaint. Fed.R.Civ.P. 15(a). Defendant Fax Source shall answer Counts V and VI of the Complaint within 10 days of the date of this Order.

IT IS THEREFORE SO ORDERED.

ENTER: ___February 12___, 2000.

FOR THE COURT:

JEANNE E. SCOTT
UNITED STATES DISTRICT JUDGE

10

Obtained from
**TCPALAW.COM**
The leading source for TCPA legal research

Copyright © 2008. No claim to text of U.S. Government works. This file is property of TCPALaw.com. Acquisition and use of this document is subject to subscriber agreement. All rights reserved. Contact subscriptions@TCPALaw.com for more information.