### IN THE UNITED STATES DISTRICT COURT FOR THE
### NORTHERN DISTRICT OF ILLINOIS - EASTERN DIVISION

| | | |
|---|---|---|
| R. Rudnick & Company, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 08 CV 2560 |
| | ) | |
| JOE ANDERSON and RICHARD ANDERSON, | ) | |
| doing business as DISPOSAL MANAGEMENT | ) | |
| SYSTEMS and JOHN DOES 1-10, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' REPLY PLAINTIFF'S RESPONSE TO RULE 12(b)(6) MOTION TO DISMISS

Defendants JOE ANDERSON and RICHARD ANDERSON, by counsel, state as follows as their Reply Brief in Support of their Motion to Dismiss:

## I.  INTRODUCTION.

Plaintiff brought this case against Richard and Joe Anderson as individuals responsible for the actions of a dissolved corporation.  The complaint alleges that the Andersons are to be held liable for the unauthorized fax communication sent to plaintiff, and to others similarly situated on a class-action basis, pursuant to the  TCPA, 47 U.S.C. Sec. 227, now known as the Junk Fax Protection Act, the Illinois Consumer Fraud Act (815 ILCS 505/et seq.) and common law conversion.  A copy of the complaint is attached to Defendants' Motion.

Defendants moved to dismiss all counts in reliance on the fact that the Anderson's corporation, Disposal Management Systems, Inc., has never been dissolved by the Secretary of State.  Defendants moved to dismiss the TCPA and conversion claims based on the prior consent of Plaintiff.  Plaintiff and Defendant are subscribers to the "Blue Book of Building and

1

Construction" ("Blue Book") which specifically authorizes the faxing of communications between subscribers. Blue Book subscribers are members of the building and construction industry. Disposal Management Systems, Inc. is in the business of construction waste disposal, while on information and belief Plaintiff is a general construction contractor.

Plaintiff responded to the motion to dismiss all counts by alleging that the corporation was dissolved prior to May, 2008. Plaintiff responded to the motion to dismiss the TCPA and Conversion counts by denying that it had given prior consent to receive fax advertisements from Defendants.

## II. DISCUSSION.

### A. Dismissal As to All Counts.

Plaintiff's complaint Par 4-6 allege that defendants Joe and Richard Anderson are individuals doing business as Disposal Management Systems, Inc., and that Disposal Management Systems, Inc. has been dissolved. In fact, Defendants are shareholders and officers of Disposal Management Systems, Inc. (DMS) an Illinois Corporation incorporated since 1989. Defendants' conduct, whether or not said conduct is actionable, was undertaken in a corporate capacity, not in an individual capacity.

Plaintiff assumes, and so argues in its response, that the omission of the timely filing of the 2007 annual report with the Illinois Secretary of State resulted in the administrative dissolution of the corporation (Plaintiff's Brief pp. 2-4). In fact, the failure to file a timely report in Illinois merely subjects the corporation to the public designation "not in good standing", as evidenced in this case by the attachment to Plaintiff's Brief (Exhibit "A"). Plaintiff failed to fully investigate the corporate status of DMS, and Plaintiff conflates the meaning of "not in good standing" with the meaning of

"administratively dissolved" as used by the Secretary of State.

DMS was never administratively dissolved by the Illinois Secretary of State, as established by Exhibit "A" attached hereto and made a part hereof. On information and belief, the designation "not in good standing" as used by the Secretary of State merely means that the corporation in question has failed for the time being to comply with a required filing. Upon submission of the missing documents the designation is removed. It is only after a prolonged period of non-compliance that the Secretary of State issues appropriate paperwork holding the corporation to be administratively dissolved, thus putting an end to the corporate existence *and only then* subjecting the officers and directors to personal liability.

Accordingly, the complaint against Joe and Richard Anderson should be dismissed with prejudice.

**B.  Dismissal as to Count I - TCPA, Count II - Common Law Conversion, and Count III (Illinois Consumer Fraud Act).**

As pointed out in the Motion to Dismiss, at all relevant times DMS and Plaintiff have subscribed to and participated in a publication known as "The Blue Book of Building and Construction" the "Electronic Blue Book"and the "BB-Bid Network", the latter being an online bid management system  (collectively the Blue Book), a print and web-based construction aid in which construction trades pay to advertise their services and to solicit price quotations from subcontractors for use in assembling bids on construction projects.

By advertising in the printed Blue Book and by using the web-based version Plaintiff subscribed to the Terms and Conditions thereof, which authorize the other users of and subscribers to the Blue Book to send them faxes (Motion to Dismiss pp. 10-12).  In other words, the Terms and Conditions of the Blue Book, create an existing business relationship (EBR) between the Plaintiff

and Disposal Management Systems, Inc. which the FCC has determined are exempt from the prohibition on sending unsolicited facsimile advertisements (47 CFR Sec. 64.1200(a)(3)).

Since the faxes in question in this case are not wrongful there can be no TCPA, Conversion, or Illinois Consumer Fraud Act Claims.

In *Travel 100 Group, Inc. v. Mediterranean Shipping Company (USA), Inc., No. 1-06-3744 (Ill. App. 5/30/2008),* a copy of which is attached hereto as Exhibit "B", the Illinois Appellate Court recently considered an almost identical set of circumstances to those present in this case and declined to find liability under the TCPA. Travel 100 Group, Inc. ("Travel 100") operates travel agencies and at all relevant times was a member of International Airlines Travel Agent Network (IATAN) (*Id.*, pp. 2-3). Incident to it's membership in IATAN, Travel 100 supplied its fax number to IATAN for inclusion in its database (*Id.*, p. 5). Travel 100's fax number was obtained by defendant-appellee through this database (*Id.*, p. 3). The appellate court concluded that "Travel 100 approved the inclusion of its contact information in the IATAN database, and Travel 100 representatives signed and returned documents that expressly stated the information would be provided to travel-industry suppliers, thus inviting communications from those businesses." (*Id.*, p.9). "The undisputed facts establish Travel 100's express permission and invitation for advertisements to be sent by third parties .... It is uncontroverted that Travel 100 went beyond simply agreeing to the inclusion of its contact information in the IATAN database. Various representatives of travel 100 submitted the agency's contact information upon being told that IATAN would release the information 'to any industry supplier that may wish to use' Travel 100's services (*Id.*, p.15). According to the Illinois appellate Court, such prior approval places the fax communications squarely within the exception for an "established business relationship" (EBR) set forth in the Junk

4

Fax Prevention Act *(Id.*, p.17).

      In the facts at hand in this case, the parallels are striking. The Blue Book arrangement seems to be very similar to the IATAN network. Both agencies are trade groups dedicated to facilitating communication between members of the same industry for the mutual benefit of all users. Plaintiffs in both cases voluntarily provided their fax contact information to the network in order to improve their business prospects. In the case at hand Plaintiff subjected itself to the Terms and Conditions which authorize receipt of faxes from other Blue Book Network members, such as DMS. The Illinois Appellate Court properly held that the Plaintiff could not maintain a cause of action for the supposedly unlawful receipt of a fax that Plaintiff had itself solicited, and it is reasonable to assume that the same court would make the very same decision in this case. As such, Defendants consider *Travel 100* to be persuasive authority in this court and urge that its reasoning be adopted by the District Court.

      Plaintiff sets up a straw man argument when it contends that its voluntary publication of its fax number in the Blue Book is insufficient to create an EBR. (Plaintiff's Response, p. 6). First, Plaintiff did more than simply publish its fax number in the Blue Book. By publishing its fax number in the Blue Book *and* by subscribing to the Blue Book's services, Plaintiff expressly consented to receiving fax advertisements from other Blue Book members, like the Andersons ' company Disposal Management Systems. (Defendants' Motion to Dismiss, pp. 2-3). Moreover, Plaintiffs' argument that an EBR defeats a TCPA claim only where the sender possessed the recipient's fax number before the 2005 amendments to the TCPA misconstrues the statute and applicable regulations. (Plaintiff's Response, p. 6). While it is true that Congress amended the TCPA in 2005 to explicitly recognize an EBR, the Federal Communications Commission, the

agency responsible for promulgating regulations under the TCPA, has recognized that an EBR defeats a TCPA claim since at least 1992. See In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 7 FCC Rcd. 8752, ¶ 54, n. 87. (October 16, 1992). Thus, an EBR defeats a TCPA claim both when the sender obtained the recipient's fax number before the 2005 amendment or where the sender obtained that number after those amendments. The only difference is that where the fax is sent based on an EBR that came into existence after the 2005 amendments – as here – the sender can transmit the fax even if it obtained the recipient's fax number from a "directory, advertisement, or site on the Internet to which the recipient voluntarily agreed to make available its facsimile number for public distribution." See 47 U.S.C. § 227(b)(1)© (the clause permitting a sender to transmit a fax based on an EBR where the sender obtains the fax number from a directory "shall not apply in the case of an unsolicited advertisement that is sent based on an [EBR] with the recipient that was in existence before July 9, 2005, if the sender possessed the facsimile machine number of the recipient before such date of enactment"); 47 C.F.R. § 64.1200(a)(3)(ii)© ("There shall be a rebuttable presumption that if a valid established business relationship was formed prior to July 9, 2005, the sender possessed the facsimile number prior to such date as well").

Accordingly, the existence of an EBR in this case defeats plaintiff's claims under the Junk Fax Prevention Act. Further, a fax which is not wrongful under the Act cannot be wrongful under the Illinois Consumer Fraud Act. Plaintiff devotes a very substantial portion of it's brief to this subject, but all plaintiff's arguments are founded on the wrongfulness of the fax. Since the fax is not wrongful under the Act it cannot furnish the basis for a Consumer Fraud Act claim.

Likewise, an invited fax transmission cannot provide the foundation of a conversion claim, which requires a showing that the sender converted plaintiff's ink and paper to its own use. A fax

6

which is invited through the enrollment in a trade organization cannot be said to be "appropriation" of plaintiff's property.

WHEREFORE, defendants  JOE ANDERSON and RICHARD ANDERSON pray that this action be dismissed and that this court grant such other and further relief as it deems just.

By: /S/   David T Grisamore
Attorney for Defendants
Joe Anderson and Richard Anderson

David T. Grisamore, Esq.
53 W Jackson #1643
Chicago IL 60604
(312) 913-3448
(312) 913-3458 fax
6237226

EXHIBIT "A"

FIFTH DIVISION
May 30, 2008

No. 1-06-3744

| | | |
|---|---|---|
| TRAVEL 100 GROUP, INC., on Behalf of Itself and All Others Similarly Situated, | ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | |
| MEDITERRANEAN SHIPPING COMPANY (USA) INC., d/b/a MSC Cruises, a Corporation Organized Under the Laws of the State of New York, | ) ) ) ) | Honorable James F. Henry and Patrick McGann, Judges Presiding. |
| Defendant-Appellee | ) ) ) | |
| (Mediterranean Shipping Company (USA) Inc., | ) ) | |
| Third-Party Plaintiff; | ) ) | |
| Captaris, Inc., | ) ) | |
| Third-Party Defendant). | ) | |

JUSTICE GALLAGHER delivered the opinion of the court:

Plaintiff Travel 100 Group, Inc., appeals the circuit court's entry of summary judgment for defendant Mediterranean Shipping Company (USA), Inc., (MSC) on Travel 100's complaint seeking damages under the Telephone Consumer Protection Act of 1991 (the TCPA) (47 U.S.C. §227 (2000)) for advertisements sent to Travel 100 by facsimile. For the reasons that follow, we affirm.

1-06-3744

## BACKGROUND

This appeal involves the widespread practice of sending advertisements to the fax machines of businesses and consumers, who often view these documents as the more modern equivalent to "junk mail." This method of distribution became prevalent in the last 15 years as a less expensive alternative to regular mail, especially because the cost of printing the advertisement necessarily is borne by the recipient.

At the time of this litigation, Travel 100 Group operated travel agencies in Chicago and Kenilworth, Illinois. On July 29, 2003, Travel 100 brought a class action lawsuit against MSC, alleging that MSC sent or was responsible for sending an unsolicited advertisement by fax on or around June 24, 2003, to Travel 100 and other members of the class as "part of a mass broadcast of unauthorized faxes." Travel 100 asserted that by sending such advertisements by fax, the documents were printed by using the paper and toner of Travel 100 and other class members, converting those resources for MSC's benefit and shifting to the recipients the cost of printing the messages. Furthermore, Travel 100 stated it could not use its fax line while receiving the ad.

Attached to the complaint was a copy of the faxed advertisement describing "2003-2004 Winter Cruises: 7 Nights [*sic*] South America Cruises from $640 per person." The single-page advertisement lists dates, destinations and prices for various trips, broken down by deck and type of cabin. The bottom of the page states "MSC Italian Cruises" with a telephone number, fax number and Web site address. At the top of the page is a line stating: "If you no longer wish to receive faxes, please call (800) 769-6921."

In response to Travel 100's complaint, defendant MSC filed a third-party complaint

2

1-06-3744

against, among others, Captaris, Inc., the company that marketed MSC cruises through its MediaLinq Services division, which provides high volume fax broadcast services. MSC stated that Captaris obtained the list of fax recipients from Northstar Travel Media (Northstar), which owned the Travel-Edge Database.

MSC and the third-party defendants moved for summary judgment pursuant to section 2-1005 of the Code of Civil Procedure (735 ILCS 5/2-1005 (West 2004)). The defendants argued that Travel 100 had been a member of the International Airlines Travel Agent Network (IATAN) since 1995 and routinely had supplied its contact information to IATAN and other entities to enable airlines, hotels, cruise lines such as MSC, and other travel suppliers to direct information to Travel 100 about availability and promotions.

The defendants contended that Travel 100 provided IATAN with its contact information, including its fax number, and agreed to the inclusion of that information in IATAN's membership database. IATAN then licensed its database for use by NFO Plog Research, Inc. (Plog), the company that compiled the Travel-Edge Database. Plog and its assets, including the Travel-Edge Database, subsequently were purchased by Northstar.

In response to Travel 100's assertion that it received 93 faxes between January 3, 2001, and July 22, 2003, MSC raised the affirmative defenses of *laches* and estoppel. MSC pointed out that Travel 100 never contacted the toll-free phone number listed on the faxes from MSC to request that it not be faxed advertisements about MSC cruises. MSC further asserted that Travel 100 did not inform IATAN until May 2005 that it did not want to receive promotional faxes and that Travel 100's request only included the fax number of the Kenilworth office. As affirmative

1-06-3744

defenses, MSC claimed that Travel 100's damages were inconsequential because its actual cost of receiving each fax was approximately 20 cents, and MSC challenged the constitutionality of the TCPA as violative of due process.

On September 29, 2006, the circuit court granted summary judgment in favor of MSC and the third-party defendants, and Travel 100 now appeals. The other third-party defendants are not parties to this appeal.

ANALYSIS

Travel 100 argues that the circuit court erred in granting summary judgment because the record raises a genuine issue of material fact as to whether Travel 100 agreed to receive advertisements from MSC and other travel carriers by fax.

The TCPA prohibits the sending of an unsolicited advertisement to a telephone facsimile machine. 47 U.S.C. §227(b)(1)(C) (2000). An unsolicited advertisement is defined as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission." 47 U.S.C. §227(a)(4) (2000). The TCPA provides for monetary damage for each violation in the amount of the party's actual monetary loss or $500, whichever is greater. 47 U.S.C. §227(b)(3)(B) (2000). Upon a finding by the court that the defendant willfully or knowingly violated the Act, the court may award treble damages. 47 U.S.C. §227(b)(3) (2000).[1]

---

[1] In 2005, the TCPA was amended and renamed the Junk Fax Prevention Act of 2005 (47 U.S.C. §227 (Supp. 2005).

1-06-3744

Travel 100 does not contest its membership in IATAN or dispute that it provided contact information, including its fax number, for inclusion in IATAN's database. Travel 100 maintains that although it "occasionally verified its contact information as requested by IATAN," the documents did not grant Travel 100's express permission to receive advertisements from third parties such as MSC or to receive those ads by fax.


I.  Affidavit of Stacy Fisher

Before reviewing the circuit court's grant of summary judgment, we first consider the affidavit of Travel 100 office manager Stacy Fisher describing a questionnaire that Fisher completed and returned to Plog/Northstar in December 2002. Travel 100 moved to strike Fisher's affidavit, contending it was obtained in violation of Illinois Supreme Court Rule 206 (188 Ill. 2d R. 206). The circuit court stated that its grant of summary judgment for defendants did not rely on Fisher's testimony. However, the circuit court discussed Travel 100's motion to strike the affidavit and addressed the manner in which the affidavit was procured, concluding that counsel for defendants did not violate the discovery rules.

Evidence that would be inadmissible at trial may not be considered in support of or in opposition to a motion for summary judgment. See *Fabiano v. City of Palos Hills*, 336 Ill. App. 3d 635, 648, 784 N.E.2d 258, 271 (2002). Therefore, it is necessary to review the circuit court's denial of the motion to strike Fisher's affidavit to determine if the affidavit can be considered in our analysis of MSC's motion for summary judgment.

The parties first disagree on the standard of review to be applied to the denial of the

5

1-06-3744

motion to strike the affidavit.  Travel 100 seeks *de novo* review of the circuit court's ruling; MSC

asserts that because Travel 100 moved to strike the affidavit as a sanction for an alleged

discovery violation, the decision should be reviewed for an abuse of discretion.  We agree with

Travel 100 that *de novo* review is warranted because the circuit court's ruling on the motion to

strike was made in connection with the court's ruling on a motion for summary judgment.  See

*Jackson v. Graham*, 323 Ill. App. 3d 766, 773, 753 N.E.2d 525, 532-32 (2001).

In the affidavit, Fisher stated that from about April 2002 to June 2004, she was an office

manager of Travel 100's Chicago office.  The office received a questionnaire from

Plog/Northstar by fax.  Fisher completed the document and returned it by fax on December 16,

2002.  The cover letter to the questionnaire stated, in part:

> "Dear Travel Agency Owner or Manager:
>
> We are in the process of updating your Company's Profile in our TravelEdge
>
> research database, and would appreciate your taking a few minutes to fill out the
>
> update form.  Having current information enhances the quality of all our
>
> research/trend data on the travel agency market, and assures that suppliers will
>
> direct relevant promotions and FAM [familiarization] trip information to our
>
> participants."

In moving for summary judgment, MSC and the third-party defendants argued that the

December 2002 questionnaire, as well as other documents sent from Travel 100 to IATAN,

established Travel 100's express invitation and permission to receive advertisements by fax.

Travel 100 moved to strike Fisher's affidavit, contending that it was not given notice of

6

1-06-3744

the January 17, 2006, deposition of Fisher by counsel for Captaris.  Travel 100 argues that the attorneys for Captaris led Fisher to believe she was being subpoenaed for a deposition at which she had no choice but to appear.  Travel 100 asserted that what was represented to be a deposition actually amounted to an "*ex parte* witness interview" and that the affidavit should be stricken to punish the attorneys' conduct.  On appeal, Travel 100 renews that argument, asserting that the circuit court should not have allowed use of the affidavit because Travel 100 was not notified of Fisher's deposition and Captaris "improperly procured" the affidavit as a result.

Although the discovery rules are in place to govern the flow of information once a lawsuit has been filed, the rules "do not bar all *ex parte* investigations" after the filing of a complaint. *Fair Automotive Repair, Inc. v. Car-X Service Systems, Inc.*, 128 Ill. App. 3d 763, 770, 471 N.E.2d 554, 560 (1984).  Fisher was terminated from her position at Travel 100 because the agency suspected her of engaging in unethical conduct.  Although Travel 100 asserts that Fisher's affidavit should be discounted due to her bias against the agency, Travel 100 was aware of Fisher's role in the pertinent facts, and counsel for Travel 100 deposed Fisher before it responded to the motion for summary judgment; Travel 100 therefore had the opportunity to explore and expose the motives for Fisher's testimony.  We find no basis to reverse the circuit court's denial of the motion to strike Fisher's affidavit.


II.  Summary Judgment for MSC

The proceeding in the circuit court involved several defendants; however, MSC is the only defendant-appellee in this appeal.  Summary judgment is proper where the pleadings,

1-06-3744

depositions, admissions and affidavits on file, viewed in the light most favorable to the non-moving party, reveal no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. *State Farm Mutual Automobile Insurance Co. v. Illinois Farmers Insurance Co.*, 226 Ill. 2d 395, 400, 875 N.E.2d 1096, 1099 (2007). In reviewing the circuit court's ruling on a motion for summary judgment, the appellate court considers anew the facts and law related to the case and determines whether the circuit court was correct in its decision. *Follis v. Watkins*, 367 Ill. App. 3d 548, 556, 855 N.E.2d 579, 586 (2006). Our review of a grant of summary judgment is *de novo*. See *State Farm*, 226 Ill. 2d at 400, 875 N.E.2d at 1099.

The purpose of summary judgment is not to try a question of fact but, rather, to determine if a question of fact exists. *Forsythe v. Clark USA, Inc.*, 224 Ill. 2d 274, 280, 864 N.E.2d 227, 232 (2007). "If the undisputed material facts could lead reasonable observers to divergent inferences, or where there is a dispute as to a material fact, summary judgment should be denied and the issue decided by the trier of fact." *Forsythe*, 224 Ill. 2d at 280, 864 N.E.2d at 232. Summary judgment should not be entered unless the moving party's right to judgment is clear and free from doubt. *Mydlach v. DaimlerChrysler Corp.*, 226 Ill. 2d 307, 311, 875 N.E.2d 1047, 1053 (2007).

Under the TCPA, an advertisement is unsolicited if it is transmitted without the recipient's "prior express invitation or permission." 47 U.S.C. § 227(a)(3)(A) (2000). Travel 100 argues that its inclusion in IATAN's database and the presentation of its contact information on various forms did not constitute its "express invitation or permission" for the transmission of advertisements. However, our analysis of the communications between Travel 100 and IATAN

1-06-3744

reveals that Travel 100 approved the inclusion of its contact information in the IATAN database,

and Travel 100 representatives signed and returned documents that expressly stated the

information would be provided to travel-industry suppliers, thus inviting communications from

those businesses.

To begin with, Travel 100 (then doing business as Ivory Isle Travel) received a letter from

IATAN in May 2001, which stated, in relevant part:

"Dear Owner/Manager:

We need your help!  As an IATAN endorsed agency, you enjoy the benefit

of holding an IATA Numeric Code that identifies you to the travel supplier

community.  *This code number also enables suppliers to pay commissions and to*

*market their products and services to you directly.*  In order for this to happen

most efficiently and cost-effectively, we must rely on the accuracy of our

database, which contains up-to-date profile information about travel agencies in

the U.S. and its possessions.

IATAN's database is unique and plays an essential role within the industry

to identify legitimate travel sales outlets.  That is why we are currently in the

process of updating our system so that we may better serve you, our valuable

customer.

*By completing the attached IATAN Travel Agency Survey, we will be able*

*to offer more specific information about your agency's marketing and destination*

*specialties.*  It will also help us to better identify who you are because it asks you

9

1-06-3744

to indicate your agency's principal activity as well as its primary market focus in

either leisure or corporate travel." (Emphasis added.)

The survey was returned to IATAN by Ivory Isle Travel with the responses correlating to

the agency's clientele. The bottom of the page was labeled an "information disclosure

authorization" and listed the address, phone number, fax number, e-mail address and Web

address of Ivory Isle Travel and a place for corrections to be made to that information. The

authorization was signed by Howard Scharf, then the vice president of Travel 100.[2]

The record reflects that between August 2002 and May 2003, IATAN requested on at

least three occasions that Travel 100 verify its contact information for use by "industry

customers" or "industry participants." A representative of Travel 100 complied with each

request by a form or release and returning it to IATAN, often by fax. According to the discovery

deposition of Travel 100 office manager Rosemarie McGuire, McGuire completed and returned a

form to IATAN in August 2002 because Travel 100 wanted IATAN to inform suppliers of Travel

100's contact information, including its IATAN number. A similar communication in April

2003 stated that the contact information was for inclusion into the IATAN database and that the

database's purpose was to "aid in the administration of IATAN programs to provide contact

information to other industry participants." A form that Travel 100 received in May 2003 stated

that "[t]he applicant authorizes [IATAN] to release the information contained herein to any

---

[2] Scharf described membership in IATAN as a "seal of approval" for travel agencies;
Travel 100 states in its brief on appeal that an IATAN number is an important identifier for a
travel agent and that the number is used by airlines and hotels to make reservations for the
agency's clients.

1-06-3744

industry supplier that may wish to use the applicant's services."  In addition, as we have

previously discussed, Fisher completed and returned a questionnaire to Plog/Northstar in

December 2002 "to ensure that our office would receive targeted marketing/promotional

materials from travel suppliers, including by fax."[3]

On appeal, Travel 100 argues that the documents it executed did not establish its express

consent under the TCPA.  No Illinois case has addressed the "express invitation or permission"

language of the statute.  The Illinois Supreme Court's only opinion involving the TCPA did not

discuss the topic of consent.  See *Valley Forge Insurance Co. v. Swiderski Electronics, Inc.*, 223

Ill. 2d 352, 860 N.E.2d 307 (2006) (addressing insurer's duty to defend lawsuit against insured

brought under TCPA).   The United States District Court for the Northern District of Illinois

recently denied a defendant's motion to dismiss a TCPA claim.  In *Sadowski v. Med1 Online,*

---

[3] After Travel 100 filed suit in July 2003, the course of its conduct regarding IATAN
changed.  In April 2004, Travel 100 received an IATAN application that Scharf returned with
Travel 100's fax number crossed out.
   We also note that despite Travel 100's stated objection to the faxes, Scharf and McGuire
signed a more specific IATAN release in 2004, which stated, in part:
   "**Consent**
         As owner/manager of the location I understand and agreed [*sic*] that one
   benefit of IATAN endorsement is the periodic receipt of travel-related
   information.  The undersigned hereby certifies and acknowledges that we consent
   to receive travel information and travel-related facsimile communications,
   electronic mail communications and direct mail communications, including
   material advertising the commercial availability or quality of property, goods, or
   services from IATAN [] authorized licensees and their duly authorized customers
   at the fax number(s) and e-mail addresses contained in this recertification.  In
   order to receive this benefit of IATAN endorsement, we consent to IATAN
   providing the fax number(s) and e-mail address(es) contained herein for this
   purpose.  By signing this written consent, I represent that I am authorized to grant
   consent to receive faxes, e-mails and other communications."
   Lawrence Weiner, a director of Travel 100, executed the same release in November 2004.

11

1-06-3744

*LLC*, No. 07 C 2973 (N.D. Ill. February 20, 2008), the federal district court observed that it was required to accept as true the allegation of the plaintiff doctor that he had no prior business relationship with the defendant; the court referred to an exception inserted in the TCPA in 2005 that classifies faxes between parties with an "established business relationship" as transactional and outside the statute's scope.  See 47 U.S.C. § 227 (b)(1)(C)(i) (Supp. 2005).

Many published decisions regarding the TCPA have involved challenges under the first amendment and the commerce clause of the United States Constitution and have included due process and equal protection arguments.  See, *e.g.*, *Missouri ex rel. Nixon v. American Blast Fax, Inc.*, 323 F.3d 649 (8th Cir. 2003), *cert. denied*, 540 U.S. 1104, 157 L. Ed. 2d 888, 124 S. Ct. 1043 (2004) (restrictions on unsolicited fax communications do not violate first amendment); *Chair King, Inc., v. GTE Mobilnet of Houston, Inc.*, 135 S.W.3d 365 (Tex. App. 2004).

Given this lack of direct precedent, Travel 100 compares its situation to that of the plaintiff in *Travel Travel, Kirkwood, Inc. v. Jen N.Y. Inc.*, 206 S.W.3d 387, 390 (Mo. App. 2006).  In that case, the plaintiff travel agency sued an airline ticket consolidator under the TCPA for sending 31 unsolicited advertisements by fax.  The Missouri appellate court affirmed the trial court's grant of summary judgment for the travel agency and an award of $46,500 plus court costs.  *Travel Kirkwood*, 206 S.W.3d at 388.  The agency executed a form identical to the IATAN membership form in this case, which stated in pertinent part:  "The applicant authorizes [IATAN] to release the information contained herein to any industry supplier that may wish to use the applicant's services."  *Travel Kirkwood*, 206 S.W.3d at 391.

On appeal, the defendant argued that the agency agreed to receive faxed advertisements

1-06-3744

by its affiliation with IATAN and its completion of the membership form. *Travel Kirkwood*, 206 S.W.3d at 390. The Missouri appellate court concluded that whether the agency's IATAN membership constituted "prior express invitation or permission" under the TCPA was, as the trial court had determined, a question of law and that the agency had not given its express consent to receive faxes. *Travel Kirkwood*, 206 S.W.3d at 391-92. The court noted the conclusion of the Federal Communications Commission (FCC) that the TCPA was not designed "to equate mere distribution or publication of a telephone facsimile number with prior express permission or invitation to receive such advertisements." *Travel Kirkwood*, 206 S.W.3d at 392, quoting *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 10 F.C.C.R. 12,391, 12,408 (August 7, 1995) (reconsideration order). The court held that the FCC's interpretation of the statute and the plain meaning of the word "express" supported the conclusion that the agency did not convey its prior express invitation or permission to send faxes merely by its membership in IATAN. *Travel Kirkwood*, 206 S.W.3d at 392.

Though we note the paucity of case law on this issue, we first observe that a decision from another jurisdiction is not binding on this court. See *Kim v. Mercedes-Benz, U.S.A., Inc.*, 353 Ill. App. 3d 444, 455, 818 N.E.2d 713, 722 (2004). Furthermore, we disagree with the analysis of the Missouri court. The court concluded that the plaintiff travel agency's agreement that IATAN could distribute the agency's fax number to other members of IATAN constituted, at most, implicit consent to receive unsolicited advertisements:

> "The defendant seems to believe that the plaintiff's agreement to release of
> its fax number to IATAN members necessarily implies consent to receive

13

1-06-3744

unsolicited advertisements from such members.  But even if that were the case, the defendant ignores the fact that implicit consent is insufficient under the law.  If the consent is not manifested by explicit and direct words, but rather is gathered only by implication or necessary deduction from the circumstances, the general language, or the conduct of the parties, it is not express consent.  Rather, it is merely implied consent.  And, without express consent, the law forbids the defendant from sending unsolicited facsimiles to the plaintiff." *Travel Kirkwood*, 206 S.W.3d at 392.

However, the Missouri court fails to acknowledge that the plaintiff travel agency, in addition to agreeing that its contact information be included in the IATAN database, also completed a form, as did Travel 100 here, authorizing IATAN "to release the information contained herein to any industry supplier that may wish to use the applicant's services."  By the Missouri court's reasoning, an industry supplier, such as a hotel, airline or cruise line, that belongs to an organization with access to a database of travel agents through a licensing agreement must seek permission from each travel agency before sending advertisements.  The largely unworkable nature of that situation was noted by a Missouri federal court in *Missouri ex rel. Nixon v. American Blast Fax, Inc.*, 196 F. Supp. 2d 920, 933 n.26 (E.D. Mo. 2002), *rev'd*, 323 F.3d 649 (8th Cir. 2003), while discussing a first amendment challenge to the TCPA:

"The government argues that the TCPA is not a complete ban [on unsolicited advertisements] because it allows fax advertisements to be sent if the consumer gives express permission.  However, there is no practical way for

14

1-06-3744

companies to gain permission. They could fax a request form to the consumer

asking for permission, and forcing the consumer to fax something back to the

company, but that does not seem sensible."

The circuit court in this case made a similar salient observation in its memorandum

opinion:

"It would be an unreasonable interpretation of the statute to conclude that Travel

100 was entitled to approve the individual supplier's use of its facsimile machine

prior to transmission of any message in order to comply with the TCPA. Such

conclusion would be at odds with Congress' intent to allow business with

unencumbered access to commercial communication links. It would also upset

what the evidence suggests was an accepted industry-wide practice."

The undisputed facts establish Travel 100's express permission and invitation for

advertisements to be sent by third parties, *i.e.*, travel suppliers such as MSC. It is uncontroverted

that Travel 100 went beyond simply agreeing to the inclusion of its contact information in the

IATAN database. Various representatives of Travel 100 submitted the agency's contact

information upon being told that IATAN would release the information "to any industry supplier

that may wish to use" Travel 100's services. The questionnaire that Fisher returned to

Plog/Northstar indicated that Travel 100's contact information "assures that suppliers will direct

relevant promotions and FAM [familiarization] trip information to our participants." Fisher

suggested that the faxed advertisements were advantageous to Travel 100 and stated that she

collected the documents and maintained a binder of the advertisements for reference by the travel

15

1-06-3744

agents in the office. Fisher also stated that Travel 100 sold trips and other services to customers

as a result of the information in the faxed advertisements.

Another nuance of Travel 100's position appears to be that because it did not state its

permission or invitation to receive advertisements in its own words, it did not expressly agree to

such communications. However, by submitting its information on the releases described above,

Travel 100 indicated its express agreement to receive marketing materials from suppliers of

travel services.

Travel 100 also contends that it never permitted or invited the sending of advertisements

by fax. MSC responds that the TCPA does not require that the recipient specifically permit faxed

communications but simply that the recipient invite or permit the "transmission" of an

advertisement. The statute prohibits solicitations by telephone or by fax unless transmitted

without express invitation or permission. 47 U.S.C. §227 (a)(3)(A) (2000). Travel 100 supplied

both its phone and fax numbers to IATAN for use by travel suppliers in directing promotions and

sales information to Travel 100.

Travel 100 became a member of IATAN to improve its commercial contacts and success.

The wheels of commerce would become bogged down if each business had to obtain the kind of

consent Travel 100 requires, and we will not impede the advances of modern technology and

commerce. Based on our analysis of the communications described above, and construing the

record in the light most favorable to Travel 100, we nevertheless conclude that, as a matter of

law, Travel 100 expressly invited and permitted the faxed advertisements.

In a separate section of its brief, Travel 100 asserts that because it did not expressly allow

16

1-06-3744

MSC to send advertisements, the circuit court's ruling necessarily was based on a determination of implied permission, which Travel 100 contends was in conflict with the language of the statute, the Federal Communications Commission's construction of the statute, and the intent of Congress in enacting the law. Because we have determined, as did the circuit court, that Travel 100 expressly invited and permitted the advertisements, we need not address Travel 100's contentions regarding implied permission.

CONCLUSION

Travel 100 sought membership in IATAN and maintained that membership, providing the organization with its contact information, including its fax number, in several documents, including a form authorizing IATAN to release that information "to any industry supplier that may wish to use [Travel 100's] services." Therefore, Travel 100 expressly invited and permitted MSC, as a provider of cruises, to fax advertisements to Travel 100.

For all of the reasons set out above, we affirm the circuit court's grant of summary judgment to MSC.

Affirmed.

FITZGERALD SMITH, P.J., and O'MARA FROSSARD, J., concur.

1-06-3744

REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT
(Front Sheet to be Attached to Each case)

_____

TRAVEL 100 GROUP, INC., on Behalf of Itself and All Others Similarly Situated,

       Plaintiff-Appellant,

  v.

MEDITERRANEAN SHIPPING COMPANY (USA) INC., d/b/a MSC Cruises, a Corporation Organized Under the Laws of the State of New York,

       Defendant-Appellee

(Mediterranean Shipping Company (USA) Inc.,

       Third-Party Plaintiff;

Captaris, Inc.,

       Third-Party Defendant).

_____

No. 1-06-3744

Appellate Court of Illinois
First District, Fifth Division

May 30, 2008

_____

JUSTICE GALLAGHER delivered the opinion of the court.

FITZGERALD SMITH, P.J., and O'MARA FROSSARD, J., concur.

_____

Appeal from the Circuit Court of Cook County.

Honorable James F. Henry and Patrick E. McGann, Judges Presiding.

_____

For APPELLANT, Barnow and Associates, P.C., Chicago, IL (Ben Barnow, Sharon Harris and Erich Schork, of counsel); William J. Harte, Ltd, Chicago, IL (William J. Harte, of counsel); Stein & Bogot Ltd., Chicago, IL (Robert J. Stein III, of counsel); and Margulis Law Group, Chesterfield, MO (Max Margulis, of counsel)

1-06-3744

For APPELLEE, Locke Lord Bissell & Liddell LLP, Chicago, IL (Albert E. Fowerbaugh, Jr., Hugh S. Balsam, Michael G. Salemi, of counsel)

EXHIBIT "A"

FIFTH DIVISION
May 30, 2008

No. 1-06-3744

| | | |
|---|---|---|
| TRAVEL 100 GROUP, INC., on Behalf of Itself and All Others Similarly Situated, | ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | |
| MEDITERRANEAN SHIPPING COMPANY (USA) INC., d/b/a MSC Cruises, a Corporation Organized Under the Laws of the State of New York, | ) ) ) ) | Honorable James F. Henry and Patrick McGann, Judges Presiding. |
| Defendant-Appellee | ) ) ) | |
| (Mediterranean Shipping Company (USA) Inc., | ) ) | |
| Third-Party Plaintiff; | ) ) | |
| Captaris, Inc., | ) ) | |
| Third-Party Defendant). | ) | |

JUSTICE GALLAGHER delivered the opinion of the court:

Plaintiff Travel 100 Group, Inc., appeals the circuit court's entry of summary judgment for defendant Mediterranean Shipping Company (USA), Inc., (MSC) on Travel 100's complaint seeking damages under the Telephone Consumer Protection Act of 1991 (the TCPA) (47 U.S.C. §227 (2000)) for advertisements sent to Travel 100 by facsimile. For the reasons that follow, we affirm.

1-06-3744

## BACKGROUND

This appeal involves the widespread practice of sending advertisements to the fax machines of businesses and consumers, who often view these documents as the more modern equivalent to "junk mail."  This method of distribution became prevalent in the last 15 years as a less expensive alternative to regular mail, especially because the cost of printing the advertisement necessarily is borne by the recipient.

At the time of this litigation, Travel 100 Group operated travel agencies in Chicago and Kenilworth, Illinois.  On July 29, 2003, Travel 100 brought a class action lawsuit against MSC, alleging that MSC sent or was responsible for sending an unsolicited advertisement by fax on or around June 24, 2003, to Travel 100 and other members of the class as "part of a mass broadcast of unauthorized faxes."  Travel 100 asserted that by sending such advertisements by fax, the documents were printed by using the paper and toner of Travel 100 and other class members, converting those resources for MSC's benefit and shifting to the recipients the cost of printing the messages.  Furthermore, Travel 100 stated it could not use its fax line while receiving the ad.

Attached to the complaint was a copy of the faxed advertisement describing "2003-2004 Winter Cruises: 7 Nights [*sic*] South America Cruises from $640 per person."  The single-page advertisement lists dates, destinations and prices for various trips, broken down by deck and type of cabin.  The bottom of the page states "MSC Italian Cruises" with a telephone number, fax number and Web site address.  At the top of the page is a line stating:  "If you no longer wish to receive faxes, please call (800) 769-6921."

In response to Travel 100's complaint, defendant MSC filed a third-party complaint

2

1-06-3744

against, among others, Captaris, Inc., the company that marketed MSC cruises through its

MediaLinq Services division, which provides high volume fax broadcast services.  MSC stated

that Captaris obtained the list of fax recipients from Northstar Travel Media (Northstar), which

owned the Travel-Edge Database.

MSC and the third-party defendants moved for summary judgment pursuant to section 2-

1005 of the Code of Civil Procedure (735 ILCS 5/2-1005 (West 2004)).  The defendants argued

that Travel 100 had been a member of the International Airlines Travel Agent Network (IATAN)

since 1995 and routinely had supplied its contact information to IATAN and other entities to

enable airlines, hotels, cruise lines such as MSC, and other travel suppliers to direct information

to Travel 100 about availability and promotions.

The defendants contended that Travel 100 provided IATAN with its contact information,

including its fax number, and agreed to the inclusion of that information in IATAN's

membership database.  IATAN then licensed its database for use by NFO Plog Research, Inc.

(Plog), the company that compiled the Travel-Edge Database.  Plog and its assets, including the

Travel-Edge Database, subsequently were purchased by Northstar.

In response to Travel 100's assertion that it received 93 faxes between January 3, 2001,

and July 22, 2003, MSC raised the affirmative defenses of *laches* and estoppel.  MSC pointed out

that Travel 100 never contacted the toll-free phone number listed on the faxes from MSC to

request that it not be faxed advertisements about MSC cruises.  MSC further asserted that Travel

100 did not inform IATAN until May 2005 that it did not want to receive promotional faxes and

that Travel 100's request only included the fax number of the Kenilworth office.  As affirmative

3

1-06-3744

defenses, MSC claimed that Travel 100's damages were inconsequential because its actual cost of receiving each fax was approximately 20 cents, and MSC challenged the constitutionality of the TCPA as violative of due process.

On September 29, 2006, the circuit court granted summary judgment in favor of MSC and the third-party defendants, and Travel 100 now appeals. The other third-party defendants are not parties to this appeal.


ANALYSIS

Travel 100 argues that the circuit court erred in granting summary judgment because the record raises a genuine issue of material fact as to whether Travel 100 agreed to receive advertisements from MSC and other travel carriers by fax.

The TCPA prohibits the sending of an unsolicited advertisement to a telephone facsimile machine. 47 U.S.C. §227(b)(1)(C) (2000). An unsolicited advertisement is defined as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission." 47 U.S.C. §227(a)(4) (2000). The TCPA provides for monetary damage for each violation in the amount of the party's actual monetary loss or $500, whichever is greater. 47 U.S.C. §227(b)(3)(B) (2000). Upon a finding by the court that the defendant willfully or knowingly violated the Act, the court may award treble damages. 47 U.S.C. §227(b)(3) (2000).[1]

---

[1] In 2005, the TCPA was amended and renamed the Junk Fax Prevention Act of 2005 (47 U.S.C. §227 (Supp. 2005).

1-06-3744

Travel 100 does not contest its membership in IATAN or dispute that it provided contact information, including its fax number, for inclusion in IATAN's database. Travel 100 maintains that although it "occasionally verified its contact information as requested by IATAN," the documents did not grant Travel 100's express permission to receive advertisements from third parties such as MSC or to receive those ads by fax.


## I.  Affidavit of Stacy Fisher

Before reviewing the circuit court's grant of summary judgment, we first consider the affidavit of Travel 100 office manager Stacy Fisher describing a questionnaire that Fisher completed and returned to Plog/Northstar in December 2002. Travel 100 moved to strike Fisher's affidavit, contending it was obtained in violation of Illinois Supreme Court Rule 206 (188 Ill. 2d R. 206). The circuit court stated that its grant of summary judgment for defendants did not rely on Fisher's testimony. However, the circuit court discussed Travel 100's motion to strike the affidavit and addressed the manner in which the affidavit was procured, concluding that counsel for defendants did not violate the discovery rules.

Evidence that would be inadmissible at trial may not be considered in support of or in opposition to a motion for summary judgment. See *Fabiano v. City of Palos Hills*, 336 Ill. App. 3d 635, 648, 784 N.E.2d 258, 271 (2002). Therefore, it is necessary to review the circuit court's denial of the motion to strike Fisher's affidavit to determine if the affidavit can be considered in our analysis of MSC's motion for summary judgment.

The parties first disagree on the standard of review to be applied to the denial of the

5

1-06-3744

motion to strike the affidavit. Travel 100 seeks *de novo* review of the circuit court's ruling; MSC

asserts that because Travel 100 moved to strike the affidavit as a sanction for an alleged

discovery violation, the decision should be reviewed for an abuse of discretion. We agree with

Travel 100 that *de novo* review is warranted because the circuit court's ruling on the motion to

strike was made in connection with the court's ruling on a motion for summary judgment. See

*Jackson v. Graham*, 323 Ill. App. 3d 766, 773, 753 N.E.2d 525, 532-32 (2001).

In the affidavit, Fisher stated that from about April 2002 to June 2004, she was an office

manager of Travel 100's Chicago office. The office received a questionnaire from

Plog/Northstar by fax. Fisher completed the document and returned it by fax on December 16,

2002. The cover letter to the questionnaire stated, in part:

> "Dear Travel Agency Owner or Manager:
>
> We are in the process of updating your Company's Profile in our TravelEdge
>
> research database, and would appreciate your taking a few minutes to fill out the
>
> update form. Having current information enhances the quality of all our
>
> research/trend data on the travel agency market, and assures that suppliers will
>
> direct relevant promotions and FAM [familiarization] trip information to our
>
> participants."

In moving for summary judgment, MSC and the third-party defendants argued that the

December 2002 questionnaire, as well as other documents sent from Travel 100 to IATAN,

established Travel 100's express invitation and permission to receive advertisements by fax.

Travel 100 moved to strike Fisher's affidavit, contending that it was not given notice of

6

1-06-3744

the January 17, 2006, deposition of Fisher by counsel for Captaris.  Travel 100 argues that the

attorneys for Captaris led Fisher to believe she was being subpoenaed for a deposition at which

she had no choice but to appear.  Travel 100 asserted that what was represented to be a

deposition actually amounted to an "*ex parte* witness interview" and that the affidavit should be

stricken to punish the attorneys' conduct.  On appeal, Travel 100 renews that argument, asserting

that the circuit court should not have allowed use of the affidavit because Travel 100 was not

notified of Fisher's deposition and Captaris "improperly procured" the affidavit as a result.

Although the discovery rules are in place to govern the flow of information once a lawsuit

has been filed, the rules "do not bar all *ex parte* investigations" after the filing of a complaint.

*Fair Automotive Repair, Inc. v. Car-X Service Systems, Inc.*, 128 Ill. App. 3d 763, 770, 471

N.E.2d 554, 560 (1984).  Fisher was terminated from her position at Travel 100 because the

agency suspected her of engaging in unethical conduct.  Although Travel 100 asserts that Fisher's

affidavit should be discounted due to her bias against the agency, Travel 100 was aware of

Fisher's role in the pertinent facts, and counsel for Travel 100 deposed Fisher before it responded

to the motion for summary judgment; Travel 100 therefore had the opportunity to explore and

expose the motives for Fisher's testimony.  We find no basis to reverse the circuit court's denial

of the motion to strike Fisher's affidavit.


## II.  Summary Judgment for MSC

The proceeding in the circuit court involved several defendants; however, MSC is the

only defendant-appellee in this appeal.  Summary judgment is proper where the pleadings,

1-06-3744

depositions, admissions and affidavits on file, viewed in the light most favorable to the non-moving party, reveal no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. *State Farm Mutual Automobile Insurance Co. v. Illinois Farmers Insurance Co.*, 226 Ill. 2d 395, 400, 875 N.E.2d 1096, 1099 (2007). In reviewing the circuit court's ruling on a motion for summary judgment, the appellate court considers anew the facts and law related to the case and determines whether the circuit court was correct in its decision. *Follis v. Watkins*, 367 Ill. App. 3d 548, 556, 855 N.E.2d 579, 586 (2006). Our review of a grant of summary judgment is *de novo*. See *State Farm*, 226 Ill. 2d at 400, 875 N.E.2d at 1099.

The purpose of summary judgment is not to try a question of fact but, rather, to determine if a question of fact exists. *Forsythe v. Clark USA, Inc.*, 224 Ill. 2d 274, 280, 864 N.E.2d 227, 232 (2007). "If the undisputed material facts could lead reasonable observers to divergent inferences, or where there is a dispute as to a material fact, summary judgment should be denied and the issue decided by the trier of fact." *Forsythe*, 224 Ill. 2d at 280, 864 N.E.2d at 232. Summary judgment should not be entered unless the moving party's right to judgment is clear and free from doubt. *Mydlach v. DaimlerChrysler Corp.*, 226 Ill. 2d 307, 311, 875 N.E.2d 1047, 1053 (2007).

Under the TCPA, an advertisement is unsolicited if it is transmitted without the recipient's "prior express invitation or permission." 47 U.S.C. § 227(a)(3)(A) (2000). Travel 100 argues that its inclusion in IATAN's database and the presentation of its contact information on various forms did not constitute its "express invitation or permission" for the transmission of advertisements. However, our analysis of the communications between Travel 100 and IATAN

8

1-06-3744

reveals that Travel 100 approved the inclusion of its contact information in the IATAN database, and Travel 100 representatives signed and returned documents that expressly stated the information would be provided to travel-industry suppliers, thus inviting communications from those businesses.

To begin with, Travel 100 (then doing business as Ivory Isle Travel) received a letter from IATAN in May 2001, which stated, in relevant part:

"Dear Owner/Manager:

We need your help!  As an IATAN endorsed agency, you enjoy the benefit of holding an IATA Numeric Code that identifies you to the travel supplier community.  *This code number also enables suppliers to pay commissions and to market their products and services to you directly*.  In order for this to happen most efficiently and cost-effectively, we must rely on the accuracy of our database, which contains up-to-date profile information about travel agencies in the U.S. and its possessions.

IATAN's database is unique and plays an essential role within the industry to identify legitimate travel sales outlets.  That is why we are currently in the process of updating our system so that we may better serve you, our valuable customer.

*By completing the attached IATAN Travel Agency Survey, we will be able to offer more specific information about your agency's marketing and destination specialties*.  It will also help us to better identify who you are because it asks you

9

1-06-3744

to indicate your agency's principal activity as well as its primary market focus in

either leisure or corporate travel." (Emphasis added.)

The survey was returned to IATAN by Ivory Isle Travel with the responses correlating to

the agency's clientele. The bottom of the page was labeled an "information disclosure

authorization" and listed the address, phone number, fax number, e-mail address and Web

address of Ivory Isle Travel and a place for corrections to be made to that information. The

authorization was signed by Howard Scharf, then the vice president of Travel 100.[2]

The record reflects that between August 2002 and May 2003, IATAN requested on at

least three occasions that Travel 100 verify its contact information for use by "industry

customers" or "industry participants." A representative of Travel 100 complied with each

request by a form or release and returning it to IATAN, often by fax. According to the discovery

deposition of Travel 100 office manager Rosemarie McGuire, McGuire completed and returned a

form to IATAN in August 2002 because Travel 100 wanted IATAN to inform suppliers of Travel

100's contact information, including its IATAN number. A similar communication in April

2003 stated that the contact information was for inclusion into the IATAN database and that the

database's purpose was to "aid in the administration of IATAN programs to provide contact

information to other industry participants." A form that Travel 100 received in May 2003 stated

that "[t]he applicant authorizes [IATAN] to release the information contained herein to any

_____

[2] Scharf described membership in IATAN as a "seal of approval" for travel agencies;
Travel 100 states in its brief on appeal that an IATAN number is an important identifier for a
travel agent and that the number is used by airlines and hotels to make reservations for the
agency's clients.

1-06-3744

industry supplier that may wish to use the applicant's services." In addition, as we have previously discussed, Fisher completed and returned a questionnaire to Plog/Northstar in December 2002 "to ensure that our office would receive targeted marketing/promotional materials from travel suppliers, including by fax."[3]

On appeal, Travel 100 argues that the documents it executed did not establish its express consent under the TCPA. No Illinois case has addressed the "express invitation or permission" language of the statute. The Illinois Supreme Court's only opinion involving the TCPA did not discuss the topic of consent. See *Valley Forge Insurance Co. v. Swiderski Electronics, Inc.*, 223 Ill. 2d 352, 860 N.E.2d 307 (2006) (addressing insurer's duty to defend lawsuit against insured brought under TCPA). The United States District Court for the Northern District of Illinois recently denied a defendant's motion to dismiss a TCPA claim. In *Sadowski v. Med1 Online,*

---

[3] After Travel 100 filed suit in July 2003, the course of its conduct regarding IATAN changed. In April 2004, Travel 100 received an IATAN application that Scharf returned with Travel 100's fax number crossed out.

We also note that despite Travel 100's stated objection to the faxes, Scharf and McGuire signed a more specific IATAN release in 2004, which stated, in part:

"**Consent**

As owner/manager of the location I understand and agreed [*sic*] that one benefit of IATAN endorsement is the periodic receipt of travel-related information. The undersigned hereby certifies and acknowledges that we consent to receive travel information and travel-related facsimile communications, electronic mail communications and direct mail communications, including material advertising the commercial availability or quality of property, goods, or services from IATAN [] authorized licensees and their duly authorized customers at the fax number(s) and e-mail addresses contained in this recertification. In order to receive this benefit of IATAN endorsement, we consent to IATAN providing the fax number(s) and e-mail address(es) contained herein for this purpose. By signing this written consent, I represent that I am authorized to grant consent to receive faxes, e-mails and other communications."

Lawrence Weiner, a director of Travel 100, executed the same release in November 2004.

1-06-3744

*LLC*, No. 07 C 2973 (N.D. Ill. February 20, 2008), the federal district court observed that it was

required to accept as true the allegation of the plaintiff doctor that he had no prior business

relationship with the defendant; the court referred to an exception inserted in the TCPA in 2005

that classifies faxes between parties with an "established business relationship" as transactional

and outside the statute's scope.  See 47 U.S.C. § 227 (b)(1)(C)(i) (Supp. 2005).

　　　Many published decisions regarding the TCPA have involved challenges under the first

amendment and the commerce clause of the United States Constitution and have included due

process and equal protection arguments.  See, *e.g.*, *Missouri ex rel. Nixon v. American Blast Fax,*

*Inc.*, 323 F.3d 649 (8th Cir. 2003), *cert. denied*, 540 U.S. 1104, 157 L. Ed. 2d 888, 124 S. Ct.

1043 (2004) (restrictions on unsolicited fax communications do not violate first amendment);

*Chair King, Inc., v. GTE Mobilnet of Houston, Inc.*, 135 S.W.3d 365 (Tex. App. 2004).

　　　Given this lack of direct precedent, Travel 100 compares its situation to that of the

plaintiff in *Travel Travel, Kirkwood, Inc. v. Jen N.Y. Inc.*, 206 S.W.3d 387, 390 (Mo. App.

2006).  In that case, the plaintiff travel agency sued an airline ticket consolidator under the TCPA

for sending 31 unsolicited advertisements by fax.  The Missouri appellate court affirmed the trial

court's grant of summary judgment for the travel agency and an award of $46,500 plus court

costs.  *Travel Kirkwood*, 206 S.W.3d at 388.  The agency executed a form identical to the

IATAN membership form in this case, which stated in pertinent part:  "The applicant authorizes

[IATAN] to release the information contained herein to any industry supplier that may wish to

use the applicant's services."  *Travel Kirkwood*, 206 S.W.3d at 391.

　　　On appeal, the defendant argued that the agency agreed to receive faxed advertisements

1-06-3744

by its affiliation with IATAN and its completion of the membership form. *Travel Kirkwood*, 206 S.W.3d at 390.  The Missouri appellate court concluded that whether the agency's IATAN membership constituted "prior express invitation or permission" under the TCPA was, as the trial court had determined, a question of law and that the agency had not given its express consent to receive faxes. *Travel Kirkwood*, 206 S.W.3d at 391-92.  The court noted the conclusion of the Federal Communications Commission (FCC) that the TCPA was not designed "to equate mere distribution or publication of a telephone facsimile number with prior express permission or invitation to receive such advertisements." *Travel Kirkwood*, 206 S.W.3d at 392, quoting *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 10 F.C.C.R. 12,391, 12,408 (August 7, 1995) (reconsideration order).  The court held that the FCC's interpretation of the statute and the plain meaning of the word "express" supported the conclusion that the agency did not convey its prior express invitation or permission to send faxes merely by its membership in IATAN. *Travel Kirkwood*, 206 S.W.3d at 392.

Though we note the paucity of case law on this issue, we first observe that a decision from another jurisdiction is not binding on this court.  See *Kim v. Mercedes-Benz, U.S.A., Inc.*, 353 Ill. App. 3d 444, 455, 818 N.E.2d 713, 722 (2004).  Furthermore, we disagree with the analysis of the Missouri court.  The court concluded that the plaintiff travel agency's agreement that IATAN could distribute the agency's fax number to other members of IATAN constituted, at most, implicit consent to receive unsolicited advertisements:

> "The defendant seems to believe that the plaintiff's agreement to release of
> its fax number to IATAN members necessarily implies consent to receive

13

1-06-3744

unsolicited advertisements from such members.  But even if that were the case, the defendant ignores the fact that implicit consent is insufficient under the law.  If the consent is not manifested by explicit and direct words, but rather is gathered only by implication or necessary deduction from the circumstances, the general language, or the conduct of the parties, it is not express consent.  Rather, it is merely implied consent.  And, without express consent, the law forbids the defendant from sending unsolicited facsimiles to the plaintiff." *Travel Kirkwood*, 206 S.W.3d at 392.

However, the Missouri court fails to acknowledge that the plaintiff travel agency, in addition to agreeing that its contact information be included in the IATAN database, also completed a form, as did Travel 100 here, authorizing IATAN "to release the information contained herein to any industry supplier that may wish to use the applicant's services."  By the Missouri court's reasoning, an industry supplier, such as a hotel, airline or cruise line, that belongs to an organization with access to a database of travel agents through a licensing agreement must seek permission from each travel agency before sending advertisements.  The largely unworkable nature of that situation was noted by a Missouri federal court in *Missouri ex rel. Nixon v. American Blast Fax, Inc.*, 196 F. Supp. 2d 920, 933 n.26 (E.D. Mo. 2002), *rev'd*, 323 F.3d 649 (8th Cir. 2003), while discussing a first amendment challenge to the TCPA:

"The government argues that the TCPA is not a complete ban [on unsolicited advertisements] because it allows fax advertisements to be sent if the consumer gives express permission.  However, there is no practical way for

14

1-06-3744

> companies to gain permission.  They could fax a request form to the consumer
>
> asking for permission, and forcing the consumer to fax something back to the
>
> company, but that does not seem sensible."

The circuit court in this case made a similar salient observation in its memorandum

opinion:

> "It would be an unreasonable interpretation of the statute to conclude that Travel
>
> 100 was entitled to approve the individual supplier's use of its facsimile machine
>
> prior to transmission of any message in order to comply with the TCPA.  Such
>
> conclusion would be at odds with Congress' intent to allow business with
>
> unencumbered access to commercial communication links.  It would also upset
>
> what the evidence suggests was an accepted industry-wide practice."

The undisputed facts establish Travel 100's express permission and invitation for

advertisements to be sent by third parties, *i.e.*, travel suppliers such as MSC.  It is uncontroverted

that Travel 100 went beyond simply agreeing to the inclusion of its contact information in the

IATAN database.  Various representatives of Travel 100 submitted the agency's contact

information upon being told that IATAN would release the information "to any industry supplier

that may wish to use" Travel 100's services.  The questionnaire that Fisher returned to

Plog/Northstar indicated that Travel 100's contact information "assures that suppliers will direct

relevant promotions and FAM [familiarization] trip information to our participants."  Fisher

suggested that the faxed advertisements were advantageous to Travel 100 and stated that she

collected the documents and maintained a binder of the advertisements for reference by the travel

1-06-3744

agents in the office.  Fisher also stated that Travel 100 sold trips and other services to customers

as a result of the information in the faxed advertisements.

Another nuance of Travel 100's position appears to be that because it did not state its

permission or invitation to receive advertisements in its own words, it did not expressly agree to

such communications.  However, by submitting its information on the releases described above,

Travel 100 indicated its express agreement to receive marketing materials from suppliers of

travel services.

Travel 100 also contends that it never permitted or invited the sending of advertisements

by fax.  MSC responds that the TCPA does not require that the recipient specifically permit faxed

communications but simply that the recipient invite or permit the "transmission" of an

advertisement.  The statute prohibits solicitations by telephone or by fax unless transmitted

without express invitation or permission.  47 U.S.C. §227 (a)(3)(A) (2000).  Travel 100 supplied

both its phone and fax numbers to IATAN for use by travel suppliers in directing promotions and

sales information to Travel 100.

Travel 100 became a member of IATAN to improve its commercial contacts and success.

The wheels of commerce would become bogged down if each business had to obtain the kind of

consent Travel 100 requires, and we will not impede the advances of modern technology and

commerce.  Based on our analysis of the communications described above, and construing the

record in the light most favorable to Travel 100, we nevertheless conclude that, as a matter of

law, Travel 100 expressly invited and permitted the faxed advertisements.

In a separate section of its brief, Travel 100 asserts that because it did not expressly allow

16

1-06-3744

MSC to send advertisements, the circuit court's ruling necessarily was based on a determination of implied permission, which Travel 100 contends was in conflict with the language of the statute, the Federal Communications Commission's construction of the statute, and the intent of Congress in enacting the law.  Because we have determined, as did the circuit court, that Travel 100 expressly invited and permitted the advertisements, we need not address Travel 100's contentions regarding implied permission.

CONCLUSION

Travel 100 sought membership in IATAN and maintained that membership, providing the organization with its contact information, including its fax number, in several documents, including a form authorizing IATAN to release that information "to any industry supplier that may wish to use [Travel 100's] services."  Therefore, Travel 100 expressly invited and permitted MSC, as a provider of cruises, to fax advertisements to Travel 100.

For all of the reasons set out above, we affirm the circuit court's grant of summary judgment to MSC.

Affirmed.

FITZGERALD SMITH, P.J., and O'MARA FROSSARD, J., concur.

1-06-3744

REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT
(Front Sheet to be Attached to Each case)

_____

TRAVEL 100 GROUP, INC., on Behalf of Itself and All Others Similarly Situated,

      Plaintiff-Appellant,

   v.

MEDITERRANEAN SHIPPING COMPANY (USA) INC., d/b/a MSC Cruises, a Corporation
Organized Under the Laws of the State of New York,

      Defendant-Appellee

(Mediterranean Shipping Company (USA) Inc.,

      Third-Party Plaintiff;

Captaris, Inc.,

      Third-Party Defendant).

_____

No. 1-06-3744

Appellate Court of Illinois
First District, Fifth Division

May 30, 2008

_____

JUSTICE GALLAGHER delivered the opinion of the court.

FITZGERALD SMITH, P.J., and O'MARA FROSSARD, J., concur.

_____

Appeal from the Circuit Court of Cook County.

Honorable James F. Henry and Patrick E. McGann, Judges Presiding.

_____

For APPELLANT, Barnow and Associates, P.C., Chicago, IL (Ben Barnow, Sharon Harris and
Erich Schork, of counsel); William J. Harte, Ltd, Chicago, IL (William J. Harte, of counsel);
Stein & Bogot Ltd., Chicago, IL (Robert J. Stein III, of counsel); and Margulis Law Group,
Chesterfield, MO (Max Margulis, of counsel)

1-06-3744

For APPELLEE, Locke Lord Bissell & Liddell LLP, Chicago, IL (Albert E. Fowerbaugh, Jr., Hugh S. Balsam, Michael G. Salemi, of counsel)